**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | | |
|---|---|---|
| **ELLENOR ZINSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. <u>6:24-cv-41-NKM</u>** |
| | ) | |
| **LIBERTY UNIVERSITY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT LIBERTY UNIVERSITY'S MEMORANDUM OF LAW <u>IN SUPPORT OF MOTION TO DISMISS</u>

Pursuant to Local Rule 11(c) and Fed. R. Civ. P. 12(b)(1) and (6), Defendant Liberty University, Inc. ("Liberty University") hereby files this Memorandum of Law in Support of its Motion to Dismiss. For the following reasons, Sections 702 and 703 of Title VII of the Civil Rights Act, the Religious Freedom Restoration Act, and First Amendment all demand that Plaintiff's Complaint (dkt. 1) against Liberty University be dismissed with prejudice.

### <u>INTRODUCTION AND FACTUAL ALLEGATIONS</u>

On July 29, 2024, Plaintiff Zinski filed the Complaint (dkt. 1) against Defendant Liberty University alleging that Liberty University violated Title VII of the Civil Rights Act by terminating Zinski's employment. (Dkt. 1, Complaint, ¶23.) In February 2023, Jonathan Zinski was hired by Liberty University as an Information Services Apprentice at the IT Helpdesk. (Compl., ¶10.) In that role, Zinski was required to interact face-to-face with students and staff seeking technical assistance, equipment troubleshooting and servicing technology equipment in the IT Helpdesk office, in classrooms during classes where issues arose, and at various other locations across campus. (Compl., ¶11.) According to Zinski's allegations, on June 25, 2023—after Zinski's initial 90-day employment period—Zinski participated in the review with Liberty University officials.

(Compl., ¶13.) A mere ten days later, Zinski informed Liberty University that despite applying for employment as a male—Jonathan Zinksi—he now "identified as a trans woman, had been undergoing hormone replacement therapy ("HRT")," and that Zinski intended to legally change names from Jonathan to Ellenor. (Compl., ¶14.)

Dear Human Resources,

I hope this letter finds you well. My name is Jonathan Zinski, and I currently serve as an Information Services Apprentice at the IT Helpdesk on campus, currently in Green Hall.

Since my official start date on February 20th, 2023, I have cherished every moment spent in this esteemed institution. I have had the pleasure to foster friendships, acquire new skills, and consistently grow in my role. I am incredibly thankful for the opportunity and the trust you placed in me, particularly after I initially had to decline a job offer for this role when I was in the process of donating my kidney in 2022.

Today, I am reaching out to address a deeply personal matter that has been part of my journey. For the past nine months, I have been undergoing hormone replacement therapy (HRT), a decision reached after thorough consultation with several health professionals. I was initially prescribed male hormones during my adolescence to address hormonal issues, but this treatment led to various health complications. It was later determined that a regimen of female hormones is more beneficial to my overall health and wellbeing. This transition, although not a conventional one, has necessitated significant adjustments on my part.

In light of the physical changes this medication entails, I plan to legally change my name to Ellenor in the near future. I have chosen to disclose this information now to avoid potential miscommunication or misunderstanding in the future. I recently completed my 90-day review, which I am happy to say included praise about my performance, particularly impressive given my tenure, and it is my fervent wish to maintain that momentum moving forward.

My faith has been a guiding force throughout this process. I firmly believe that God led me to Liberty University, and I wholeheartedly subscribe to the university's mission of "Training Champions for Christ". I am an active member of a local Christian church and strive to manifest God's love and compassion, and to bear fruit in my daily interactions.

The public discourse surrounding the transgender community has imbued my journey with a certain degree of trepidation. However, I am hopeful that with your support and understanding, we can navigate this process with sensitivity and respect

for all parties involved, ensuring it does not reflect negatively on either the University or myself.

Please understand that my medical treatment and self-identification as a trans woman do not alter my work performance or professional conduct. I am grateful for the acceptance I have found at Liberty University, especially from a few colleagues who have known about my situation from early on, and my goal remains to serve our community to the best of my abilities.

In closing, I appreciate your understanding and your previous accommodations with regard to my health. I earnestly pray that we can turn this situation into a testament to God's grace, and hopefully, a beacon of acceptance for those who might feel estranged due to their unique paths.

Thank you for your consideration and understanding.

Yours sincerely,

Jonathan (soon to be Ellenor) Zinski

(A true and correct copy of Plaintiff Zinski email to Liberty University, referenced in paragraph 14 of the Complaint (Compl., ¶14) is attached hereto as EXHIBIT A and incorporated as if fully set forth herein.)[1]

---

[1] This Court may consider Zinski's email to Liberty University in its consideration of Liberty University's motion to dismiss because it was "integral to and explicitly relied on in the complaint," and Zinski cannot challenge its authenticity. *Phillips v. LCI, Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). *See also Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (noting that, on Rule 12(b)(6) motion, court may consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic"). And, this Court may consider correspondence referenced in the Complaint without converting Liberty University's motion to dismiss into one for summary judgment. *See, e.g.*, *RSC Equip. Rental, Inc. v. Cincinnati Ins. Co.*, 54 F. Supp. 3d 480, 484 n.2 (W.D. Va. 2014) (MOON, J.) ("I note that I may properly consider Cincinnati's March 2, 2011 correspondence without converting the motion to dismiss into a motion for summary judgment, because 'the court may consider dispositive documents that either attached to, or referenced in, the complaint during the motion to dismiss stage."); *Caison v. Scientific*, No. 5:22-cv-13, 2022 WL 10146542, *2 (W.D. Va. Oct. 17, 2022) ("In ruling on a motion to dismiss, a court may consider documents referenced by a plaintiff in the complaint and attached to a motion to dismiss, such as a right-to-sue letter from the EEOC without converting a motion to dismiss into a motion for summary judgment.").

On July 8, 2023, Liberty University officials notified Zinski that it would respond to his statement. (Compl., ¶16.) On August 8, 2023, Zinski contacted Liberty University again to say that he had not received a response to the letter. (Compl., ¶17.) Liberty University Human Resources officials scheduled a meeting with Zinski that same day. (Compl., ¶18.) In that meeting, Steve Foster, the Executive Vice President for Human Resources, and John Gauger, the Chief Information Officer and Executive Vice President of Analytics, informed Zinski he was in violation of Liberty University's sincere religious convictions and doctrinal statement requirements and that Zinski's employment was being terminated. (Compl., ¶18.) Zinski alleges and specifically references a letter from Liberty University informing Zinski of its employment decision. (Compl., ¶18.) Liberty University's Letter to Zinski reads, in full:

Jonathan,

Your recent email seeking to address your plans to attempt to transition from your birth gender through hormones and a new name has come to my attention. Thank you for your detailed explanations. This response hopefully addresses the situation in a respectful and God-honoring way, which is certainly my prayer and intention. Employing a person who takes the measures you describe to deny the biological and chromosomal sex God assigned at birth would not be consistent with Liberty University's values or advance its religious mission. I write to explain why.

Having employees select from an array of genders with which they would choose to identify is a new construct that presupposes gender fluidity and invites employees to share with others how they should be perceived and addressed. Liberty does not believe such identification and flexibility is either necessary or appropriate in its workplace. We believe the way people traditionally discerned their sex at birth and therefore how to address others has worked well for centuries and raised no conflicts with our Christian faith. Indeed, modern biology and genetics have confirmed our ability to discern and confirm God's design for male and female. Liberty must continue consistently using those traditional approaches, even if parts of the world embrace new practices and employ means such as hormone therapy to simulate a new sex or gender. Those practices are out of step with Liberty's clearly defined and publicly posted Doctrinal Statement. You can read it here: https://www.liberty.edu/about/doctrinal-statement/. I recognize that some have come to faiths that are different than Liberty's and, while we respect their rights to have such faiths and act in accordance with them, we strive to be clear about ours and employ a workforce that acts in accordance with it in order to

protect our religious mission. This does not mean that Liberty condones any hostile treatment to any individuals who disagree with us. On the contrary, as Christians we must love our neighbors as we love ourselves.

But, I would like to remind you that all employees are provided a copy of the Doctrinal Statement and acknowledge it as part of the onboarding process. Our records show you were no exception when you began full-time employment in February of 2023, only five months ago and apparently four months into your hormone regimen. A few elements of particular note are that evidence of a Christian lifestyle of virtue that avoids sin includes the virtues of upholding the God-given worth of all human beings, from conception to death, as the unique image-bearers of God; treating all people impartially, seeing them as equals before God and worthy of salvation; and pursuing unity and embrace people of all tribes and tongues as part of God's design for humanity. Even so, it notes clearly that "Human beings were directly created, not evolved, in the very image of God, as either biologically male or female from the womb." Additionally, "Sinful acts are prohibited by God and include ... denial of birth sex by self-identification with a different gender."

Liberty will look to its Doctrinal Statement when discerning the appropriate balance on workplace inclusivity, acceptance and grace. We do not think permitting employees to express their "chosen" gender identity at work is appropriate or consistent with the distinctive Christian workplace that is Liberty University. The idea that man has the final say when it comes to sex or gender is simply inconsistent with the part of Liberty's Doctrinal Statement which recognizes that the God of creation chooses gender.

Christianity is about love for all people and not seeing people as the sum of their good or bad actions, but rather as image bearers of God who are to be loved and pointed to our common need for a relationship in Christ, our savior, for the forgiveness of our sins and the grace of eternal life with Him. A person's attractions and status generally do not preclude them from employment at Liberty, but rather it is their actions. Active and unrepentant patterns of sin, including sinful behaviors regarding sexual expression and/or gender expression, would be incompatible with our Christian workplace. At Liberty, these are indeed part and parcel of job performance and workplace conduct.

I appreciate your forthrightness in disclosing the information you have shared in your email about what you have done thus far and intend to do in the future. I am sure you see this as a personal issue but hope you recognize that Liberty has to also view it as an institutional issue.

As you make these adjustments, Liberty will not make adjustments to its Doctrinal Statement and mission to accommodate your adjustments. As a religious educational institution and workplace, based upon Liberty's Doctrinal Statement and in order to fulfill its mission, Liberty does not and will not permit employees

to undertake the efforts you describe to transition away from one's birth gender through hormones and a new name, with or without surgery. I, too, hope to avoid any miscommunication. So, if I have somehow misunderstood what you are doing or planning to do, please reply with additional information so that I can consider that. For instance, in the very rare cases of an intersex birth or of a chromosomally female being misassigned a male sex at birth, Liberty would want to carefully consider those individual circumstances in applying its Doctrinal Statement. I do not understand from the information you have presented that such is your circumstance.

Please reply to this email and confirm what your final decision about transition is and the timing, and we welcome you providing any additional information about your circumstances for Liberty to consider in order to better understand your situation.

We are prepared to discuss how and when it would be most appropriate to apply Liberty's policies to your decision once your decision is firmly stated and understood. I, too, am happy to consider the paths forward that are sensitive and respectful to all involved and would welcome your input on options. In the end, Liberty must select the path most consistent with what we understand God would have us take, based on our Doctrinal Statement.

Thank you for writing and giving me the opportunity to clarify this.

(A true and correct copy of Liberty University's Letter to Plaintiff Zinski referenced in paragraph 18 of the Complaint (Compl., ¶18) is attached hereto as EXHIBIT B and incorporated as if fully set forth herein.)[2]

As is clear from Liberty University's letter, permitting employees of Liberty University to fundamentally ignore the biological reality of their God-given birth would violate Liberty University's sincerely held religious beliefs. (Ex. B at 1.) Liberty University's Doctrinal Statement was provided to Zinski as part of the onboarding process, and Zinski was required to acknowledge it upon accepting employment at Liberty University. (*Id.*) And, notably, Zinski did—in fact—

---

[2]     This Court may consider Liberty University's letter to Zinski in its consideration of Liberty University's motion to dismiss without converting it into a motion for summary judgment because it was "integral to and explicitly relied on in the complaint," and Zinski cannot challenge its authenticity. *Phillips v. LCI, Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). *See also supra* note 1 (collecting cases).

acknowledge Liberty University's sincere religious beliefs and its Doctrinal Statement upon accepting employment at Liberty University (*id.*) and acknowledged that Liberty University "employ[s] a workforce that acts in accordance with [its Doctrinal Statement] in order to protect [its] religious mission." (*Id.*) Zinski acknowledged all of this despite knowing that he was executing his plain to deny his God-given sex in contravention to the Doctrinal Statement Zinski acknowledged and was four months into a hormone regimen that specifically contradicts and conflicted with an employment requirement that Zinski knew Liberty University considered as a condition of employment. (*See id.* (quoting Liberty University Doctrinal Statement).) Zinski ignored that employment requirement, deceptively accepted, acknowledged, and signed a document indicating compliance with the requirement, and flouted Liberty University's sincere religious convictions and practices. (*Id.*) Zinski's Complaint must be dismissed. The plain text of Title VII, the First Amendment, and the Religious Freedom Restoration Act all require dismissal.

## ARGUMENT

## I.   TITLE VII'S STATUTORY SCHEME BARS PLAINTIFF'S SUIT AGAINT LIBERTY UNIVERSITY.

Title VII provides several exemptions from application of its employment discrimination provisions for religious employers in order to permit such institutions to abide by their doctrinal practices. *See Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) ("Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's religious activities."). Section 702 and Section 703 of Title VII entitle Liberty University to dismissal of Zinski's claims against the University because his manifested belief is directly contrary to Liberty University's Doctrinal Statement and sincerely held religious beliefs.

A.      **Section 702 Of Title VII Explicitly And Unequivocally Precludes Zinski's Claims Against Liberty University.**

"As a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020) (citing 42 U.S.C. s2000e-1(a)). "Section 702 of the Civil Rights Act of 1964, 42 U.S.C. §2000e-1, exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 330 (1987) (cleaned up). The reason for this is simple: Section 702's exemption for religious organizations "avoids the kind of intrusive inquiry into religious belief" that the First Amendment prohibits. *Id.* at 339. *See also Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000) ("In recognition of the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions, however, Title VII has expressly exempted religious organizations from the prohibition against discrimination on the basis of religion.").

Title VII's statutory exception is titled, "Inapplicability of subchapter to certain aliens and employees of religious entities." 42 U.S.C. §2000e-1(a). It states:

> This subchapter *shall not apply . . . to a religious corporation, association, educational institution*, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

*Id.* (emphasis added). "'This subchapter' refers to Title 42, Chapter 21, Subchapter VI, *which comprises all of Title VII*." *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring) (emphasis added).

Where, as here, a Title VII claimant brings claims against a religious educational institution, like Liberty University, on the basis of alleged discrimination in employment decisions

directly relating to the carrying on of Liberty University's mission, Title VII explicitly and unequivocally precludes this Court from entertaining the claim. As Judge King noted in *Billiard v. Charlotte Catholic High School*, "a straightforward reading of § 702 of Title VII bars Billard's [sex] discrimination claim." 101 F.4th 316, 335 (4th Cir. 2024). Judge Easterbrook's opinion in *Starkey* similarly recognizes this fact:

> A straightforward reading of § 2000e–1(a), coupled with § 2000e(j), shows that the Diocese was entitled to fire Starkey without regard to any of the substantive rules in Title VII. It is undisputed that the Roman Catholic Church deems same-sex marriages improper on doctrinal grounds and that avoiding such marriages is a kind of religious observance. Same-sex marriages are lawful in secular society and are protected by Title VII when its rules apply but are forbidden by many religious faiths. Section 702(a) permits a religious employer to require the staff to abide by religious rules. *A religious school is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of "religion" as § 2000e(j) defines that word.*

*Starkey*, 41 F.4th at 946 (emphasis added). *See also EEOC v. Mississippi Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) ("We conclude that if a religious institution of the kind described in §702 presents convincing evidence that the challenged employment practice resulted from discrimination on the basis of religion, §702 deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination. This interpretation of §702 is required to avoid the conflicts that would result between the rights guaranteed by the religion clauses of the first amendment and the EEOC's exercise of jurisdiction over religious educational institutions."); *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th529, 534 (7th Cir. 2023) (Brennan, J., concurring) ("So when the exemption applies, all of Title VII drops out." (cleaned up)).

Simply put, Congress clearly, unequivocally, and explicitly exempted Liberty University— as a religious educational institution—from Title VII sex discrimination suits when those suits are inextricably intertwined with Liberty University's religious doctrines. *See Starkey*, 41 F.4th at 946

(Easterbrook, J., concurring) ("The decision must itself be religious, as that word is defined in Title VII. This means, for example, that sex discrimination unrelated to religious doctrine falls outside the scope of § 702(a). *But when the decision is founded on religious beliefs, then all of Title VII drops out.*" (emphasis added)). "Firing people who have same-sex partners is sex discrimination, *Bostock* holds. . . . But it is also religious discrimination," and Liberty University "is carrying out its theological views; that its adherence to [Christian] doctrine produces a form of sex discrimination does not make the action less religiously based." *See id.* at 947. Title VII exempts Liberty University from such claims.

As the Western District of Pennsylvania put it, "Section 702 allows religious groups to discriminate based on religion with respect to the employment of individuals to perform work connected with their religious or secular activities." *Little v. St. Mary Magdalene Parish*, 739 F. Supp. 1003, 1005 (W.D. Pa. 1990), *aff'd Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991).

> In passing the §702 exemption, Congress chose to protect the needs and rights of religious organizations regarding their freedom of religion, and allowed those organizations to discriminate based on religion in the employment context. Consequently, plaintiff may not assert that her right to be free from religious discrimination was violated when a religious educational institution did not renew her employment based on religion.

*Id.* at 1006.

Section 702 explicitly exempts Liberty University from the requirement to employ individuals who blatantly, openly, and unrepentantly violate the Doctrinal Statement. In fact, "the sponsors of the 1972 exemption were chiefly concerned to preserve the statutory power of sectarian schools and colleges to discriminate on religious grounds in the hiring of *all their employees*." *Little*, 929 F.2d at 950 (quoting *King's Garden, Inc. v. FCC*, 498 F.2d 51, 54 (D.C. Cir. 1974)) (emphasis added). Indeed, as the Sixth Circuit noted, the statutory exemptions in Title VII for religious institutions like Liberty University "include the decision to terminate an employee whose

*conduct or religious beliefs* are inconsistent with those of its employer." *Hall*, 215 F.3d at 624 (emphasis added); *Little*, 929 F.2d at 951 ("We conclude that the permission to employ persons of a particular religion includes permission to employ *only* persons whose beliefs *and conduct* are consistent with the employer's religious precepts."). Section 702 makes it abundantly clear that Liberty University "does not violate Title VII's prohibition" when it discharges an employee "who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles." *Id.*

Zinski's Complaint makes plain that Zinski does not desire to act in accordance with the fundamental teachings and beliefs of Liberty University, as outlined in its Doctrinal Statement. Zinski alleges that Zinski is a "transgender woman, which means that she is a woman who was assigned the sex of male at birth." (Compl. ¶3.) And, Zinski alleges that so-called "gender identity" is a fundamental concept of a person's identity that can be different than the biological reality reflected in their biological chromosomes at birth. (Compl. at 1-2 n.1.)[3] But, that is an expression of his beliefs that are directly contradictory to the sincerely held religious beliefs, and employment requirements, of Liberty University. Permitting employees of Liberty University to fundamentally ignore the biological reality of their God-given birth sex would violate Liberty University's sincerely held religious beliefs. (Ex. B at 1.) More importantly, Liberty University "employ[s] a workforce that acts in accordance with [its Doctrinal Statement] *in order to protect [its] religious mission*." (*Id.* (emphasis added).) And, permitting Liberty University to require its employees to live their lives in accordance with the Doctrinal Statement is critical and serves as the basis for the

---

[3]     The gratuitous and self-serving statements made in reference to "gender identity" are not in keeping with the requirements of Fed. R. Civ. P. 8(a)(2) that a complaint include a short and plain statement of the claims, but they do show that Zinski's religious beliefs and conduct are directly contrary to Liberty University's Doctrinal Statement.

Section 702 exemption. *Little*, 929 F.2d at 951 ("Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's religious activities.") As such, Zinski's Complaint against Liberty University must be dismissed because Liberty University is statutorily entitled to require its employees to conduct themselves in accordance with its Doctrinal Statement.

**B.     Section 703 Of Title VII Explicitly And Unequivocally Precludes Zinski's Claims Against Liberty University.**

Congress also provided religious educational institutions with their own unique statutory exemption for the hiring and retention of only those who share their religious values and convictions. Section 703 states,

> it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. §2000e-2(e). Liberty University is a religious educational institution and workplace with a Christian mission and places its Biblical Doctrinal Statement at the center of what it does, including its standards of workplace conduct. (Compl., ¶18 and Ex. A.) As Judge Easterbrook put it, Section 703 "separately provides an exemption for employment of co-religionists by schools and colleges affiliated with religious groups." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). *See also Ritter v. Mount St. Mary's Coll.*, 495 F. Supp. 724, 727 (D. Md. 1980) (noting that it was "clear that Congress exempted religiously affiliated schools" from discrimination suits on the basis of religious employment decisions). As the Sixth Circuit recognized in *Hall*, Section

703—like the exemption provided in Section 702—permits a religious institution, such as Liberty University, "to terminate an employee whose *conduct or religious beliefs* are inconsistent with those of its employer." 215 F.3d at 624 (emphasis added).

Liberty University is explicitly exempted under Title VII from suits like Zinski's here. The Complaint must be dismissed with prejudice. Zinski's conduct and manifestation of religious belief contradict the clear and unequivocal religious positions in its Doctrinal Statement that Zinski acknowledged were employment requirements for Liberty University. As discussed *supra* Section I.A, Liberty University "employ[s] a workforce that *acts* in accordance with [its Doctrinal Statement] in order to protect [its] religious mission." (Ex. B at 1 (emphasis added).)

Similarly, Liberty University requires that its employees ascribe to the religious beliefs of the Doctrinal Statement. Zinski made it clear that his religious beliefs do not align with and explicitly reject Liberty University's Doctrinal Statement. (*See* Ex. A.) Specifically, in Zinski's announcement to Liberty University that Zinski was transitioning from a male to a female, Zinski stated that "self-identification as a trans woman do[es] not alter my work performance or professional conduct." (Ex. A at 1.) But, under the explicit exemptions of Title VII, Zinski is not entitled to announce a fundamental distinction of religious belief—one directly contrary to Liberty University's Doctrinal Statement—and retain status as a co-religionist under Title VII. As Liberty University made clear, "Employing a person who takes the measures [Zinski] describe[d] to deny the biological and chromosomal sex God assigned at birth would not be consistent with Liberty University's values or advance its religious mission." (Ex. B at 1.) More specifically, Liberty University made clear that it "does not believe such identification and flexibility is either necessary or appropriate in [Liberty's] workplace," because it transgresses Liberty University's religious beliefs in "God's design for male and female," outlined in its Doctrinal Statement. (*Id.*)

Furthermore, Zinski stated, "I am active member of a local Christian church and strive to manifest God's love and compassion, and to bear fruit in my daily interactions." (Ex. A at 1.) Zinski also stated that Zinski "pray[ed] that we can turn this situation into a testament to God's grace, and hopefully, a beacon of acceptance for those who might feel estranged due to their unique paths." (*Id.*) The inescapable import of these statements was to demonstrate Zinski's belief that one can be a practicing Christian identifying as a transgender without "reflect[ing] negatively" on the University. (*Id.*) Liberty University made clear that it "recognize[s] that some have come to faiths that are different than Liberty's," but that Liberty University "will look to its Doctrinal Statement when discerning the appropriate balance on workplace inclusivity, acceptance and grace." (Ex. B at 1.) It simply does not matter that others, including a church that Zinski purportedly attends, may have different religious beliefs concerning transgender ideology. But, Liberty University made its religious beliefs clear to Zinski, "The idea that man has the final say when it comes to sex or gender is simply inconsistent with the part of Liberty University's Doctrinal Statement which recognizes that the God of Creation chooses gender." (Ex. B at 1.) Title VII entitles Liberty University to determine for itself what its religious beliefs are and to require its workforce to share those religious beliefs. 42 U.S.C. §2000e-2(e). Zinski's actions and beliefs ran afoul of Liberty University's clearly articulated and sincerely held religious beliefs, and it was entitled under Title VII to terminate Zinski on that basis. Zinski's Complaint must be dismissed.

## II.  THE ECCLESIASTICAL ABSTENTION DOCTRINES BARS THIS COURT FROM INQUIRING INTO LIBERTY UNIVERSITY'S RELIGIOUS POSITIONS.

It has been settled for over 150 years that the First Amendment ecclesiastical abstention doctrine[4] prohibits Article III courts from entertaining suits arising specifically from the religious

---

[4]       Though related in some respects to the ministerial exception, discussed *infra* Section IV, the ecclesiastical abstention doctrine is a separate and distinct First Amendment principle that

doctrinal positions, as such decisions are exclusively within the province of the church. *See, e.g.,* *Watson v. Jones*, 80 U.S. 679 (1871); *Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.A.*, 344 U.S. 94 (1952); *Jones v. Wolf*, 443 U.S. 595 (1979).

As the Supreme Court unequivocally stated in *Milivojevich*,

> where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts . . . must accept such decisions as binding upon them, in their application to the religious issues of doctrine and polity before them.

426 U.S. at 709.

In essence, Zinski's Complaint and the question it raises concerning Liberty University's interpretation and application of Scripture in the Doctrinal Statement "belongs to a class, happily rare in our courts, in which one of the parties to a controversy, essentially ecclesiastical, resorts to the tribunal of the [government] for maintenance of rights which the church has refused, or found itself unable to protect." *Watson*, 80 U.S. at 713. And, "[c]onscious as we may be of the excited feeling engendered by this controversy, and of the extent to which it has agitated the intelligent and pious body of Christians in whose bosom it originated," *id.* at 714, the Court is not authorized to adjudicate the proper interpretation of Scripture because "the law knows no heresy, and is committed to the support of no dogma." *Id.* at 728. Indeed, "[a]ll who unite themselves to such a [religious] body do so with an implied consent . . . to submit to it." *Id.* at 729. "[I]t would be vain

---

requires dismissal of Zinski's Complaint regardless of whether the Court determines that Zinski falls within the category of minister. *See, e.g.*, *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 46 (D.D.C. 2017) ("the Court will analyze defendants' arguments under the ecclesiastical abstention doctrine—which is related to but distinct from the ministerial exception" (cleaned up)); *Kavanaugh v. Zwilling*, 997 F. Supp. 2d 241, 248 n.7 (S.D.N.Y. 2014) (same).

consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed." *Id.*

This is precisely what Zinski's Complaint requests in this matter. Zinski acknowledged Liberty University's Doctrinal Statement and knew what the employment requirements were under such doctrinal positions. (Ex. B at 1.) Yet, knowing of a stark disagreement with such doctrinal positions, Zinski informed Liberty University of those doctrinal disagreements (Ex. A at 1), stated that Zinski's own positions were not a problem for "active member[ship] [in] a local Christian church" (*id.*) that holds different religious positions than Liberty University, that Zinski desired for Liberty University to use the revelation as "a testament to God's grace," (*id.* at 2) in a manner that was unacceptable under its Doctrinal Statement (Ex. B at 1), that Zinski's choices would "not reflect negatively on the University" (Ex. A at 1), and that Zinski's choices "do not alter [Zinski's] work performance or professional conduct." (*Id.*; *see also* Compl. ¶15.) Indeed, Zinski's Complaint makes clear that Zinski believes Liberty University's Doctrinal Statement is incorrect because it represents "a rejection of who [Zinski] is on a fundamental, unchangeable level." (Compl. ¶19.)

All of these positions are steeped in religious doctrine, are directly contradictory to Liberty University' Doctrinal Statement, and reflect a fundamental disagreement with theology. To determine whether Zinski or Liberty University is correct about the compatibility of transgender employment with a Christian institution inescapably requires the Court to delve into religious doctrine and ignores the fundamental principle that Liberty University has the "power to decide for [itself], free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 115. Liberty University's unequivocal doctrinal position is that "a denial of birth sex by self-identification with a different gender" is sin, and that "[t]he idea that man has the final say when it comes to sex or gender is simply inconsistent with the part of

Liberty's Doctrinal Statement which recognizes that the God of creation chooses gender." (Ex. B at 1.) Whether Zinski believes that is correct (or, for that matter, whether this Court does) is of no moment. The First Amendment forbids the very inquiry into Liberty University's doctrinal positions, which "must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." *Id.* at 116.

As the Supreme Court noted in *Watson*, Liberty University's officials "are the best judges of what constitutes an offence against the word of God and the discipline of the church." 80 U.S. at 732. Simply put, "*civil courts exercise no jurisdiction [over] a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standards of morals required of them.*" *Id.* at 733 (emphasis added). *See also Milivojevich*, 426 U.S. at 714 (same). And "[t]his is applicable to questions of discipline, or of faith, or of ecclesiastical rule, custom, or law." *Kedroff*, 344 U.S. at 115.

> Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of "fundamental fairness" or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance.

*Id.* at 714-15. The same is true of Zinski's claims under Title VII. Zinski asks this Court to determine that Zinski's interpretation of Scripture is correct, that Liberty University's Doctrinal Statement is incorrect, and that Zinski's interpretation of Scripture entitles Zinski to remain an employee in good standing under the appropriate interpretation of Scriptural morals and principles. (*See* Compl. ¶15.) This Court is prohibited from that exercise. Zinski's Complaint must be dismissed because the First Amendment guarantees Liberty University the right to make its own determination of matters concerning its Doctrinal Positions, religious beliefs, and the conformity of its employees to those religious beliefs.

III.   **THE RELIGIOUS FREEDOM RESTORATION ACT BARS PLAINTIFF'S COMPLAINT AGAINST LIBERTY UNIVERSITY.**

   A.   **Liberty University May Raise RFRA As A Defense To Title VII Suits Brought By Private Litigants.**

The Religious Freedom Restoration Act ("RFRA") states, "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. §2000bb-1. The only exception to that concrete prohibition on burdening religious exercise is if the government demonstrates that its burden is both "in furtherance of a compelling government interest," and "is the least restrictive means of furthering that compelling government interest." 42 U.S.C. §2000bb-1(b). RFRA requires a focused inquiry "to the person." *Id. See also Gonzales v. O'Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 430 (2006) ("RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened."). RFRA adopted "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 US. 507, 534 (1997), which is rarely passed. *See Burson v. Freeman*, 504 U.S. 191, 200 (1992) ("[W]e readily acknowledge that a law rarely survives such scrutiny . . . .").

RFRA likewise applies and may be raised by Liberty University "as a claim or defense in a judicial proceeding." 42 U.S.C.  §2000bb-1(c). And, it applies against all branches of government, including burdens imposed by the judicial branch in an employment discrimination suit. 42 U.S.C. §2000bb-2(1) ("the term 'government' includes a *branch* . . . of the United States" (emphasis added)). There is little doubt that RFRA was intended to protect Liberty University in instances such as this because the explicit purpose of RFRA was to restore strict scrutiny as the

18

governing standard and "to guarantee its application *in all cases* where free exercise is substantially burdened." 42 U.S.C. §2000bb(b) (emphasis added).

Indeed, RFRA "operates as a kind of super statute, displacing the normal operation of other federal laws," and "*supersede[s] Title VII's commands in appropriate cases*." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020) (emphasis added). As the Second Circuit recognized, "RFRA is unusual in that it amends the entire United States Code," *Rweyemamu v. Cote*, 520 F.3d 198, 202 (2d Cir. 2008), because "[a]t bottom, the import of RFRA is that, whatever other statutes may (or may not) say, 'the Federal Government may not, *as a statutory matter*, substantially burden a person's exercise of religion.'" *Id.* (quoting *Gonzales*, 546 U.S. at 424) (emphasis original). *See also Rojas v. Roman Catholic Diocese of Rochester*, 557 F. Supp. 2d 387, 396 (W.D.N.Y. 2008) ("RFRA applies to all federal law, and therefore amended federal discrimination statutes such as Title VII."). RFRA has been recognized as a defense in claims between private parties. *See, e.g.*, *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996); *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006).[5]

In *Hankins*, a former clergy member sued his church and its bishop under the Age Discrimination in Employment Act. 441 F.3d at 99. The Second Circuit held that RFRA barred the minister's claims against the church. *Id.* at 103. Though noting that "[t]here is little caselaw addressing the issue of whether RFRA applies to an action by a private party seeking relief under a federal statute against another private party who claims that the federal statute substantially burdens his or her religious exercise," it held that RFRA was "broad enough to encompass such a

---

[5]    The Fourth Circuit has not yet decided the issue of whether RFRA applies in a suit against private parties. *See Billiard v. Charlotte Catholic High Sch.*, 101 F.4th 316 (4th Cir. 2024) ("Neither the Supreme Court not this court has applied RFRA . . . to suits between private parties.").

case." *Id.* Because RFRA "applies to all federal law, and the implementation of that law" and allows a religious defendant claiming that application of such law constitutes a substantial burden on his religious beliefs to be a violation of RFRA "as a defense in a judicial proceeding," RFRA "*easily covers the present action*." *Id.* (emphasis added). As such, the Second Circuit held that RFRA was plainly available as a defense to private actions. *Id.*

But, it went a step further and explained why that was easily the case. It noted that "[t]he ADEA is enforceable by the EEOC as well as private plaintiffs, and the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved party." *Id.* Simply put, "[a]n action brought by an agency such as the EEOC is clearly one in which the RFRA may be asserted as a defense, and no policy of either RFRA or the ADEA should tempt a court to render a different decision on the merits in a case such as the present one," involving only private parties. *Id.*

In *Catholic University*, the University was sued by both the EEOC *and* its employee, Sister Elizabeth McDonough, for sex discrimination under Title VII. 83 F.3d at 457. The D.C. Circuit held that RFRA has "in effect, incorporated a statutory compelling interest test into Title VII that Catholic University is entitled to invoke." *Id.* at 468. And, because application of even neutral employment laws can, in some instances, burden religious exercise, RFRA is available as a defense to those laws. *Id.* at 470 (noting that RFRA created "a compelling interest defense for the benefit of those whose free exercise rights would be burdened by a neutral *federal* law of general application," such as Title VII (emphasis original)).

Here, just as in *Catholic University* and *Hankins*, the EEOC could have brought claims against Liberty University under Title VII, and Plaintiff filed a charge of discrimination with the EEOC for just that purpose. (Compl., ¶7.) Later, Plaintiff requested that the EEOC dismiss its

investigation and provide him with a Notice of Right to Sue. (*See* Compl., ¶7). (*See also* EXHIBIT C, Dismissal and Notice of Rights, May 2, 2024.)[6] The ability of Liberty University to raise defenses under the RFRA cannot vary depending on whether the EEOC or a private party brings an identical claim under an identical statute. This is why the Supreme Court in *Bostock* noted that employers, such as Liberty University, can raise RFRA in future cases in which application of Title VII would substantially burden their religious exercise. *See* 590 U.S. at 682. Requiring Liberty University to continue employing a person openly, intentionally, and unrepentantly defying its sincerely held religious convictions is a substantial burden the government is not permitted to impose on Liberty University by virtue of Title VII. That such a burden comes via a private plaintiff's court verdict rather than an administrative agency final order does not change the burden at all. The burden comes by virtue of a federal statute (Title VII) being implemented and enforced against a religious entity (Liberty University) by a branch of the federal government (the judicial branch). Treating the burden on Liberty University as completely different based on whether the EEOC or a private litigant brings the complaint would make Liberty University's fundamental right to religious exercise and the critical protections RFRA was intended to enshrine subject to a plaintiff who is demonstrably hostile to Liberty University's religious beliefs. Such is not the law. *See Hankins*, 441 F.3d at 103.

---

[6] This Court can consider the EEOC administrative record without converting the instant motion into one for summary judgment. *Caison v. Scientific*, 2022 WL 10146542, *2 (W.D. Va. Oct. 17, 2022) ("In ruling on a motion to dismiss, a court may consider documents referenced by a plaintiff in the complaint and attached to a motion to dismiss, such as a right-to-sue letter from the EEOC without converting a motion to dismiss into a motion for summary judgment."). (*See also supra* Note 1.).

**B.     Requiring Liberty University To Employ Individuals Openly, Intentionally, And Unrepentantly Contradicting Its Doctrinal Position And Sincere Religious Convictions Is A Substantial Burden.**

Under RFRA, the definition of the "exercise of religion" includes "'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (quoting 42 U.S.C. § 2000cc-5(7)(A)). And, under RFRA, the only relevant inquiry is whether Liberty University has articulated a sincerely held religious belief that compels it to abstain from a particular action—acceptance of employees and agents that openly, intentionally, and unrepentantly violate the Doctrinal Statement and religious convictions of Liberty University. (*See* Ex. B at 1 (noting that Liberty University's Doctrinal Statement and sincere religious convictions compel it to conclude that Scripture views rejection of one's biological composition at birth to be a direct sin against God and a violation of Scripture); *id.* ("We do not think permitting employees to express their "chosen" gender identity at work is appropriate or consistent with the distinctive Christian workplace that is Liberty University.  The idea that man has the final say when it comes to sex or gender is simply inconsistent with the part of Liberty's Doctrinal Statement which recognizes that the God of creation chooses gender.").)

In determining whether a belief is sincerely held, the Supreme Court has made clear that the protections under the Free Exercise Clause, which are more limited than under RFRA, are "'not limited to beliefs which are shared by all of the members of a religious sect.'" *Holt v. Hobbs*, 574 U.S. 356, 362 (2015). Courts cannot sit in judgment of whether a person's "religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 573 U.S. at 725. The "narrow function" of a court "'is to determine' whether the line drawn [between conduct that is and is not permitted under one's religion] reflects an honest conviction.'" *Id.* (emphasis added) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 716 (1981)). "It is not within the judicial ken to question the

centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r,* 490 U.S. 680, 699 (1989).

"[T]he question that RFRA presents [is] whether the [Title VII's application] imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with their religious beliefs." *See Hobby Lobby*, 573 U.S. at 724. Notably, the substantial burden inquiry does not address the "very different question that the federal courts have no business addressing (as to whether the religious belief asserted in a RFRA case is reasonable)." *Id.*

As in *Hobby Lobby*, individuals who openly, intentionally, and unrepentantly flout the Bible's teachings on sex and gender, as articulated in Liberty University's Doctrinal Statement, "is sufficient to make it immoral for [Liberty University] to provide the [employment]." 573 U.S. at 724. Liberty University's "belief implicates a difficult and important question of religion and moral philosophy." *Id.* "Arrogating the authority to provide a binding national answer to this religious and philosophical question," Title VII's application in this manner would "in effect tell [Liberty University] that [its] beliefs are flawed. For good reason, we have repeatedly refused to take such a step." *See id.* Requiring Liberty University to violate its sincere religious convictions is a substantial burden under RFRA.

> **C.    There Is No Compelling Interest In Requiring Liberty University To Employ Individuals Openly, Intentionally, And Unrepentantly Contradicting Its Doctrinal Position And Sincere Religious Convictions.**

Once Liberty University demonstrates a substantial burden on its religious beliefs, the burden shifts to Zinski to demonstrate a compelling government interest in enforcing Title VII against Liberty University in a manner that violates its sincere religious convictions. The Complaint does not and cannot satisfy that standard. RFRA requires application of the compelling interest test "to the person," (*i.e.*, Liberty University) and "requires [the Court] to look beyond

broadly formulated interests." *Hobby Lobby*, 573 U.S. at 726. As the Court noted in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), "[t]he interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Id.* at 181. And, when it comes to the interplay between those interests, RFRA and "the First Amendment [have] struck the balance for us." *Id.* Indeed, as the Fourth Circuit has held, "upholding constitutional rights serves the public interest" in a compelling way. *Newsom ex rel. Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Application of Zinski's claims against Liberty University in this Court substantially burdens Liberty University in a manner that is not supported by a compelling interest. Zinski's claims must be dismissed. And, because there is no compelling government interest in requiring Liberty University to violate its religious convictions, Zinski's attempt to enforce Title VII against Liberty University in this instance violates RFRA and cannot stand.

## IV.   THE FIRST AMENDMENT PLACES LIBERTY UNIVERSITY'S MINISTERIAL DECISIONS BEYOND THE JURISDICTION OF THIS COURT AND PROHIBITS INTRUSION INTO LIBERTY UNIVERSITY'S INTERNAL MANAGEMENT DECISIONS.[7]

### A.   Liberty University Is Entitled To First Amendment Rights.

Corporations enjoy all the same protections as individuals under each clause of the First Amendment. Corporations have the right to free speech. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 365 (2010) (corporations have a First Amendment right to free speech); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784 (1978) ("We thus find no support . . . for the proposition that

---

[7]   As noted *supra* Note 4, the ministerial exception is distinct from the ecclesiastical abstention doctrine, which requires dismissal of Zinski's claims even if the Court finds that Zinski is not a minister. But, as discussed *infra*, the ministerial exception likewise requires dismissal of Zinski's claims.

speech that otherwise would be within the protection of the First Amendment loses that protection simply because its source is a corporation."); *Pac. Gas & Elec. Co. v. Public Utils. Com'n of Cal.*, 475 U.S. 1, 8 (1986) (same). Corporations similarly enjoy the protection of the First Amendment's free exercise rights. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 181 (2012) (corporations have free exercise rights under the First Amendment); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768 (2014) (corporations enjoy the right to free exercise of religion to "protect the religious liberty of the humans who own and control the companies"). Corporations enjoy the right to freedom of association. *See Hosanna-Tabor*, 565 U.S. at 181; *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Thus, the First Amendment is broadly applicable to the expressive and associational activities of Liberty University.

**B.      The Ministerial Exception Prohibit This Court From Adjudicating Plaintiff's Claims Against Liberty University.**

**1.      The Court is jurisdictionally barred from reviewing a religious institution's employment decisions that implicate matters of faith and doctrine and must therefore dismiss it.**

**a.      The ministerial exception operates as a jurisdictional bar.**

The decisions concerning religious doctrine and policy are reserved for the church, and courts have no jurisdiction to review such decisions. *See, e.g.*, *Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976) ("the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine and polity before them"); *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997) ("decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts. Rather, such courts must defer to the religious

organizations on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law."); *Dixon v. Edwards*, 172 F. Supp. 2d 702, 714 (D. Md. 2001).

The Supreme Court's precedents make clear that it is not within the judicial ken of Article III courts to question the employment decisions of churches and religious organizations concerning those employed in critical religious positions, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 592 U.S. 732 (2020). It is now beyond cavil that both the Free Exercise and Establishment Clauses of the First Amendment prohibit intrusion into a religious organization's employment decisions. *Hosanna-Tabor*, 565 U.S. at 188.

Indeed,

Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.*

"The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason." *Id.* at 194. "The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—*is the church's alone*." *Id.* at 194-95 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. America*, 344 U.S. 94, 119 (1952)) (emphasis added). Because the First Amendment guarantees judicial limits on the intrusion into the employment decisions of a church or religious institution, *Hosanna-Tabor* held that "the ministerial exception *bars* such a suit." *Id.* at 196

26

(emphasis added). The reason for that is simple: "the First Amendment has struck the balance for us, and the church must be free to choose those who will guide its way." *Id.* (cleaned up).

> **b.** **The ministerial exception must be adjudicated at the motion to dismiss stage because subjecting a religious institution to court-ordered discovery and intrusively probing inquiries into its religious decisions violates the First Amendment.**

The High Court's subsequent foray into the ministerial exception further suggested that the ministerial exception properly operates as an immunity from suit, rather than a mere defense to liability. Under the ministerial exception, "courts are *bound to stay out of employment disputes* involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe*, 592 U.S. at 746 (emphasis added). *See also id.* at 747 (noting that in *Hosanna-Tabor* "we unanimously recognized that the Religion Clauses *foreclose certain employment discrimination claims* brought against religious organizations" (emphasis added)). Simply put, "[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* at 762.

As Justice Thomas opined, "[t]he First Amendment's protection of religious organizations' employment decisions is *not limited* to members of the clergy or others holding positions akin to that of a 'minister.'" *Id.* at 762 n.1 (Thomas, J., concurring) (emphasis added). "What qualifies as 'ministerial' is an inherently theological question, and thus one that cannot be resolved by civil courts through legal analysis." *Id.* at 763.

The Fourth Circuit's recent decision in *Billard v. Charlotte Catholic High School* demands that this Court dismiss Zinski's Complaint. 101 F.4th 316 (4th Cir. 2024). There, despite the religious educational institution explicitly waiving the ministerial exception defense in the district

court, the Fourth Circuit held that it was nevertheless required to consider it because the immunity the First Amendment provides to religious institutions is "grounded in constitutional structure," "implicates important institutional interests of the court," and "involve[s] structural concerns regarding the separation of powers." 101 F.4th at 325 (cleaned up). As the Fourth Circuit put it, the First Amendment itself—through the church autonomy and ministerial exception doctrines— "does not protect the church alone; *it also confines the state and its civil courts to their proper roles*." *Id.* (emphasis added). Because "[t]he First Amendment's Religion Clauses . . . bar the government from interfering with ministerial employment decisions or involving itself in ecclesiastical matters," *id.* at 326, "*civil courts like ours are bound to stay out of employment disputes*" involving religious institutions like Liberty University. *See id.* (emphasis added).

The Fourth Circuit's decision appropriately applies broadly—to all "employment disputes," not just those disputes involving pastors, clergy, teachers, and the like. Indeed, "[t]he term 'minister' is shorthand for somebody who qualifies for the ministerial exception," but "the title of the exception made it into the case law only 'because the individuals involved in the pioneering cases were described as 'ministers,' and not because the title – with its independent religious significance governs the analysis." *Id.* at 326 n.4 (quoting *Our Lady of Guadalupe*, 591 U.S. at 746). The exception is intended to—and must, by virtue of constitutional command— "shelter certain employment decisions from the scrutiny of civil authorities." *Billard*, 101 F.4th at 329 (quoting *E.E.O.C. v. Roman Catholic Diocese of Raliegh*, 213 F.3d 795, 801 (4th Cir. 2000)).

Judge Richardson's concurring opinion in *Palmer v. Liberty University, Inc.*, is instructive. 72 F.4th 52 (4th Cir. 2023). There, Judge Richardson noted that the ministerial exception unequivocally "*bars employment claims* made by ministers against religious institutions." 72 F.4th at 76 (Richardson, J., concurring) (emphasis added). Relying on the Supreme Court's decision in

28

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979), Judge Richardson demonstrated that the First Amendment prohibits "*the very process of inquiry*" into Liberty University's employment decisions, *id.* (emphasis added), because "adjudicating the merits of [plaintiff's] claim would force us to make that inquiry" into a religious institution's decisions about employment. *Id.* "**Before** biting into that apple, we should determine whether the First Amendment protects Liberty" from that very inquiry. *Id.* (emphasis added). Judge Richarson's answer: "It plainly does.  The First Amendment's ministerial exception bars Palmer's suit." *Id.*

Pushing the analysis one step further, Judge Richardson noted that the ministerial exception "entitles Liberty to *absolute immunity* over its decisions to fire" its employees. *Id.* (emphasis added). His reason for concluding that the ministerial exception operates as immunity from suit rather than a defense to liability is because "[s]werving around that issue" in the beginning of litigation "veers [the court] too close to the very interests that the First Amendment protects, and risks entangling us in inherently religious questions." *Id.* at 76. It is critical that this Court stay far clear of the inquiry contemplated by Zinski's Complaint because the ministerial exception is but one "specific facet of the church-autonomy doctrine that guards a religious institution's authority to select certain personnel." *Id.* And, the church-autonomy doctrine "protects religious institutions' power to decide for themselves, free from state interference, matters of church government, *as well as those of faith and doctrine.*" *Id.* (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)) (emphasis added).

Once a court decides that the ministerial exception applies, *its inquiry ends*. The employer need not show that it had a religious reason for firing the minister . . . Instead, the employer may fire the minister for *any* reason—including one that, on its face, has no connection to religion and would otherwise be illegal. *Id.* at 77. "Not only is there no *need* to inquire into [Liberty

University's] motives . . . that inquiry itself may offend the First Amendment." *Id.* Simply put, the ministerial exception is intended "to protect a religious institution *not only from ultimate liability, but also from judicial inquiry itself*." *Id.* at 78 (emphasis added). This is because the inquiry itself "encompasses more than just digging through a religious institution's employment files and deposing its leaders . . . the mere act of *questioning* the institution's motives—even if the court ultimately decides that those motives are pure—cheapens its authority over ecclesiastical affairs." *Id.* (cleaned up) (emphasis added).

This is why numerous courts, including the Fourth Circuit itself, have treated the ministerial exception as a jurisdictional bar—requiring adjudication at the motion to dismiss stage to prevent the intrusive and unconstitutional inquiry into a religious organization's employment decisions. The Fourth Circuit's decision in *Rayburn* held that application of Title VII to disputes between a religious institution and its religious employees is prohibited because religious institutions are immune from such inquiries. 772 F.2d at 1168-72. Indeed, "*[a]ny attempt* by government to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise rights." *Id.* at 1168 (emphasis added). Because intrusion into the employment decisions of religious institutions would violate the First Amendment, the Fourth Circuit held that "the Constitution requires that civil authorities decline to review" such employment decisions, even if the parties seem to invite it to. *Id.* at 1172.

The D.C. Circuit, too, has held that "the EEOC's attempt to enforce Title VII would both burden Catholic University's right of free exercise and excessively entangle the Government in religion." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996). The reason for this is simple: "the EEOC's two-year investigation of Sister McDonough's claim, together with the extensive pre-trial inquiries and the trial itself, constituted an impermissible entanglement with

judgements that fell within the exclusive province" of the religious institution itself. *Id.* "The suit and the extended investigation that preceded it has caused significant diversion of the Department's time and resources [and] the prospect of future investigations and litigation would inevitably affect to some degree the criteria by which future vacancies in the ecclesiastical faculties will be filled." *Id.* Indeed, "[h]aving once been deposed, interrogated, and haled into court," religious entities would be forced to make employment decisions "with an eye to avoiding litigation or bureaucratic entanglement." *Id.* The D.C. Circuit held the Religion Clauses of the First Amendment bar that kind of inquiry and burden on a religious organization. *Id.* at 470 ("we find that the EEOC's and Sister McDonough's claims are barred by the Free Exercise and the Establishment Clause of the First Amendment").

The Seventh Circuit's en banc decision in *Demkovich v. St. Andrew the Apostle Parish, Calumet City* likewise demonstrates that intrusive inquiry and discovery to Liberty University's employment decision is categorically prohibited by the First Amendment. 3 F.4th 968 (7th Cir. 2021) (en banc). "The ministerial exception, grounded in the First Amendment's Religion Clauses, protects religious organizations from employment discrimination suits brough by their ministers." *Id.* at 972-73. The en banc court noted that Supreme Court precedent "teaches that avoidance, rather than intervention, should be a court's proper role when adjudicating disputes involving religious governance." *Id.* at 975. The court held that the "ministerial exception covers the entire employment relationship, including hiring, firing, and supervising in between," *id.* at 976-77, and that the courts "cannot lose sight of the harms—civil intrusion and excessive entanglement—that the ministerial exception prevents." *Id.* at 977. Simply put, "[a]djudicating [a minister's employment dispute] would not only undercut a religious organization's constitutionally protected relationship with its ministers, but also cause civil intrusion into, and excessive entanglement with,

the religious sphere." *Id.* at 977-78. Thus, "*judicial involvement*" in an employment dispute between a religious organization and its minister impermissibly "threaten[s] the independence of religious organizations 'in a way that the First Amendment does not allow.'" *Id.* at 978 (quoting *Our Lady of Guadalupe*, 591 U.S. at 762) (emphasis added). The ministerial exception's operation as immunity from suit is necessary because "we worry about a protracted legal process pitting church and state as adversaries." *Demkovich*, 3 F.4th at 982 (quoting *Rayburn*, 772 F.2d at 1171). Though "some threshold inquiry" may be appropriate (*i.e.*, review on a motion to dismiss), the "very process of inquiry in weighing the competing interests" between the First Amendment and employment discrimination statutes "may impinge on rights guaranteed by the Religion Clauses." *Id.* at 983. "When these interests conflict, as here, the ministerial exception must prevail," and the employment claims barred. *Id.* at 983.

Numerous other circuits have reached the similar, constitutionally required conclusion. *See, e.g.*, *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575, 1576-77 (1st Cir. 1989) (holding that it is "beyond peradventure that civil courts cannot adjudicate disputes turning on church policy and administration or on religious doctrine and practice" because such a "dispute which underlies plaintiffs' complaint treads on this forbidden terrain"); *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974) ("[T]he law is clear: civil courts are *barred* by the First Amendment from determining ecclesiastical questions," and matters touching upon the relationship between "an organized church and its ministers" "must necessarily be recognized as of prime ecclesiastical concern." (emphasis added)); *id.* ("[T]he church is a sanctuary, if one exists anywhere, immune from the rule or subjection to the authority of the civil courts; either state or federal; by virtue of the First Amendment."); *id.* at 494 ("[C]ivil courts are not an appropriate forum for review of internal ecclesiastical decisions."); *McClure v. Salvation Army*, 460 F.2d 553,

560 (5th Cir. 1972) ("Application of the provisions of Title VII to the employment relationship between . . . a church and its minister would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment").

Judge Bacharach, dissenting from a denial of rehearing in *Tucker v. Faith Bible Chapel International*, likewise noted that the ministerial exception is more akin to immunity than a traditional defense to liability. 53 F.4th 620, 625 (10th Cir. 2022) (Bacharach, J., dissenting). "Though most defenses protect only against liability, *the ministerial exception protects a religious body from the suit itself*." *Id.* (emphasis added). "Without that protection, religious bodies will inevitably incur protracted litigation over matters of religion." *Id.* Judge Bacharach based his opinion that the ministerial exception is more akin to immunity from suit rather than a defense to liability on *Hosanna-Tabor*. *See id.* ("Given the structural role of the ministerial exception, the Supreme Court held that the 'ministerial exception *bars . . . a suit*' over the religious body's decision to fire the plaintiff." (quoting 565 U.S. at 196).

As this abundant precedent demonstrates, Zinski's Complaint against Liberty University simply treads too far into the religious doctrine, religious beliefs, and religious decisions concerning who may represent it as an employee, and it therefore must be dismissed. As the First Circuit noted in *Natal*, "[b]y its very nature, the inquiry which [plaintiff] would have us undertake into the circumstances of his discharge plunges an inquisitor into a maelstrom of Church policy, administration, and governance. *It is an inquiry barred by the Free Exercise Clause*." 878 F.2d at 1578 (emphasis added). This Court can only avoid that maelstrom by dismissing the Complaint and refusing to become Zinski's desired inquisitor.

As its letter to Zinski references, Liberty University's Doctrinal Statement "clearly" provides that: "Human beings were directly created, not evolved, in the very image of God, as either biologically male or female from the womb. . . . Sinful acts are prohibited by God and include denial of sex by self-dentification with a different gender." (Ex. B 1 (quoting Doctrinal Statement).) It continued, Liberty University does "not think permitting employees to express their 'chosen' gender identity at work is appropriate *or consistent with the distinctive Christian workplace that is Liberty University*," and Liberty University only "*employ[s] a workforce that acts in accordance with [its Doctrinal Statement] to protect our religious mission*." (*Id.* (emphasis added).) For an Article III court to inject itself into employment decisions and practices that Liberty University unequivocally states are imperative to protect its religious mission is plainly forbidden by the First Amendment. Because maintaining employees that strictly acknowledge and adhere to the Doctrinal Statement of Liberty University is necessary to protect Liberty University's religious mission, it cannot be gainsaid that adherence to the Doctrinal Statement is "important to the spiritual and pastoral mission of the church," *Catholic Diocese of Raleigh*, 213 F.3d at 801, and Liberty University's "explanation of the role of [its] employees in the life of the religion in question is important." *Our Lady of Guadalupe*, 591 U.S. at 757. The First Amendment forbids the inquiry requested in Zinski's Complaint, and this Court must abstain from engaging in it.

> **2.**     **That Zinski's employment position was not one of an ordained religious minister does not diminish the First Amendment's prohibition into inquiring into Liberty University's religious reasons for terminating his employment.**

The fact that Zinski was employed to provide information technology services and not formal religious instruction is neither dispositive nor even relevant. Just as "[s]imply giving the title of 'minister' is not enough to justify the exception," the use of a formal title "cannot be a necessary requirement." *Our Lady of Guadalupe*, 591 U.S. at 752.  This is why even employees in

past cases that were not teachers, priests, ministers, or other prototypical clerical employees still qualify for the ministerial exception. *See, e.g.*, *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 309 (4th Cir. 2004) (holding that religious institution's decision to fire a "mashgiach" or kitchen supervisor was not subject to judicial scrutiny); *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 802 (4th Cir. 2000) (music director qualified as minister for purposes of the ministerial exception); *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 942 (7th Cir. 2022) (holding that a guidance counselor at a religious educational institution qualified under the ministerial exception); *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 985 (7th Cir. 2021) (applying ministerial exception to choir director's suit brought on the basis that a religious institution fired him on the basis of his sexual orientation); *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 704 (7th Cir. 2003) (holding that a religious institution's press secretary constituted a minister for purposes of the ministerial exception).

All Liberty University employees cooperatively work together to fulfill the University's religious mission to "Train champions for Christ." As the Supreme Court recognized in *Our Lady of Guadalupe*, the ministerial "exception should include *any employee* who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of the faith." 591 U.S. at 754 (quoting *Hosanna Tabor*, 565 U.S. at 199 (Alito, J., concurring). Every position at Liberty University, including those in Information Services and IT, such as where Zinski worked, are critical to advancing Liberty University's mission and Christian objective. As Liberty University noted to Zinski: "Active and unrepentant patterns of sin, including sinful behaviors regarding sexual expression and/or gender expression,

would be incompatible with our Christian workplace.  At Liberty, these are indeed part and parcel of job performance and workplace conduct." (Ex. B at 2.)

As Liberty University's letter to Zinski made clear, all employees are to model Scriptures and its sincere religious convictions in all aspects of work and a method of conveying and teaching that to its students. And, Liberty University does not believe that "permitting employees to express their 'chosen' gender identity at work is appropriate or consistent with the distinctive Christian workplace that is Liberty University." (*Id.*) It continued, "The idea that man has the final say when it comes to sex or gender is simply inconsistent with the part of Liberty's Doctrinal Statement which recognizes that the God of creation chooses gender." (*Id.*). Zinski was "expected to help [Liberty University] carry out [its] mission" and was unquestionably required to model Liberty University's religious beliefs "by word and deed" to the students at Liberty University. *Our Lady of Guadalupe*, 591 U.S. at 757.

Even technology workers enable the school to continue spreading its faith to students around the world.  Zinski's employment fell within the meaning of the ministerial exception because his role supported the education of young people in their faith, the inculcation of Liberty University's Christian teachings, and the training of young people to live their faith, all of which are key responsibilities "that lie at the very core of the mission of a private religious school." *Our Lady of Guadalupe*, 591 U.S. at 754. Liberty University considers its employees to be ministers to the students. The Court "cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious institution," and Liberty University's and "explanation of the role of [Zinski] in the life of the religion is important." *See id.* at 757. Zinski's employment falls under the ministerial exception, and Zinski's employment discrimination suit against Liberty University must be dismissed.

**C.      Should This Court Determine More Factual Information Is Necessary To Reach A Determination On The Application Of The Ministerial Exception To Zinski's Complaint, It Should Hold An Evidentiary Hearing On That Limited Issue Before Permitting Discovery To Commence.**

Liberty University maintains that the factual allegations of Zinski's Complaint, together with the materials for which this Court can consider in the adjudication of Liberty University's motion to dismiss, are plainly sufficient for the Court to determine that Zinski's employment falls within the ministerial exception. *See supra* Section IV.A-B. However, should the Court determine that more factual development is necessary for that determination, the issue is jurisdictional in nature, concerns the Court's subject matter jurisdiction, and must be adjudicated by a separate evidentiary hearing on that isolated issue prior to full discovery being permitted to commence. *See, e.g.*, *Kerns v. United States*, 585 F,3d 187, 192 (4th Cir. 2009) ("If the defendant challenges the factual predicate of subject matter jurisdiction, 'a trial court may then go beyond the allegations of a complaint *and in an evidentiary hearing* determine if there are facts to support the jurisdictional allegations,' without converting the motion to a summary judgment proceeding." (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)) (emphasis original). *See also Brooks v. Branham*, 675 F. Supp. 3d 624, 632 (W.D. Va. 2023) (MOON, J.) (same). To the extent the Court determines more information is necessary, Liberty University respectfully requests an evidentiary hearing on the limited jurisdictional issue of the application of the ministerial exception.

**V.      THE FIRST AMENDMENT'S RIGHT TO ASSOCIATION BARS PLAINTIFF'S SUIT AGAINST LIBERTY UNIVERSITY.**

Liberty University is entitled to a dismissal of Zinski's Complaint for a separate and independent First Amendment reason, it is entitled to freely associate with whomever it desires and cannot be compelled to associate with individuals who openly, intentionally, and unrepentantly contradict its religious message. The freedom of expressive association the Court has explained,

"presupposes a freedom not to associate" because "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984). The right of association is likewise applicable in the employment context. *See, e.g. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200-01 (2012) (Alito. J., concurring) ("[O]ur expressive-association cases are nevertheless useful in pointing out what those essential rights are. Religious groups are the archetype of associations formed for expressive purposes, and their fundamental rights surely include the freedom to choose who is qualified to serve as a voice for their faith.")

As the Supreme Court noted, "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). There, as Zinski here, "Dale, by his own admission, is one of a group of gay Scouts who have "become leaders in their community and are open and honest about their sexual orientation." *Id.* at 653. And, Dale was unapologetically trying to alter the Boy Scouts message by forcing it to adopt his views as their own. *Id.* ("Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior."). Dale's chosen lifestyle and message was "inconsistent with the values it seeks to instill in its youth members," *id.* at 654, and "the presence of Dale as an assistant scoutmaster would just as surely interfere with Boy Scouts' choice not to propound a view contrary to its beliefs." *Id.* The Court held that such forced inclusion and forced affiliation by application of otherwise neutral statutes violated Boy Scouts' associational rights under the First Amendment. *Id.* at 656 ("Having

38

determined that the Boy Scouts is an expressive association and that the forced inclusion of Dale would significantly affect its expression, we inquire whether the application of New Jersey's public accommodations law to require that the Boy Scouts accept Dale as an assistant scoutmaster runs afoul of the Scouts' freedom of expressive association. We conclude that it does.").

The Second Circuit's decision in *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) is particularly instructive. There, New York antidiscrimination law prohibited employers from taking any adverse employment action against any employee on the basis of the employee's decision to obtain an abortion. *Id.* at 283. A pro-life pregnancy resource center in New York sued stating such an employment requirement would infringe the pro-life organization's associational rights by forcing it "to associate with employees or prospective employees whose action indicate that they do not share their views." *Id.* at 287. Much like application of Title VII would here, the Second Circuit held that the New York "statute forces Evergreen to employ individuals who act or have acted against the very mission of its organization." *Id.* at 288. The Second Circuit held, "the government's general interest in bolstering the legal right to engage in that conduct gives way to the freedom of those in the association to join together to express a different view." *Id.* at 291. Simply put, "*Evergreen has a right to limit its employees to people who share its views and will effectively communicate its message*." *Id.* (emphasis added). *See also Darren Patterson Christian Academy v. Roy*, 699 F. Supp. 3d 1163, 1184-85 (D. Colo. 2023) (noting that it would be a "significant burden on the [Academy's] religious expression" and right to expressive association to require the violate its desire "to hire only coreligionists, and to continue internal polices related to gender distinctions rooted in religious belief"); *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, (N.D. Tex. 2021), *aff'd in part Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023) ("For the same reasons that Defendants do not have a compelling interest in forcing an

organization to retain, as a scoutmaster, a member who is a gay rights activist, Defendants do not have a compelling interest in forcing Religious Business-Type Employers to hire and retain individuals that engage in conduct that is contrary to the employers' expressive interests. The Government can no more force an association that opposes homosexuality or transgender behavior to hire individuals engaged in that conduct than it can force a gay-rights organization to hire an avowed opponent of homosexuality.").

The same is true here. Forcing Liberty University to retain an employee who is openly, intentionally, and unrepentantly engaging in conduct contrary to its sincerely held religious convictions and Doctrinal Statement would violate Liberty University's right to expressive association. Liberty University has the right to restrict the individuals it employs to those individuals who share its religious beliefs, values, convictions, and interpretations of Scripture. Forcing them to employ an individual who openly lives a lifestyle that is directly contradictory to its Biblical Doctrinal Statement and religious convictions is akin to forcing a pro-life pregnancy center to employ a vocal pro-abortion advocate openly devoted to contradicting its message. The First Amendment does not tolerate that nonsense. Zinski's Complaint must be dismissed.

## <u>CONCLUSION</u>

Because the First Amendment ministerial exception, the Religious Freedom Restoration Act, and Title VII itself all prohibit this Court's adjudication of Zinski's claims against Liberty University, the Complaint must be dismissed with prejudice.

Respectfully submitted,

/s/ Daniel J. Schmid
Mathew D. Staver*
Horatio G. Mihet*
Daniel J. Schmid (VA Bar 84415)
*Attorneys for Defendant Liberty University, Inc.*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Email: court@LC.org
        hmihet@LC.org
        dschmid@LC.org

*Pro hac vice admission forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of October, 2024, I caused a true and correct copy of the foregoing to be electronically filed with this Court. Service will be effectuated on all counsel of record via this Court's ECF/electronic notification system.

/s/ Daniel J. Schmid
Daniel J. Schmid