**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division**

| | | |
|---|---|---|
| **ELLENOR ZINSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:24-cv-41-NKM** |
| | ) | |
| **LIBERTY UNIVERSITY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT LIBERTY UNIVERSITY'S REPLY
IN SUPPORT OF MOTION TO DISMISS**

Pursuant to Local Rule 11(c) and the Court's Scheduling Order (dkt. 15, ¶7), Defendant Liberty University, Inc. hereby files this Reply in Support of its Motion to Dismiss (dkt. 12).

## INTRODUCTION

Zinski's entire opposition to Liberty University's motion to dismiss can be boiled down to the notion that *Bostock v. Clayton County*, 590 U.S. 644 (2020) answered every question of relevance to Liberty University's decision to terminate Zinski for openly manifesting and defiantly stating an intention to act in direct contradiction to Liberty University's Doctrinal Statement and religious employment requirements. (Opp'n 4, 5, 6, 12, 14, 32.) Indeed, Zinski goes so far as to claim that *Bostock* involved "the very example before this Court." (*Id.*) This is incorrect, but it represents the fundamental misunderstanding of Liberty University's defenses that pervades Zinski's opposition. Zinski's opposition fails at every turn.

In *Bostock*, the Supreme Court explicitly noted that it was addressing a *narrow and singular question*. 590 U.S. at 681 ("The *only question* before us is whether an employer who fires someone *simply* for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex." (emphasis added)). The Court unequivocally

declared that "*no other religious liberty claim is now before us*." *Id.* at 682 (emphasis added). Here, Liberty University's religious liberty claim is before the Court front and center, and requires a dismissal of Zinski's claims. And, in *Bostock*, the Court noted that it was "deeply concerned with preserving the promise of free exercise of religion enshrined in our Constitution," *id.* at 681, and that so, too, was Congress because "[a]s a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations." *Id.* at 682. Thus, in deciding the broader issues involving individuals claiming to be terminated for identifying differently than their chromosomal and biological reality at birth, the Supreme Court specifically noted that Sections 702 and 703 would impact the result reached in *Bostock*. And, the Court left no question that it was not deciding those issues in *Bostock* because "how these doctrines protecting religious liberty interact with Title VII are questions for future cases." *Bostock*, 590 U.S. at 682. This is that case, and Liberty University's defenses compel a different answer and result.

The Fourth Circuit's most recent foray into religiously based employment suits likewise left for another day the question of Title VII Sections 702 and 703 statutory exemptions for religious employers like Liberty University. *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316 (4th Cir. 2024). Thus, neither the Supreme Court nor the Fourth Circuit has conclusively answered the question of whether a religious decision by a religious institution to terminate an employee whose manifested conduct and beliefs are fundamentally at odds with the religious mission of the educational institution is exempt under Title VII, regardless of its intersection with modern interpretations of sex-based discrimination under Title VII. It falls to his Court to now answer that question.

Liberty University is exempt from Zinski's claims under Sections 702 and 703 of Title VII, is immune from an inquiry into its religiously grounded decision to terminate Zinski under the

ecclesiastical abstention doctrine of the First Amendment, is protected by the First Amendment
ministerial exception's bar to Zinski's employment discrimination claims against it, and is entitled
to refrain from associating with individuals who diminish its vital religious mission. Zinski's
claims cannot overcome these constitutional and statutorily defenses, which are fatal to Zinski's
claims. Zinski's Complaint must be dismissed with prejudice.

## ARGUMENT

I. **ZINSKI'S LETTER TO LIBERTY UNIVERISTY AND LIBERTY UNIVERSITY'S
LETTER TO ZINSKI EXPLAINING ITS DECISION TO TERMINATE ON THE
BASIS OF RELIGION ARE INTEGRAL TO ALL OF ZINSKI'S CLAIMS.**

### A. The Court May Consider The Exhibits To Liberty University's Motion To Dismiss Because They Are Integral To Zinski's Claims.

Zinski concedes, as Zinski must, that the Court is permitted to consider documents attached
to a complaint or to a motion to dismiss if they are "integral to the complaint and authentic."
(Opp'n 3.) Zinski does not (and cannot) challenge the authenticity of the documents attached to
Liberty University's Motion, so the latter portion is necessarily satisfied. A document is integral to
the complaint when—as here—the plaintiff's claims "turn on [or] are otherwise based on,
statements contained in the document" or "'where the complaint relies heavily upon [the
document's] terms and effect.'" *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir.
2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). Another
example of integral documents are those that "provide the bases for Plaintiff's claims." *NAC
Consulting, LLC v. 3Advance, LLC*, 650 F. Supp. 3d 441, 447 (E.D. Va. 2023); *Humbert v. Selective
Ins. Co. of S.C.*, No. TDC-23-1811, 2024 WL 1140752, *2 (D. Md. Mar. 14, 2024) (holding that a
document was integral to the complaint where the plaintiff's claims are "based on statements in
that document" and the document "serves as the basis of Plaintiff's claims"). The reason for
permitting examination of Liberty University's exhibits is it prevents Zinski from "extracting an

isolated statement from a document" and relying upon that to serve as the basis of the claims against Liberty University, "even though if the statement [is] examined in the full context of the document, it would be clear the statement was not [discriminatory]." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

And, in the context of an allegedly discriminatory termination claim, the documents that provide the basis for the termination have been held integral to the complaint, regardless of whether the plaintiff incorporates the documents. *See, e.g.*, *Bradley v. Gannett Co. Inc.*, No. 1:23-cv-1100 (RDA/WEF), 2024 WL 3905817, *6 (E.D. Va. Aug. 20, 2024) ("In cases where a plaintiff alleges discriminatory discharge, courts have held that 'the Separation Agreement is integral to the Complaint because it sets forth the terms of plaintiff's termination that forms the basis for claims of discrimination.'" (quoting *McGuire v. Lord Corp.*, No. 5:19-CV-25-FL, 2019 WL 4858850, *2 (E.D.N.C. Sept. 30, 2019)); *Spencer v. Virginia State Univ.*, No. 3:16cv331-HEH, 2016 WL 6902401, *3-4 (E.D. Va. Nov. 23, 2016) (noting that the VSU faculty handbook was integral to a complaint where the plaintiff's complaint cited to the faculty handbook and relied upon the handbook to frame the central contention in her employment discrimination claim)

There is no question that both Zinski's letter to Liberty University (dkt. 12-1) and Liberty University's letter to Zinski (dkt. 12-2) articulates Liberty University's basis for terminating Zinski and thus form the basis for Zinski's claims. Zinski's Opposition makes plain that Zinski believes Liberty University's termination decision was premised on Zinski's identification as a transgender. (*See* Opp'n 1 ("Zinski filed a single count lawsuit against Liberty for discrimination on the basis of sex."); dkt. 1, Compl. ¶23 ("Defendant intentionally discriminated against Plaintiff on the basis of sex in violation of Title VII by terminating [Zinski's] employment for being a transgender woman.").) Zinski also makes clear that the gravamen of Zinski's Complaint arises from Liberty

University's letter outlining its reasons for terminating Zinski's employment. (*See* Compl. ¶18 ("The letter makes clear that [Zinski's] employment was terminated because of [Zinski's] transition . . . .").) Thus, because the statements in the letters between Zinski and Liberty University articulate the entire premise of the alleged employment discrimination, they are integral to the complaint as a matter of binding law.

### B.     The Court May Consider The Exhibits To Liberty University's Motion To Dismiss Because They Are Dispositive Of Zinski's Claims.

As Zinski acknowledges, there is a separate and independent basis authorizing the Court to rely upon the Exhibits to Liberty University's motion to dismiss. (Opp'n 4.) The documents attached to a motion to dismiss or a complaint may be considered without converting the motion into one for summary judgment where, as here, they are dispositive of the claims. (*Id.* (citing *RSC Rental, Inc. v. Cincinnati Ins. Co.*, 54 F. Supp. 3d 480, 484 n.2 (W.D. Va. 2014) (MOON, J.) (citations omitted). Liberty University's letter, in particular, demonstrates that its decision to terminate Zinski was based entirely upon religion. (Dkt. 12-2, Exhibit B, 2 ("As a religious institution and workplace, based upon Liberty's Doctrinal Statement and in order to fulfill its mission, Liberty does not and will not permit employees to undertake the efforts you describe to transition away from one's birth gender . . . ."); *id.* at 1 ("Employing a person who takes the measures you describe to deny the biological and chromosomal sex God assigned at birth would not be consistent with Liberty University's values or advance its religious mission."); *id.* (noting that Liberty University "strive[s] to be clear about [its religious beliefs] and employ a workforce that acts in accordance with it in order to protection our religious mission."). The letter makes clear that Liberty University terminated Zinski on the basis of its religious beliefs and Doctrinal Statement, and that religious decision is dispositive of Zinski's claims under Title VII. (*See* dkt. 12, Memorandum in Support of Motion to Dismiss, "MTD Memorandum," 7-17.)

## II. LIBERTY UNIVERSITY'S DECISION TO TERMINATE ZINSKI'S EMPLOYMENT WAS BASED ON RELIGION AND IS EXEMPT FROM TITLE VII CLAIMS.

Zinski contends that Liberty University's decision to terminate Zinski was not based on religion but constituted unlawful sex discrimination under Title VII. (Opp'n 5.) This is incorrect both factually and legally. The allegations of Zinski's Complaint and the relevant record this Court can consider on Liberty University's motion make clear that Liberty University's decision was made on the basis of religion. Title VII's text dictates a finding that Liberty University's decision to terminate Zinski was based on its religious values, and Title VII's text exempts that religious decision from employment discrimination suits.

### A. The Allegations Of Zinski's Complaint And The Relevant Record Demonstrate Liberty University Terminated Zinski On The Basis Of Its Religion.

Zinski's Complaint plainly alleges that the letter from which Liberty University Human Resources officers read to inform Zinski about the rationale of Liberty University's decision to terminate Zinski identified the basis for Liberty University's decision. (Dkt. 1, Compl. ¶18.) In the letter, Liberty University made it abundantly clear that the decision to terminate Zinski was based on Liberty University's religion. (Dkt. 12-2, Exhibit B, 1 ("Employing a person who takes the measures you describe to deny the biological and chromosomal sex God assigned at birth would not be consistent with Liberty University's values or advance its religious mission."); *id.* ("modern biology and genetics have confirmed our ability to discern and confirm God's design for male and female. Liberty must continue consistently using those traditional approaches, even if parts of the world embrace new practices and employ means such as hormone therapy to simulate a new sex or gender. Those practices are out of step with Liberty's clearly defined and publicly posted Doctrinal Statement."); *id.* ("Liberty will look to its Doctrinal Statement when discerning the appropriate balance on workplace inclusivity, acceptance and grace. We do not think permitting

6

employees to express their "chosen" gender identity at work is appropriate or consistent with the distinctive Christian workplace that is Liberty University."); *id.* ("The idea that man has the final say when it comes to sex or gender is simply inconsistent with the part of Liberty's Doctrinal Statement which recognizes that the God of creation chooses gender."); *id.* ("As a religious educational institution and workplace, based upon Liberty's Doctrinal Statement and in order to fulfill its mission, Liberty does not and will not permit employees to undertake the efforts you describe to transition away from one's birth gender through hormones and a new name, with or without surgery.").)

As is abundantly clear, Liberty University's entire communication and explanation to Zinski articulated the religious basis for its decision to terminate Zinski's employment. In fact, Liberty University's letter is 41 sentences long and its religious beliefs, religious mission, religious Doctrinal Statement, or other religious values, faith, message, or requirements are mentioned 38 times in those 41 sentences. In other words, in virtually every statement Liberty University made to Zinski concerning its decision to terminate Zinski's employment, Liberty University referenced its religion. If that does not articulate a religious basis for its decision, regardless of whatever other beliefs, action, or conduct was also inextricably intertwined with that religious belief, nothing would ever suffice. Liberty University's decision was religious, plain and simple.

**B.    Title VII's Plain Text Demonstrates Liberty University's Decision To Terminate Zinski Was Based On Its Religion.**

As a matter of plain text, Liberty University is statutorily exempt from Title VII suits for employment decisions made on the basis of its religion. *See* 42 U.S.C. §2000e-1(a) ("The subchapter shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society

of its activities."); 42 U.S.C. §2000e-2(e) ("it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion."). Thus, by the explicit and unequivocal language of two separate sections of Title VII, a religious institution (§2000e-1(a)) and a religious educational institution (§2000e-2(a)) are wholly exempt from Title VII suits for any employment decision that is based on religion.

Title VII did not leave the Court or Liberty University guessing as to what was protected by those sections either. Congress made clear that, for purposes of Title VII, "religion" means "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §2000e(j). *See also EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) ("Congress defined 'religion,' for Title VII purposes, as 'including all aspects of religious observance and practice, as well as belief.'"). And, Liberty University imposes its religious requirements on all employees regardless of sex, and requires conformance with all aspects of Liberty University's religious convictions, including observance, practices, conduct, and belief. (Dkt. 12-2, Exhibit B, 1-2.)

Zinski contends that if Zinski "had identified as male," Zinski "would not have been terminated." (Opp'n 11.) And, Zinski further contends that "Zinski was terminated not because of [Zinski's] religious beliefs" but because Zinski "identified as one gender rather than another gender." (Opp'n 11.) This is incorrect. A few analogies demonstrate the fallacy of this argument.

Assume Zinski, instead of sending a letter (dkt. 12-1) announcing an intention to "transition" from a male to a female and identify as an individual different from the chromosomal and biological reality of Zinski's birth, the letter informed Liberty University that Zinski had adopted a religious belief that required Zinski to become an advocate for individuals claiming to be transgender, was starting an organization solely dedicated to the advancement of that cause, and intended to spend every hour outside of the workday promoting and advocating for the organization. And, assume that Zinski stated the intention to become the face of a movement designed to change the opinions and beliefs of religious organizations, including Liberty University, concerning the Biblical understanding of gender. The manifestation of Zinski's religious beliefs and Zinski's outward conduct would demonstrate that Zinski did not accept Liberty University's religious convictions and beliefs, that Zinski was actively seeking to undermine and change Liberty University's religious beliefs, and that Zinski's acknowledgement of Liberty University's religious employment requirements at hiring was deceptive. In fact, it would demonstrate a fundamental disagreement with Liberty University's Doctrinal Statement and religious beliefs and would show that Zinski's beliefs were not those of a co-religionist at Liberty University. Liberty University's decision to terminate Zinski's employment on that ground would be religiously grounded because Zinski would have shown non-conformance with Liberty University's fundamental employment requirements. It was the manifestation of Zinski's religious beliefs that compelled Liberty University to terminate Zinski's employment, regardless of whether Zinski took the additional step of claiming to identify as a gender different than Zinski's chromosomal and biological reality at birth. The same is true of Zinski's situation here. (*See* dkt. 12, MTD Memorandum, 11-12 (noting that Zinski's announcement "is an expression of his beliefs

that are directly contrary to the sincerely held religious beliefs, and employment requirements, of Liberty University").)

Or, consider a more direct comparison. Assume that a young female, Jane Doe, applied to work at Liberty University. In February 2023, Jane Doe walks into the Human Resources department at Liberty University, fills out an application, receives the Doctrinal Statement and employment handbook for review, and is interviewed by Liberty University Information Technology managers. Jane Doe explains to Liberty University that she is a devout Christian, was raised in a Southern Baptist church, agrees that the Bible is the inerrant and infallible Word of God, agrees with all of the positions in Liberty University's Doctrinal Statement, agrees that she will be a faithful messenger of the Evangelical Christian message of Liberty University to its students, faculty, and staff to which she provides services, and agrees that she will minister to each individual with whom she interacts while employed at Liberty University. Jane Doe signs the acknowledgment of Liberty University' Doctrinal Statement and employment requirements. Jane Doe is hired by Liberty University as an Information Services Apprentice at the IT Helpdesk. Jane Doe begins working for Liberty University, has several performance reviews that suggest competency in IT services, and then receives her 90-day review and satisfactory evaluation on June 25, 2023. A few days later, on July 5, Jane Doe walks into the IT Helpdesk offices, dressed not in her Liberty University IT shirt, but is wearing a burka. She states that she has been in the process of transitioning to identity with Islam, informs Liberty University that she now believes she must wear a burka as part of her conversion, and states that she must go outside several times each day to pray towards the east.

Liberty University has a meeting with Jane Doe to read her a letter informing her that her employment is being terminated because her transition to a new identity violates Liberty

University's Doctrinal Statement and manifests a religious belief that is fundamentally inconsistent with Liberty University's sincerely held religious beliefs and mission. Jane Doe goes to the EEOC to claim that she has been discriminated against on the basis of her sex because only Muslim women are required to wear a burka, so Liberty University's termination of her employment violates Title VII as Liberty University's decision was "necessarily and intentionally discriminat[ing] against [Jane Doe] in part because of sex." (*See* Opp'n 6 (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 661 (2020)).) But, Liberty University's decision was explicitly and undeniably religious, even though Jane Doe's religious beliefs manifested in something unique to female Muslims.

Now, consider a slight alteration of the analogy closer to present circumstances. Presume Jonathan Doe followed the precise path as Jane Doe above in terms of acknowledgement, acceptance, and hiring. On July 5, Jonathan Doe walks into Human Resources dressed not in Jonathan's Liberty University IT shirt, but is wearing a burka. Jonathan Doe states that he has been in the process of transitioning to identify with Islam, informs Liberty University that he now also has been transitioning to identify as a female and believes the Islamic faith requires him to wear a burka, and states that he must go outside several times each day to pray towards the east.

Would Liberty University's basis for the employee's termination be any less religious in the latter scenario than in the former? Certainly not. The fundamental problem in both scenarios is that the employee (Jonathan Doe and Jane Doe) informed Liberty University by manifested word and conduct that their religious beliefs were fundamentally contrary to the stated religious views in Liberty University's Doctrinal Statement, views they both acknowledged and agreed were employment requirements at Liberty University a few short months prior. The only difference is that Jonathan Doe's transition manifested more religiously contrary words and conduct than Jane

Doe's. It mattered not what the gender of the employee was, it was the employee's outward manifestation of religious beliefs directly contrary to Liberty University's that resulted in the termination. But, under Zinski's formulation of the rule, the stated identity of the job applicant or employee is all that matters. Such construction is evident because Zinski contends Zinski is a Christian and transgenderism is consistent with Christendom. (Dkt. 12-1, Exhibit A, 1.) Thus, according to Zinski, Liberty's decision cannot be based on religion whenever it involves characteristics unique to a single sex even if those characteristics are inherent in a manifestation of religious belief. That is not the law, and to impose such a construction on Liberty University's employment decisions would violate the very purpose behind the Title VII statutory exemptions.

Understanding Liberty University's decision to terminate Zinski as a religious decision is also necessary to prevent this Court from imposing an unconstitutional burden on Liberty University to determine which of its employment decisions would be exempt under Sections 702 and 703. As the Supreme Court noted in *Corporation of Presiding Bishop of Church of Jesus Christ of Latter Day Saints v. Amos*, the exemption in Title VII for religious employment decisions is necessarily broad because "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." 483 U.S. 327, 336 (1987). The Court should decline Zinski's invitation (Opp'n 6) to subject Liberty University to liability for informing Zinski that its religious beliefs prohibited continued employment because of Zinski's outward manifestation of contrary religious beliefs. The plain text of Title VII requires nothing less.

### C.    Because Liberty University Terminated Zinski On The Basis Of Religion, Title VII Bars Zinski's Claims Against It.

Because Liberty University made a religious decision to terminate Zinski's employment on the basis of Zinski's manifestation of a religious belief fundamentally contrary to that of Liberty

University, its decision to terminate Zinski is exempt from Title VII suits. "Section 702 of the Civil Rights Act of 1964, 42 U.S.C. §2000e-1, exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Amos*, 483 U.S. at 330 (cleaned up). Liberty University's reliance on the explicit statutory protections in Sections 702 and 703 of Title VII do not, as Zinski contends, "contradict Fourth Circuit precedent." (Opp'n 11.) Indeed, contrary to what Zinski espouses, the Fourth Circuit's decision in *Billard v. Charlotte Catholic High School* did not conclusively address the application of Title VII's religious exemptions to situations where—as here—there is an intersection of religious employment decisions and alleged discrimination on the basis of sex. 101 F.4th 316, 328 & n.6 (4th Cir. 2024) (declining to address Section 702 and 703's exceptions in favor of a constitutional adjudication).

Nevertheless, as the Fourth Circuit noted, "Title VII's religious exemptions, though statutory, are also constitutionally inspired, implementing the First Amendment's command to avoid 'intrusive inquiry into religious belief.'" *Id.* at 329 (quoting *Amos*, 483 U.S. at 339). And, as demonstrated *infra*, the Supreme Court's decision in *Bostock* specifically and explicitly contemplated that the intersection of Sections 702 and 703 of Title VII would necessarily need to be adjudicated given its holdings concerning discrimination on the basis of sex. This makes perfect sense given the many gender preferences and gender roles that are fundamental to the doctrines of many faiths and inevitably play a role in employment decisions. Such employment decisions, when based on longstanding religious doctrine, cannot be blithely re-characterized as simply based on sex and therefore eviscerate all religious protection. Neither Zinski nor this Court can simply "recast" these fundamentally religious decisions as something else, "lest the First Amendment be reduced to a simple semantic exercise." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001).

Liberty University's decision to terminate Zinski was due to the manifestation of religious beliefs and conduct that directly contradict Liberty University's Doctrinal Statement and religious employment requirements. (*See* dkt. 12, MTD Memorandum, 7-14.) Because its decision was religiously based, Liberty University is exempt from Zinski's claims under Sections 702 and 703. Zinski's Complaint must be dismissed with prejudice.

### D.    Zinski's Reliance on *Bostock* Does Not Compel A Contrary Conclusion.

Because Liberty University's decision to terminate Zinski was based on its own religious beliefs and requirements, Zinski's claims necessarily fail. Predictably, Zinski relies heavily on *Bostock v. Clayton County*, 590 U.S. 644 (2020) to suggest that Zinski was terminated on the basis of sex. (Opp'n 6.) Zinski goes so far as to suggest that *Bostock* involved "the very example before this Court." (*Id.*) This is incorrect. For one, Zinski is correct that *Bostock* said (in the ordinary sense) that Title VII's prohibition on sex discrimination can apply to employees fired for identifying as a gender inconsistent with their chromosomal reality. 590 U.S. at 681. But, there, the Supreme Court explicitly noted that it was addressing a *narrow and singular* question. *Id.* ("The *only question* before us is whether an employer who fires someone *simply* for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex." (emphasis added)). To specify even further the limited scope of its decision, the Supreme Court noted that "[u]nder Title VII, too, *we do not purport to address* bathrooms, locker rooms, *or anything else* of the kind." *Id.* (emphasis added). In other words, the Court was addressing the limited question of whether—in the general sense of Title VII—an employer *with no other statutory or constitutional protections* violates Title VII by making an adverse employment decision against an individual who identifies with a gender different than their chromosomal and biological reality at birth.

14

To put that limitation in the specific context of Liberty University, the Supreme Court made clear it was not addressing the question before this Court in this matter. It unequivocally declared that "*no other religious liberty claim is now before us*." *Id.* at 682 (emphasis added). *See also id.* ("none of the employers before us today represent in this Court that compliance with Title VII will infringe their own religious liberties in any way."). And, the defendants in *Bostock* abandoned their RFRA claim before the Supreme Court, compelling the Court to recognize that "other employers in other cases may raise free exercise arguments that merit careful consideration." *Id.* Clearly, in this case, Liberty University's religious liberty claim is before the Court, making *Bostock* quite evidently *not* "the very example before this Court," as Zinski contends. (Opp'n 6.) Contrary to Zinski's opposition, the *Bostock* Court specifically noted it was not answering the question before this Court in this case. And, in addressing the concerns articulated in *Bostock*, the Court noted that it was "deeply concerned with preserving the promise of free exercise of religion enshrined in our Constitution," *id.* at 681, and that so, too, was Congress because "[a]s a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations." *Id.* at 682. Thus, in deciding the broader issues involving individuals claiming to be terminated for identifying differently than their chromosomal reality, the Supreme Court specifically noted that Sections 702 and 703 would impact the result reached in *Bostock*. And, the Court left no question that it was not deciding the "very example" at issue here (Opp'n 6) because "how these doctrines protecting religious liberty interact with Title VII are questions for future cases too." *Bostock*, 590 U.S. at 682.

Thus, by its own terms, *Bostock*'s precedential authority is limited to the facts before the Court in *that* case. *Bostock* did not address the exceptions available to Liberty University under Sections 702 and 703 in *this* case, and it left for future cases in which the party was asserting

religious exceptions as a defense to determine whether such institutions were exempt from claims

such as Zinski's here. Liberty University's decision was based on its sincere religious convictions,

and as such it is exempt from Zinski's Title VII claims here.

## II.    THE FIRST AMENDMENT ECCLESIASTICAL ABSTENTION APPLIES BEYOND ONLY CHURCHES, INCLUDES RELIGIOUS ORGANIZATIONS, AND DEMANDS DISMISSAL OF ZINSKI'S COMPLAINT.

### A.    The Ecclesiastical Abstention Doctrine Applies To More Than Just Churches.

Zinski's contends that the ecclesiastical abstention doctrine is inapplicable here because

"Liberty is not a church." (Opp'n 12.) Zinski's opposition falters right out of the starting gate and

never recovers. First, the ecclesiastical abstention doctrine applies to more than just churches, and

provides identical ecclesiastical protection for religious organizations, including Liberty

University. *E.g.*, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344

U.S. 94, 116 (1952) ("The opinion radiates, however, a spirit of freedom for *religious*

*organizations*, an independence from secular control or manipulation, in short, power to decide for

themselves, free from state interference, matters of church government as well as those of faith

and doctrine." (emphasis added)); *Edley-Worford v. Virgina Conf. of United Methodist Church*,

430 F. Supp. 3d 132, 137 (E.D. Va. 2019) (noting the First Amendment's ecclesiastical abstention

doctrine applies to "religious organizations"); *Curatola v. Dekel*, No. 9:22-cv-03967-DCN-MHC,

2023 WL 11886863, *3 (D.S.C. Sept. 29, 2023) (same). *See also Seattle's Union Gospel Mission*

*v. Woods*, 142 S. Ct. 1094, 1094 (2022) (Alito, J., statement) ("The First Amendment gives special

solicitude to the rights of *religious organizations*" (emphasis added) (citations omitted)).

Zinski's precise argument has been explicitly rejected by numerous courts. *See, e.g.*,

*Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, No. 1:21-CV-3161-TWT, 2022 WL 1540206, *5

(N.D. Ga. May 13, 2022) ("Next, the Plaintiffs contend that ecclesiastical abstention does not

foreclose this action because [RZIM] is not a church . . . . The Plaintiffs miss the mark with their
first point: *there are numerous cases in which non-church religious organizations were permitted
to make ecclesiastical abstention arguments*." (emphasis added)); *id.* (citing *Puri v. Khalsa*, 844
F.3d 1152 (9th Cir. 2017) (religious non-profit organization); *Garrick v. Moody Bible Inst.*, 412 F.
Supp. 3d 859 (N.D. Ill. 2019) (religious educational institution); *Rymer v. Lemaster*, No. 3:16-cv-
02711, 2017 WL 4414163 (M.D. Tenn. Aug. 30, 2017) (private spiritual advisor)).

### B. Zinski's Claims Necessarily Require An Impermissible Adjudication Of Liberty University's Religious Beliefs.

Zinski contends that not only is the ecclesiastical abstention doctrine inapplicable because
Liberty University is not a church, but contends it is also inapplicable because the case will not
require the Court to adjudicate whether Zinski's interpretation of Scripture is correct, whether
Liberty University's Doctrinal Statement is incorrect, or—most curiously—"if either party's
interpretation of Scripture compels or prohibits Zinski's employment at Liberty." (Opp'n 12
(cleaned up).) This is fundamentally incorrect.

Zinski acknowledged Liberty University's Doctrinal Statement and knew what Liberty
University's Doctrinal Statement required of its employees. (Dkt. 12-2, Exhibit B, 1.) Yet, Zinski
espoused deep disagreements with such positions and manifested an intention to live in direct
contradiction to Liberty University's religiously grounded employment requirements. (Dkt. 12-1,
Exhibit A, 1.) Zinski informed Liberty University of those doctrinal disagreements (dkt. 12-1,
Exhibit A, 1), stated that Zinski's own positions were not a problem for "active member[ship] [in]
a local Christian church" (*id.*) that holds different religious positions than Liberty University, that
Zinski desired for Liberty University to use the revelation as "a testament to God's grace," (*id.* at
2) in a manner that was unacceptable under its Doctrinal Statement (dkt. 12-2, Exhibit B, 1), that
Zinski's choices would "not reflect negatively on the University" (dkt. 12-1, Exhibit A, 1), and

17

that Zinski's choices "do not alter [Zinski's] work performance or professional conduct." (*Id.*; *see also* dkt. 1, Compl. ¶15.) Indeed, Zinski's Complaint makes clear that Zinski believes Liberty University's Doctrinal Statement is incorrect because it represents "a rejection of who [Zinski] is on a fundamental, unchangeable level." (Dkt. 1, Compl. ¶19.)

Though Zinski contends that such issues do not involve adjudication of a religious matter (Opp'n 12), that contention ignores the plain import and requirements of adjudicating Liberty University's basis for terminating Zinski's employment. Liberty University terminated Zinski's employment because Zinski's announcement manifested a religious belief and conduct diametrically opposed to Liberty University's Doctrinal Statement. As Liberty University's letter to Zinski made clear, permitting employees of Liberty University to fundamentally ignore the biological reality of their God-given birth would violate Liberty University's sincerely held religious beliefs. (Dkt. 12-2, Exhibit B, 1.) Liberty University's Doctrinal Statement was provided to Zinski as part of the onboarding process, and Zinski was required to acknowledge it upon accepting employment at Liberty University. (*Id.*) And, notably, Zinski did—in fact— acknowledge Liberty University's sincere religious beliefs and its Doctrinal Statement upon accepting employment at Liberty University (*id.*) and acknowledged that Liberty University "employ[s] a workforce that acts in accordance with [its Doctrinal Statement] in order to protect [its] religious mission." (*Id.*) Zinski acknowledged all of this despite knowing that Zinski was executing a plan to deny Zinski's God-given sex in contravention to the Doctrinal Statement Zinski acknowledged and was four months into a hormone regimen that specifically contradicts and conflicted with an employment requirement that Zinski knew Liberty University considered as a condition of employment. (*See id.* (quoting Liberty University Doctrinal Statement).) Zinski ignored that employment requirement, deceptively accepted, acknowledged, and signed a

document indicating compliance with the requirement, and flouted Liberty University's sincere religious convictions and practices. (*Id.*)

Yet, despite all of this, while claiming transitioning from male to female is acceptable in the Christian church and without impact in the Christian workplace of Liberty University (dkt. 12-1, Exhibit A, 1; *see also* dkt. 1, Compl. ¶15), Zinski then claims this Court is only asked to determine that Liberty University's termination of Zinski was "unlawful discrimination in violation of Title VII." (Opp'n 12.) But, to answer that question, the Court is required to adjudicate whether Liberty University's religious beliefs actually compelled Zinski's termination in light of the religious position held by Zinski's church and Zinski's new manifested identification purportedly having no impact in a Christian workplace, whether Liberty University's decision to terminate Zinski because of the manifestation of a religious belief contrary to Liberty University's Doctrinal Statement was a religious decision, and as such, exempt from Title VII suits. Boiled down to its essence, the adjudication of Zinski's claims requires the Court to inquire into whether Zinski's announcement of a conflict with Liberty University's religious employment requirements is a religious decision. *It is*. But, this Court can "exercise no jurisdiction" over questions of whether Zinski's manifested intentions conform "to the standards of morals required" of Liberty University's employees. *Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich*, 426 U.S. 696, 714 (1976). Liberty University is given explicit First Amendment protection to decide which employees align with its religious mission and beliefs, and to associate with and employ only those individuals who hold its religious beliefs. This Court is not permitted to second guess its judgment. Zinski's request for this Court to ignore that constitutional demand and probe Liberty University's religious justifications must be rejected as a matter of law.

III.    **THE MINISTERIAL EXCEPTION REQUIRES DISMISSAL OF ZINSKI'S CLAIMS.**

    A.    **The Ministerial Exception Can, And Must, Be Adjudicated On The Face Of Zinski's Complaint.**

Zinski contends that this Court cannot adjudicate Liberty University's ministerial exception defense until summary judgment, at the earliest. (Opp'n 21-22.) This is incorrect. Though the Supreme Court suggested that the ministerial exception operates as an affirmative defense, its subsequent decisions call that into serious question. Under the ministerial exception, "courts are *bound to stay out of employment disputes* involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (emphasis added). *See also id.* at 747 (noting that in *Hosanna-Tabor* "we unanimously recognized that the Religion Clauses *foreclose certain employment discrimination claims* brought against religious organizations" (emphasis added)). And, the Fourth Circuit's decisions likewise counsel in favor of adjudicating the ministerial exception defense at the earliest possible stage because it "shelter[s] certain employment decisions from the scrutiny of civil authorities," *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 326 (4th Cir. 2024) (quoting *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000)). "So here, swerving around the ministerial exception would veer us too close to the very interests that the First Amendment protects," *Id.* at 329 (quoting *Palmer v. Liberty University*, 72 F.4th 52, 76 (4th Cir. 2023(Richardson, J., concurring)), and "risks entangling us in inherently religious questions." *Palmer*, 72 F.4th at 76 (Richardson, J., concurring). (Dkt. 12, MTD Memorandum, 25-34.)

Though Zinski contends that nothing in Judge Richardson's concurrence in *Palmer* suggested that the Court should address the ministerial exception at the earliest stage (Opp'n 22), that is plainly incorrect. As Judge Richardson noted, the First Amendment prohibits "*the very*

*process of inquiry*" into Liberty University's employment decisions, *id.* (emphasis added), because "adjudicating the merits of [plaintiff's] claim would force us to make that inquiry" into a religious institution's decisions about employment. *Palmer*, 72 F.4th at 76. "***Before*** biting into that apple, we should determine whether the First Amendment protects Liberty" from that very inquiry. *Id.* (emphasis added). Judge Richarson's answer: "It plainly does. The First Amendment's ministerial exception bars Palmer's suit" and "entitles Liberty to *absolute immunity* over its decisions to fire" its employees. *Id.* (emphasis added). That question must be answered before subjecting Liberty University to probing discovery because Zinski's requested "inquiry itself may offend First Amendment interests." *Id.* at 77.

## B.    Even An Affirmative Defense Can Be Adjudicated At Motion To Dismiss.

Even assuming that the Supreme Court had conclusively adjudicated that the ministerial exception is an affirmative defense, rather than a bar to suit, which it did not, the Court can still adjudicate Liberty University's ministerial exception defense because all facts necessary to reach such a determination are properly before the Court. *See, e.g.*, *Goodmand v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) ("where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached on a motion to dismiss"); *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993) (same). And, determining that Liberty University's decision to terminate Zinski's employment on the basis that it requires all of its employees to "serve as a messenger or teacher of the faith." *Our Lady of Guadalupe*, 591 U.S. at 754 (quoting *Hosanna Tabor*, 565 U.S. at 199 (Alito, J., concurring)), can be made on what is plainly and properly before the Court now.

As Zinski readily concedes here (Opp'n 22-23), there are numerous instances where courts have adjudicated the ministerial exception on a motion to dismiss. Thus, Zinski's contention that

Liberty University's ministerial exception defense must be adjudicated no earlier than *after* discovery and on summary judgment is plainly incorrect by Zinski's own admission.

### C. The Ministerial Exception Bars Zinski's Claims.

As Liberty University demonstrates *supra* and in its moving papers, all of the facts necessary to reach an adjudication of Zinski as a "messenger" of Liberty University's faith, *Our Lady of Guadalupe*, 591 U.S. at 754, are apparent in the Complaint and the documents that may be considered on a motion to dismiss. (*See supra* Section I; dkt. 12, MTD Memorandum, 3 n.1, 6 n.2.) As the Fourth Circuit did in *Billard*, this Court must "begin with the core of the mission of the school" and how an employee "interact[s] with the mission of a religious school." 101 F.4th at 330 (cleaned up). Liberty University's correspondence to Zinski (dkt. 12-2) and its Doctrinal Statement referenced therein make clear that all of its employees are required to "model and promote [Christian] faith and morals." *Billard*, 101 F.4th at 331. (*See also* dkt. 12-2, Exhibit B, 1-2.) And, as in *Billard*, Liberty University considers it "vital to its religious mission" that its employees believe, espouse, and model its Biblical worldview to the students at Liberty University. 101 F.4th at 332. (*See also* dkt. 12-2, Exhibit B, 1 (Liberty University "employ[s] a workforce that acts in accordance with [its Doctrinal Statement] in order to protect [its] religious mission").)

Moreover, "[t]he ministerial exception protects religious institutions in their dealings with individuals who perform tasks so central to their religious missions – even if the tasks themselves do not advertise their religious nature." *Billard*, 101 F.4th at 332. That Zinski was not an ordained minister or teacher does not diminish how Liberty University views Zinski's role (and that of all employees, for that matter). Zinski was expected to help Liberty University carry out its religious mission, and thus Liberty University's decision to terminate Zinski for manifesting an intention to act in a way that could not comply with that religious requirement is exempt from employment

22

discrimination claims under the ministerial exception. *Our Lady of Guadalupe*, 591 U.S. at 757. All of the facts necessary to make that adjudication are before the Court now, and it should dismiss Zinski's Complaint with prejudice.

## IV. THE FIRST AMENDMENT RIGHT OF ASSOCIATION PLAINLY APPLIES TO EMPLOYMENT DECISIONS OF RELIGIOUS INSTITUTIONS, SUCH AS LIBERTY UNIVERSITY.

Zinski contends that there is no First Amendment right of association involved in the employer-employee context, so Liberty University's expressive association defense fails. (Opp'n 27-28.) This is incorrect. Zinski contends that Liberty University's reliance on *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) is misplaced because "the 'very mission'" of the pregnancy center in *Slattery* was to encourage pregnant women to choose paths other than abortion. (Opp'n 30.) Zinski then attempts to reframe the mission of Liberty University to mischaracterize the First Amendment right at issue here. That transparent legerdemain is patently misplaced.

Zinski contends that "Liberty University is an educational institution," and that "[t]here is no evidence in the record that Liberty's 'very mission' is to oppose transgender identity." (Opp'n 30.) True enough, but that is beside the point. Zinski was provided with and well understood what Liberty University's Doctrinal Statement provided (*see* dkt. 12, MTD Memorandum, 4-5), and unquestionably knew that Liberty University required adherence to that Doctrinal Statement as a condition of employment in its Christian university. (*Id.* at 4-5 ("I recognize that some have come to faiths that are different than Liberty's and, while we respect their rights to have such faiths and act in accordance with them, we strive to be clear about ours and employ a workforce that acts in accordance with it in order to protect our religious mission.").) So, Liberty University protects it's mission as a Christian university by employing only those who agree to adhere to and respect its Christian Doctrinal Statement. Moreover, Liberty University noted to Zinski the vital importance

of employing individuals who maintain beliefs and conduct consistent with Liberty University's religious mission. (*Id.* at 4 ("Employing a person who takes the measures you describe to deny the biological and chromosomal sex God assigned at birth would not be consistent with Liberty University's values or advance its religious mission.").) The religious mission of Liberty University is thus carried out by all of its employees, and the First Amendment entitles Liberty university to refrain from associating with employees who have manifested an intention to act directly contrary to those religious beliefs and mission.

This leaves Zinski with only one other contention, that the commercial nature of the employment relationship is fundamentally different than voluntary association. (Opp'n 29.) This, too, is incorrect. As the Supreme Court has plainly noted, "the right to engage in activities protected by the First Amendment implies 'a corresponding right to associate with others in pursuit of a wide variety of political, social, *economic*, *educational*, *religious*, and cultural ends.'" *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)) (emphasis added). Thus, Zinski's contention that an economic relationship somehow diminishes the constitutional protection afforded to Liberty University in this matter is simply incorrect. Liberty University has a First Amendment right to refrain from associating with individuals who do not share its religious and educational interests, regardless of any economic aspect to the relationship. And, the best Zinski could muster to support the misplaced contention is the *dissent* in *Dale*. (Opp'n 29 (citing Justice Stevens's dissent that an economic relationship would override the Boy Scouts's associational rights).) Zinski searches in vain for anything that removes Liberty University's First Amendment right to associate with only those individuals, including employees, who share its religious beliefs and manifest those shared beliefs in word and deed.

24

Moreover, Zinski's contention ignores the ramifications of compelling Liberty University to associate with someone, including an employee, who is living in direct contradiction to its vital religious mission. The First Amendment "plainly presupposes a freedom not to associate." *Roberts*, 468 U.S. at 623. And, "the forced inclusion of teachers and other staff who do not adhere to those values would significantly affect the Archdiocesan Elementary Schools' ability to advocate their viewpoints, through its teachers and staff, to their students." *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 821 (E.D. Mo. 2018). Liberty University has the freedom not to associate with individuals, such as Zinski, whose religious beliefs and conduct are directly contrary to the vital religious mission in which Liberty University is engaged. The First Amendment protects its decision to terminate Zinski, and Zinski's Complaint must be dismissed with prejudice.

## CONCLUSION

For the reasons articulated herein and for all those in Liberty University's moving papers (dkt. 11, 12), Liberty University is exempt from Zinski's employment discrimination claims. The Complaint must be dismissed with prejudice.

Respectfully submitted,

/s/ Daniel J. Schmid
Mathew D. Staver*
Horatio G. Mihet*
Daniel J. Schmid (VA Bar 84415)
*Attorneys for Defendant Liberty University, Inc.*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Email: court@LC.org
        hmihet@LC.org
        dschmid@LC.org

*Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of November, 2024, I caused a true and correct copy of the foregoing to be electronically filed with this Court. Service will be effectuated on all counsel of record via this Court's ECF/electronic notification system.

/s/ Daniel J. Schmid
Daniel J. Schmid