CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

2/21/2025
LAURA A. AUSTIN, CLERK
BY:   s/ CARMEN AMOS
       DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

|  |  |
|---|---|
| ELLENOR ZINSKI, | CASE No. 6:24-cv-00041 |
| *Plaintiff,* |  |
| | MEMORANDUM OPINION |
| v. | |
| | JUDGE NORMAN K. MOON |
| LIBERTY UNIVERSITY, INC., | |
| *Defendant.* | |

Plaintiff Ellenor Zinski sues her former employer, Defendant Liberty University, asserting one claim of sex-based employment discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq*. In her complaint, Zinski alleges that Liberty terminated her employment at the university because she underwent a sex transition from man to woman, and that Liberty, in firing her, thereby engaged in sex discrimination prohibited by Title VII. Now before the Court is Liberty's motion to dismiss, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. 11 (motion); Dkt. 12 (brief in support).

The parties do not dispute the central premise that Liberty fired Zinski because of her transgender status; they solely dispute whether Title VII proscribes such action, and/or whether Liberty may claim any statutory or constitutional defenses to Title VII liability. Namely, Liberty argues that several sources of law entitle it, as a religious institution, to terminate Zinski's employment on the basis of her transgender status, including: (1) Sections 702 and 703 of Title VII; (2) the Religion Freedom Restoration Act; (3) the ministerial exception; (4) the First

Amendment freedom of expressive association; and (5) the ecclesiastical abstention doctrine. *See* Dkt. 12. Based on these authorities, Liberty argues that Zinski cannot state a legal claim for relief and her suit must be dismissed.

Upon consideration of Liberty's motion and the parties' arguments, the Court finds that none of Liberty's proposed defenses are supported by the law on the facts thus far presented. The Court will therefore **DENY** Liberty's motion to dismiss, **Dkt. 11**, in an accompanying order.

## I.    Legal Standard

### A.   Rule 12(b)(6)

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in the plaintiff's favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics," instead the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at

2

570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").

### B. Rule 12(b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure tests a district court's subject matter jurisdiction. The burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the plaintiff, as the party invoking the court's jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant argues that a claim fails to allege facts upon which subject matter jurisdiction can be based, all the facts alleged in the complaint are assumed to be true and the plaintiff is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration. *Id*. However, when a defendant alleges that the jurisdictional allegations in a complaint are not true, a trial court may go beyond the allegations of the complaint and hold an evidentiary hearing to determine if there are facts to support the jurisdictional allegations. *Id*; *see also Kerns v. United States*, 585 F,3d 187, 192 (4th Cir. 2009) ("If the defendant challenges the factual predicate of subject matter jurisdiction, 'a trial court may then go beyond the allegations of a complaint *and in an evidentiary hearing* determine if there are facts to support the jurisdictional allegations,' without converting the motion to a summary judgment proceeding.") (quoting *Adams*, 697 F.2d at 1219 (4th Cir. 1982)) (emphasis original).

## II.    Background

"Few facts are needed to appreciate the legal question we face." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 653 (2020). Zinski was hired by Liberty University in February 2023. Dkt. 1 at 3. She was hired as a full-time Information Services Apprentice at the university's Information Technology Helpdesk. Dkt. 1 at 3. At the time she was hired, Zinski went by the name Jonathan

Zinski, having been assigned that name and "the sex of male" at birth. Dkt. 1 at 1.

In her role as IT Apprentice, Zinski assisted students and staff who came to the helpdesk with computer issues, troubleshooted problems with classroom equipment, offered on-call assistance for IT issues that arose during class, and managed technology-related administrative tasks, such as restocking printer paper. Dkt. 1 at 3. Zinski's "only contact with students concerned IT issues, and a significant portion of her time was spent speaking with other staff." Dkt. 1 at 3. Throughout her employment, Zinski was "successful in her job and met Liberty's legitimate employment expectations." Dkt. 1 at 3. She received bi-monthly performance reviews and "all reviews were positive." Dkt. 1 at 3. Her supervisor indicated that she was "doing well and meeting or exceeding" all of Liberty's metrics. Dkt. 1 at 3. During one performance review, on June 25, 2023, Zinski was told her "assessment was above average" and that she was "on the path to success." Dkt. 1 at 3.

Several weeks later, on July 5, 2023, Zinski sent an email to Liberty's Human Resources Department (HR). Zinksi's email stated that she "identified as a trans woman, had been undergoing hormone replacement therapy, . . . and intended to legally change her name" from Jonathan Zinski to Ellenor Zinski. Dkt. 1 at 3-4. Her email "made clear that her medical treatment and self-identification as a trans woman did not and would not alter her work performance or professional conduct and she did not request any accommodations from Liberty." Dkt. 1 at 4. Zinski received an email response from "an individual in the HR department" on July 8, "informing [her] that they would respond to her email." Dkt. 1 at 4. Zinski, in the meantime, continued to work for Liberty and met "all employment expectations." Dkt. 1 at 4.

One month later, Zinski had still not received the follow-up email that Liberty had promised. Dkt. 1 at 4. Zinski experienced "fear and anxiety" as she awaited a response. Dkt. 1 at

4. At one point while "she toured HR's new office together with her co-workers," she "broke down crying, racing to the restroom to avoid her co-workers seeing how upset she was." Dkt. 1 at 4. Sometimes the "anxiety was so great that she vomited." Dkt. 1 at 4.

Zinski followed up with HR on July 8, 2023. Dkt. 1 at 4. HR responded and scheduled a meeting for later that same day. Dkt. 1 at 4. The meeting was scheduled with John Gauger, Chief Information Officer and Executive VP of Analytics, and Steve Foster, Executive Vice President of Human Resources. Dkt. 1 at 4. During the meeting, Foster "read from a letter and then handed the letter to [] Zinski," advising Zinski that her employment with Liberty was "terminated because of her transition from her sex/gender assigned at birth (male) to the sex/gender for which she identifies (female)." Dkt. 1 at 4. The letter explained that Zinski's decision to transition from male to female violated Liberty's religious beliefs and its "clearly defined and publicly posted Doctrinal Statement." Dkt. 12 at 4-6; Dkt. 12-2.[1] Liberty espouses a belief that "Human beings were directly created, not evolved, in the very image of God, as either biologically male or female from the womb." Dkt. 12 at 4-6. Accordingly, Liberty "does not and will not permit employees to undertake the efforts [Zinski] describe[d] to transition away from one's birth gender through hormones and a new name, with or without surgery." Dkt. 12 at 4-6.

Upon her termination, Zinski felt "disbelief, emptiness, and hurt at being ostracized for being transgender." Dkt. 1 at 4. She found her termination to be a "rejection of who she is on a

---

[1]    This fact and the following two sentences are drawn from Exhibit B to Liberty's motion to dismiss, as opposed to Zinksi's complaint. Dkt. 12 at 4-6; Dkt. 12-2. Liberty's Exhibit B is the letter that Liberty officials sent and read to Zinksi upon her termination. Zinksi's complaint references this letter but does not provide any textual language from the letter. *See* Dkt. 1, ¶18. Zinksi argues that the letter should not be considered at this stage, but the Court disagrees. The Fourth Circuit dictates that courts may "consider documents attached to the complaint, *see* Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Here, the Court finds that the letter is "integral to the complaint and authentic" because the letter discloses the allegedly-religious basis for Liberty's decision, an important factual context which Zinksi's complaint does not provide, despite referencing the letter. Furthermore, the letter has been produced in full form and we have no reason to question its authenticity. Thus, the letter may be considered at this stage without converting the motion into a motion for summary judgment.

fundamental, unchangeable level." Dkt. 1 at 4.

Liberty now moves to dismiss Zinski's complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). *See* Dkt. 11 (motion); Dkt. 12 (brief in support).

## DISCUSSION

The Court first finds that subject matter jurisdiction is proper in this case. Zinksi clearly proceeds upon a claim arising under federal law, *see* 28 U.S.C. § 1331, and Liberty does not argue that Zinksi's allegations supporting that claim are untrue. Instead, Liberty presents various counterarguments, but, as discussed further in Section V, *infra*, each argument constitutes an affirmative defense to liability—not a jurisdictional bar. Thus, Liberty' motion to dismiss for lack of subject matter jurisdiction must be denied, and we proceed to evaluate whether Zinksi has stated a plausible claim for relief.

Liberty argues that it cannot be held liable under Title VII because several sources of law entitle the university, as a religious institution, to terminate Zinski on the basis of her transgender status and the university's corresponding religious opposition to transgender identification. As noted, Liberty's proposed defenses include (1) Sections 702 and 703 of Title VII; (2) the Religion Freedom Restoration Act; (3) the ministerial exception; (4) the First Amendment freedom of expressive association; and (5) the ecclesiastical abstention doctrine. *See* Dkt. 12. Several of these defenses present questions of first impression in the Fourth Circuit. We review each argument in turn. Per the principle of constitutional avoidance, we begin with Liberty's defenses arising under statute, before addressing those defenses arising under the Constitution. Ultimately, the Court finds that none of Liberty's asserted defenses are supported by the law on

the facts thus far presented. Liberty's motion to dismiss will therefore be denied.

### III.    Sections 702 and 703 of Title VII

Liberty first argues that it cannot be held liable under the terms of Title VII because Title VII exempts certain religious employers, like Liberty, from the statutory provisions prohibiting discrimination.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 ("Title VII"), prohibits an employer from discharging, refusing to hire, or otherwise discriminating against any employee "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Sex is the criterion at issue here. In *Bostock v. Clayton Cnty., Ga.*, the Supreme Court of the United States held that the term "sex" as used in Title VII encompasses sexual orientation and transgender status, since "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 590 U.S. 644, 659 (2020). Accordingly, Title VII prohibits employment discrimination based on sex, sexual orientation, and transgender status alike.

Furthermore, sex need only be one "but-for cause" of the employment decision to trigger Title VII scrutiny: "[T]he adoption of the traditional but-for causation standard [under Title VII] means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." *Bostock*, 590 U.S. at 656. "So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id*. "The statute's message for our cases is [] simple and momentous: An individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660.

However, Title VII contains two important exceptions—Sections 702 and 703—which allow religious institutions to discriminate on the basis of religion. *See* 42 U.S.C. §§ 2000e-1(a),

2000e-2(e). As discussed below, Liberty argues that these exceptions should be construed to allow religious institutions to discriminate against Zinski for her transgender status because her transgender status bears heavily on Liberty's religious belief. In other words, Liberty contends that firing Zinksi was *religious* discrimination (permissible), not sex discrimination (impermissible).[2] Furthermore, Liberty argues that *Bostock* is of little guidance here, since *Bostock* did not purport to address Title VII's exceptions for religious employers; it only addressed the meaning of the term "sex" under Title VII's general prohibitory provisions. *See* Dkt. 27 at 14.

Liberty's arguments present a novel question of law in the Fourth Circuit: whether Sections 702 and 703 entitle a religious employer to discriminate on the basis of transgender status when such discrimination accords with the employer's religious belief and could plausibly constitute religious discrimination. *See Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 328 (4th Cir. 2024) (in explaining its decision not to rule on Title VII grounds, stating that Sections 702 and 703 present "novel and complex statutory" questions); *Billard v. Charlotte Catholic High Sch.*, 2021 WL 4037431, at *7 (W.D.N.C. Sept. 3, 2021), rev'd and remanded on other grounds, 101 F.4th 316 (4th Cir. 2024) ("An unanswered question in *Bostock* is whether a religious employer might have a viable statutory or constitutional defense to Title VII claims of sexual orientation discrimination.").

In the following, the Court reviews Sections 702 and 703 of Title VII before turning to applicable Fourth Circuit authority.

---

[2]    For instance, Liberty argues that its decision to fire Zinksi was a "religious decision by a religious institution to terminate an employee whose manifested conduct and beliefs [i.e., her transgender status] are fundamentally at odds with [Liberty's] religious mission." Dkt. 27 at 2.

A.  **Legal Framework**

Generally, "Section 702(a) and Section 703(e) of Title VII exempt religious institutions from suits for religious discrimination." *Billard*, 2021 WL 4037431, at *8. "Both sections do the same thing for the purposes of this suit; the difference between them is that they each identify a different type of institution covered under the religion exemption." *Id*.

Section 702, in relevant part, provides as follows:

> This subchapter shall not apply . . . to a religious corporation, association, educational institution, or society *with respect to the employment of individuals of a particular religion* to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a) (emphasis added).

Section 703, in relevant part, provides as follows:

> [I]t shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees *of a particular religion* if such school, college, university, or other educational institution or institution of learning is . . . owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e) (emphasis added). For both sections, the term "religion" is defined to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e.

Based on these textual commands, courts have long recognized that Title VII's exemptions immunize "religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 329 (1987). "Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain

9

communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.'" *Kennedy v. St. Joseph's Ministries, Inc*., 657 F.3d 189, 192 (4th Cir. 2011) (quoting *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991)). Thus, "the decision to employ individuals 'of a particular religion' under [Section 702] has been interpreted to include the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." *Kennedy,* 657 F.3d at 192 (quoting *Hall v. Baptist Mem'l Health Care Corp*., 215 F.3d 618, 624 (6th Cir. 2000)).

Applying this line of thought, federal courts of appeal have held that (i) a Catholic school may fire a teacher for her entering a second marriage without proper validation, in violation of Catholic law, *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); and (ii) a Baptist university may remove a Baptist faculty member from his teaching position because his theological beliefs differed from those of the dean, *Killinger v. Samford Univ*., 113 F.3d 196, 198 (11th Cir. 1997).[3]

However, the Fourth Circuit has also held that this latitude for religious organizations is not boundless: Sections 702 and 703 do not "exempt religious organizations from Title VII's

---

[3] Some courts have cited *Hall v. Baptist Memorial Health Care Corporation* as an additional circuit case which follows this line of reasoning. 215 F.3d 618 (6th Cir. 2000). We disagree that *Hall* is on-point, though it is relevant. In *Hall*, the Sixth Circuit reviewed a case in which Glynda Hall, an employee at a religious institution (Baptist Memorial College of Health Sciences, affiliated with the Baptist Church), was fired for joining a different church that accepted gay people. She sued for religious discrimination. The district court held that the college qualified as a religious institution under Section 702 and was therefore exempt from any "Title VII liability arising from Plaintiff's claim of religious discrimination." *Hall v. Baptist Mem'l. Health Care Corp*., 27 F. Supp. 2d 1029, 1037 (W.D. Tenn. 1998), *aff'd*, 215 F.3d 618 (6th Cir. 2000). Furthermore, the court found that, even were the college not exempt, Plaintiff failed to prove a prima facie case of religious discrimination. *Id*. at 1038. The Sixth Circuit reviewed three questions on appeal: "(1) whether the district court erred in finding that the College was a religious institution entitled to an exemption from Title VII's prohibition against religious discrimination; (2) whether the district court erred in finding that the statutory Title VII exemption was not waivable; and (3) whether the district court erred in finding that Hall did not state a prima facie case of religious discrimination." *Hall*, 215 F.3d at 623. Important for our purposes, the Sixth Circuit affirmed, holding that Plaintiff had failed to prove a prima facie case of religious discrimination because she could not establish that "a similarly-situated co-worker received more favorable treatment than she did," or that "the reason for her termination was a pretext for discrimination based on her religion." *Hall*, 215 F.3d at 627. The decisional value of *Hall* is murky for our purposes, because the decision most relates to the intricacies of the *McDonnell Douglas* framework, and less to delineating the boundaries of religious versus sex discrimination. For instance, it does not appear from the papers that Plaintiff attempted to argue her firing was sex discrimination—perhaps reasonably, since this case preceded *Bostock*'s declaration that sexual orientation qualifies under the term "sex."

provisions barring discrimination on the basis of race, gender, or national origin." *Kennedy v. St. Joseph's Ministries*, Inc., 657 F.3d 189, 192 (4th Cir. 2011). "While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985). The statutory exemptions contemplated by Sections 702 and 703 only apply to "one particular reason for employment decision—that based upon religious preference." *Id*; *see also McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896 (1972) ("The language and the legislative history of [Section 702] compel the conclusion that Congress did not intend that a religious organization be exempted from liability for discriminating against its employees on the basis of race, color, sex or national origin with respect to their compensation, terms, conditions or privileges of employment."); *Rayburn*, 772 F.2d at 1166 ("The language and the legislative history of Title VII both indicate that the statute exempts religious institutions only to a narrow extent."); *E.E.O.C. v. Fremont Christian Sch*., 781 F.2d 1362 (9th Cir. 1986) (holding that religious school engaged in sex discrimination—not religious discrimination—when the school provided health insurance coverage to its married male employees but not to its married female employees, based upon a religious belief); *Boyd v. Harding Acad. of Memphis, Inc*., 88 F.3d 410 (6th Cir. 1996) (holding that a religious school engaged in sex discrimination—not religious discrimination—when it fired a teacher for being pregnant and unwed, based upon the school's religious belief about premarital sex).

In view of these contrasting statements of law, Title VII appears torn between two competing purposes: eradicating discrimination in employment, on the one hand, and affording religious institutions the freedom to cultivate a workforce that conforms to its doctrinal

principles, on the other. Zinksi's claim and Liberty's counterarguments rest precariously in

between these competing purposes. Though each party argues the law is well-weighted in its

favor, the Court is not persuaded that the Fourth Circuit caselaw cited on the issue is fully

developed or intended to be dispositive of this dispute. In fact, the Fourth Circuit in *Billard*

recently stated that the applicability of Sections 702 and 703 remained an open question in our

circuit—despite prior cases like *Rayburn* and *Kennedy* providing capacious propositions of law

that foretell the issue.[4] Thus, in what follows, the Court examines the facts and reasoning of

relevant Fourth Circuit caselaw (*Rayburn*, *Kennedy*, and *Billard*), before turning to our analysis.

### 1.  *Rayburn* and *Kennedy*

The statements of law drawn from *Rayburn* and *Kennedy* appear at first glance to be on-

point for the legal question before us, to the extent that in both cases, the Fourth Circuit

interpreted Sections 702 and 703 narrowly and declared that the exemptions do not permit

discrimination based on sex, race, or other protected classes.[5] But we are not persuaded that

*Rayburn* or *Kennedy* map on to the case before us as neatly as their statements of law would

suggest. *Kennedy* and *Rayburn* were both decided before *Bostock*—which expanded the term

"sex" to include transgender status and sexual orientation—and neither involved an employment

decision based on a criterion which meaningfully blurred the line between a sex-based and a

religion-based employment decision—as transgender status does. In other words, neither

---

[4]  *See Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 328 (4th Cir. 2024) (in explaining its decision not to rule on Title VII grounds, stating that Sections 702 and 703 present "novel and complex statutory" questions).

[5]  *Kennedy*: Sections 702 and 703 do not "exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011).

*Rayburn*: "While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985).

12

*Rayburn* nor *Kennedy* presented a situation in which the defendant's employment action was plausibly as *sex*-based as it was *religion*-based. Thus, other than the general rule statements cited above, it is not clear that the facts or reasoning of these cases clearly calls for one outcome versus the other in the instant litigation. We review the decisional weight of these precedents below.

### a.  *Rayburn v. General Conference of Seventh-Day Adventists*

Plaintiff Carole Rayburn was a white female member of the Seventh-day Adventist Church in Maryland. She held a Master of Divinity degree from Andrews University, the church's theological seminary, and a Ph.D. in psychology from Catholic University. In 1979, Rayburn began to seek various leadership roles within the administrative body of church, the Potomac Conference, and within the church itself. *Rayburn*, 772 F.2d at 1165. She applied for an "Associate in Pastoral Care internship" at the Potomac Conference and for a "vacancy on the pastoral staff of the Sligo Seventh-day Adventist Church." *Rayburn*, 772 F.2d at 1165. Rayburn hoped that the Potomac Conference administrative internship would help her secure the pastoral position at the Sligo Church. *Rayburn*, 772 F.2d at 1165.

Ultimately, however, "[b]oth the Sligo vacancy as an associate in pastoral care and the Potomac Conference internship were awarded to another woman." *Rayburn*, 772 F.2d at 1165. "Upon learning of her rejection, Rayburn filed a complaint with the Equal Employment Opportunity Commission under Title VI," alleging discrimination on the basis of sex, "her association with black persons, [and] her membership in black-oriented religious organizations." *Rayburn*, 772 F.2d at 1165.

In the district court,[6] "[l]imited discovery" showed that the pastoral position which

---

[6]    The district court's opinion in this matter is no longer accessible through diligent and reasonable efforts,

Rayburn sought indisputably entailed religious teaching, "occasionally preaching," and other evangelical responsibilities. *Rayburn*, 772 F.2d at 1165. Thus, on summary judgment, the District of Maryland held that Rayburn's Title VII suit was "barred in this instance by the religion clauses of the First Amendment" and dismissed Rayburn's case. *Rayburn*, 772 F.2d at 1165. Rayburn appealed, arguing that "selection of an associate in pastoral care is not exempt from Title VII." *Rayburn*, 772 F.2d at 1165.

Rayburn's appeal pointedly required the Fourth Circuit to decide whether a civil court's inquiry into Rayburn's claims might be outright barred by the Establishment and Free Exercise clauses of the First Amendment, as the district court had concluded. *Rayburn*, 772 F.2d at 1166. But before answering that question, the Court first considered whether Title VII applied to the facts of the case at all, based on the statute's text and purpose, or whether Section 702 applied to *prevent* the application of Title VII. If Section 702 applied, the church would be exempt from Title VII scrutiny and the First Amendment issue would be avoided.

The Court turned to the text and legislative history of Title VII. First, the Court observed that the plain text of Section 702 limits the exemption to religious employers discriminating "with respect to the employment of individuals of a particular religion." *Rayburn*, 772 F.2d at 1166. Second, the Court turned to legislative history to demonstrate that the original bill passed in the House "excluded religious employers from coverage altogether," [7] but the "final version excluded such employers only with respect to discrimination based on religion."[8] Indeed, "the analysis pertaining to § 702 states clearly that 'Such organizations remain subject to the

---

after consultation with the District of Maryland. Only the district court's order and judgment remain accessible. Thus, the information in this section regarding the district court's reasoning and disposition is drawn from the Fourth Circuit's procedural summary as stated in *Rayburn*. *See Rayburn*, 772 F.2d at 1165-66.

[7]    *Rayburn*, 772 F.2d at 1167 (citing H.R. Rep. No. 914, 88th Cong., 1st Sess. (1964), reprinted in 1964 U.S. Cong. & Admin. News, 2355, 2391, 2402).

[8]    *Rayburn*, 772 F.2d at 1167 (citing P.L. 92–261 § 3, 86 Stat. 103 (March 24, 1972)).

provisions of Title VII with regard to race, color, sex or national origin.'" *Rayburn*, 772 F.2d at

1167 (citing Section-by-Section Analysis of H.R. 1946, the Equal Employment Opportunity Act

of 1972, reprinted in Legislative History of the Equal Employment Opportunity Act of 1972

(Comm. Print 1972, at 1844, 1845)). Based on these findings, the Court declared that **"[w]hile

the language of § 702 makes clear that religious institutions may base relevant hiring

decisions upon religious preferences, Title VII does not confer upon religious organizations

a license to make those same decisions on the basis of race, sex, or national origin."**

*Rayburn*, 772 F.2d at 1166. (This passage is the statement of law oft cited by civil rights

plaintiffs.) "The statutory exemption applies to one particular reason for employment decision—

that based upon religious preference." *Id.* "It was open to Congress to exempt from Title VII the

religious employer, not simply one basis of employment, and Congress plainly did not." *Id*.

Having interpreted the statute, "[g]iven the wording of the statute and the history behind

it," the Court concluded that Title VII, "by 'the affirmative intention of the Congress, clearly

expressed,' applies to the employment decision in this case." *Rayburn*, 772 F.2d at 1167 (quoting

*N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 501 (1979)). Plaintiff Rayburn had

successfully stated a Title VII claim—that was not subsumed by Section 702—when she

presented facts to show that the church had discriminated against Rayburn for *some other reason*

than religious preference, *i.e.*, race or sex. *See Rayburn*, 772 F.2d at 1165 ("Rayburn did submit

some evidence to support her claims of sexual and racial discrimination, but the district court for

the District of Maryland granted defendants' motions for summary judgment."). But the facts

presented as to discrimination were not thoroughly expounded upon by the Court. With the

application of Title VII deemed unavoidable, the Court then turned "to the constitutional

questions." *Rayburn*, 772 F.2d at 1167.

15

From here on out, the Court embarked on a First Amendment inquiry in which it outlined (and coined) the doctrine now known as the ministerial exception. *See Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171, 202 (2012) (Alito, J., concurring) ("The Fourth Circuit [in Rayburn] was the first to use the term "ministerial exception."). The Court concluded that judicial scrutiny of the church's decision to not hire Rayburn would violate both the Establishment Clause and Free Exercise Clause of the First Amendment. "The application of Title VII to employment **decisions of this nature** would result in an intolerably close relationship between church and state," violating the Establishment Clause. *Rayburn*, 772 F.2d at 1170. And the "introduction of government standards to the selection of spiritual leaders would significantly, and perniciously" burden the church's free exercise of religion. *Rayburn*, 772 F.2d at 1169. Thus, the Court reasoned, though churches "are not . . . above the law" and their "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions," Rayburn's particular case was one in which the "Constitution require[d] that civil authorities decline to review either the procedures for selection or the qualifications of those chosen or rejected here." *Rayburn*, 772 F.2d at 1171. Accordingly, the First Amendment precluded her case, and the district court's dismissal of Rayburn on summary judgment was proper.

With this review of *Rayburn* in mind, it becomes clear that the decisional weight of *Rayburn* is mixed: It is primarily a case about constitutional avoidance and the ministerial exception, with a preliminary analysis into how Sections 702 applies at the highest level of generality. As to that analysis, *Rayburn* stated the general proposition of law that religious organizations are not exempt from Title VII's prohibitions except for the prohibition against religious discrimination. The Court reached this conclusion upon an important finding that the

16

"language and the legislative history of Title VII both indicate that the statute exempts religious institutions only to a narrow extent." *Rayburn*, 772 F.2d at 1166. But, beyond that, the Court's opinion sheds little light on what it means for discrimination to occur on a religious basis, or on some other basis like sex. In fact, it is not clear from the Court's opinion what exactly Plaintiff Rayburn had claimed in terms of discrimination, because ultimately, she ran headlong into a constitutional barrier. *Rayburn*, 772 F.2d at 1165 ("Rayburn did submit some evidence to support her claims of sexual and racial discrimination, but the district court for the District of Maryland granted defendants' motions for summary judgment."). We know that Plaintiff alleged that the church's hiring decision was not based on religion; she alleged it was based on the impermissible criteria of race and sex—but we don't know the contours of those claims and whether there may been some overlap with religion. Thus, although the Court's opinion provides the guiding statement of law that Title VII "does not confer upon religious organizations a license" to discriminate based on "race, sex, or national origin," the decision is less instructive as to how the Title VII should apply where discrimination is entangled between religion and other protected classes. Put in the context of our present purposes, *Rayburn* does not address, at any granular level, how Title VII should apply where a religious institution's employment decision plausibly constitutes religious discrimination and sex discrimination alike.

b. *Kennedy v. St. Joseph's Ministries, Inc.*

*Kennedy* is even less instructive. In 1994, Plaintiff Lori Kennedy was employed as a geriatric nursing assistant at St. Catherine, a tax-exempt Catholic religious organization. *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 190 (4th Cir. 2011). Kennedy, however, was not Catholic—she was "a member of the Church of the Brethren and, as a matter of religious principle, [wore] modest garb that includes long dresses/skirts and a cover for her hair."

17

*Kennedy*, 657 F.3d at 190 (quotations omitted). "At some point during Kennedy's employment, the Assistant Director of Nursing Services informed Kennedy that her attire was inappropriate for a Catholic facility." *Id.* at 191. Kennedy then "informed the Assistant Director that her attire was a function of her religious beliefs and that she would not change it." Thereafter, "Kennedy's employment was terminated." *Id.* at 190-91.

In response, Kennedy filed suit, "alleging claims under Title VII for religious harassment, retaliatory discharge, and discriminatory discharge on the basis of religion." *Kennedy*, 657 F.3d at 191. "The district court [found] that Kennedy's claim for discriminatory discharge was barred" since, as a religious organization, it was "exempt from Title VII's reach as to claims of religious discrimination." However, the district court concluded that her religious harassment and retaliation claims were cognizable under Title VII. *Id.* at 191.

On appeal, St. Catherine argued that the district court erred in drawing a distinction between discriminatory discharge claims (barred by Section 702) and retaliation and harassment claims (not barred by Section 702). St. Catherine argued that all three claims should be considered "employment" under the statute, which exempts religious organizations from Title VII scrutiny "with respect to the <u>employment</u> of individuals of a particular religion." *Kennedy*, 657 F.3d at 191-92 (emphasis added). Thus, the sole question before the Fourth Circuit was whether Title VII applies to claims for "religious harassment and retaliation against religious organizations." *Id.* at 191.

In its discussion of the issue, the Court cited *Rayburn* only once, in a footnote, as related to the ministerial exception. *Kennedy*, 657 F.3d at 192, n.7. Meanwhile, the Court stated (without citation but presumably referring to *Rayburn*) that Section 702 "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or

18

national origin." *Id.* at 192. The Court then went on to consider, strictly, whether retaliation and

harassment were subsumed within the term "employment" as used in Section 702. *See, e.g.,*

*Kennedy*, 657 F.3d at 193 ("Kennedy's harassment and retaliation claims both arise from her

'state' of 'being employed.'"); at 194 ("In sum, if Congress had wished to limit the religious

organization exemption to hiring and discharge decisions, it could clearly have done so. Instead,

it painted with a broader brush, exempting religious organizations from the entire 'subchapter' of

Title VII with respect to the 'employment' of persons of a 'particular religion.'"). Ultimately, the

Court concluded that when Section 702 exempted religious organizations from Title VII scrutiny

"with respect to the *employment* of individuals of a particular religion," the exemption

encompassed all claims arising from that employment—discharge, retaliation, and harassment.

   As such, while *Kennedy* restates *Rayburn*'s general proposition that Section 702 "does

not exempt religious organizations from Title VII's provisions barring discrimination on the

basis of race, gender, or national origin," the Court had no occasion to expound further upon the

contours of this proposition or apply it to the case before it. After all, no one was doubting

whether St. Catherine's discharge of Kennedy for wearing <u>another religion's garb</u> was a

discharge based on <u>religion</u>—*i.e.*, no one argued that Kennedy's garb was in fact a sex-based or

race-based characteristic, upon which she may have based a claim of non-religious

discrimination. The sole question before the Court was the meaning of "employment" and

whether Kennedy's claims for retaliation and harassment were barred in the same way her

discharge claim was barred. The Fourth Circuit answered in the affirmative and, in doing so,

shed little light on the meaning of "individuals of a particular religion."

### 2.  *Billard*

   *Billard* v. *Charlotte Catholic High School* further demonstrates that the question

presented to this Court is one of first impression, unanswered by *Rayburn* or *Kennedy*.

In *Billard*,[9] Lonnie Billard, a teacher of English and drama at Charlotte Catholic High School (CCHS), sued in the Western District of North Carolina for sex discrimination under Title VII. CCHS had fired him for his plans to marry his same-sex partner. *Billard*, 2021 WL 4037431 at *2-5. As a threshold matter, the district court found that, under *Bostock*, Billard had "raised a valid Title VII sex discrimination claim" by alleging he was fired for being homosexual. *Id.* at *7. But like Liberty does here, CCHS argued that "Sections 702 and 703 exempt religious organizations from liability when the employment decision is based on religious preference," and that since Billard "was fired for advocating against the moral tenets of the Church, [] firing him should fall under the 702 and 703 exemptions." *Billard*, 2021 WL 4037431 at *9.

The district court disagreed. The court cited *Kennedy* and *Rayburn* for the Fourth Circuit's proposition that "Section 702 provides an exception only from Title VII's prohibition against discrimination in employment on the basis of religion . . . not discrimination on the basis of race, gender, or national origin." *Billard*, 2021 WL 4037431 at *9 (citing *Kennedy*, 657 F.3d at 192; *Rayburn*, 772 F.2d at 1166). The court also turned to pre-*Bostock* decisions from the Ninth, Fifth, and Sixth Circuit Courts of Appeals, finding, generally, that Sections 702 and 703 do not give religious institutions permission to discriminate on the basis of any protected class other than religion.[10] Based in part on these authorities, the district court in *Billard* concluded

---

[9]    For the district court opinion, *see Billard v. Charlotte Catholic High Sch.*, No. 3:17-CV-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021), *rev'd and remanded on other grounds*, 101 F.4th 316 (4th Cir. 2024).
       For the Fourth Circuit opinion, *see Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 328 (4th Cir. 2024).
[10]    *See Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) (finding that Section 702 "does not, however, exempt religious educational institutions with respect to all discrimination. It merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination."); *Equal Empl. Opportunity Comm'n v. Mississippi College*, 626 F.2d 477, 485 (5th Cir. 1980) (affirming prior precedent restricting application of Section 702 to a religious organization's discrimination in

that "religious entities are only allowed to be shielded from liability when they can show (1) the

purpose of the employment decision is religious discrimination, and (2) that sex is not a but-for

cause in the decision." *Billard*, 2021 WL 4037431 at *10. As applied to the facts of the case,

although CCHS terminated Billard for a purportedly-religious reason (the Roman Catholic

Church's disapproval of homosexuality), the school could not escape liability since they could

not disprove that sex was a but-for cause of the decision under *Bostock*.

   The district court further considered the consequences of finding to the contrary:

> Defendants' argument would let religious employers completely
> bypass Title VII liability, if they could prove their discrimination
> was related to a religious justification. This would erase
> protections against racial discrimination, sexism, gender
> discrimination, sexual orientation discrimination, and xenophobia
> by employers against hundreds of thousands of employees.
> "Consider a religious employer that genuinely believes the Bible
> forbids interracial marriage. Under Defendants' interpretation of
> Section 702, that employer would be free to terminate an employee
> who married someone of a different race."

*Billard*, 2021 WL 4037431 at *10 (quoting *Starkey v. Roman Catholic Archdiocese of*

*Indianapolis, Inc*., 496 F. Supp. 3d 1195 (S.D. Ind. 2020)).

   On appeal to the Fourth Circuit, CCHS did not contest "the district court's conclusion

that it fired Billard because he planned to marry his same-sex partner, or that the firing amounted

to sex discrimination as Title VII defines it." *Billard v. Charlotte Catholic High Sch*., 101 F.4th

316, 324 (4th Cir. 2024). But CCHS did press "the same [] affirmative defenses it raised in the

district court," including its argument that Title VII's Sections 702 and 703 exempt it from

liability. *Id*.

---

employment on the basis of religion); *E.E.O.C. v. Fremont Christian Sch*., 781 F.2d 1362, 1366 (9th Cir. 1986)
("Both the language and legislative history of Title VII, however, indicate that the statute exempts religious
institutions only to a narrow extent.").

The Fourth Circuit, however, did not rule on these grounds. It observed that "a settled doctrine tailored to facts like these—the ministerial exception—already immunizes CCHS's decision to fire Billard." *Billard*, 101 F.4th at 324-25. Because the Court found that "Billard's role at CCHS was 'ministerial' for purposes of the ministerial exception," the Court "resolve[d] the case on that ground" and did not directly address the questions presented regarding Sections 702 and 703. *Id*.[11]

The Court explained why: "[T]he breadth and novelty of CCHS's statutory defenses makes this the unusual case in which we decide less by starting and finishing with a constitutional defense." *Billard*, 101 F.4th at 327. While the ministerial exception is a "well-settled doctrine," CCHS's statutory defenses would have required the Court to resolve "novel and complex statutory" questions. *Billard*, 101 F.4th at 328. The Court observed that "[n]o federal appellate court in the country has embraced the school's argument that Title VII permits religiously motivated sex discrimination by religious organizations," but that "does not mean that the claim is easily dismissed, as demonstrated by separate writings from judges who would adopt it and its endorsement by our dissenting colleague today." *Billard*, 101 F.4th at 328 (*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc*., 41 F.4th 931, 945-47 (7th Cir. 2022) (Easterbrook, J., concurring); *Fitzgerald v. Roncalli High Sch., Inc*., 73 F.4th 529, 534-35 (7th Cir. 2023) (Brennan, J., concurring)); (referring to dissenting and concurring opinion by Judge King).

Furthermore, the Court emphasized that the applicability of Title VII's exemptions was

---

[11]    In other words, the Court went the opposite road of constitutional avoidance, opting to avoid Title VII instead of the Constitution. "The ministerial exception is a constitutional defense, and ordinarily, of course, we do not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. But the general rule instructing us to prefer statutory over constitutional grounds is just that: a general rule of judicial prudence. It admits of exceptions, and we are convinced that we should make one here." *See Billard*, 101 F.4th at 327 (cleaned up).

not only an open question, but an open question of substantial consequence:

> As the district court recognized, CCHS's interpretation of Title
> VII's religious exemption [under Sections 702 and 703] would be
> wide-ranging indeed. As counsel for CCHS confirmed at oral
> argument, that exemption would apply equally to all employees of
> qualifying religious institutions – not only the relatively small
> number of employees with a claim to ministerial status, but also
> the hundreds of thousands of groundskeepers, custodians,
> administrative personnel, and the like that all agree fall outside the
> ministerial exception. And it would deprive those employees not
> only of Title VII's protections against religious discrimination, but
> also Title VII's protections against sex discrimination and, at least
> presumptively, those against race and national-origin
> discrimination, as well. A prudential doctrine resting in part on
> avoiding a constitutional ruling's consequences for others does not
> demand such a sweeping result.

*Billard*, 101 F.4th at 327 (citations and quotations omitted).

Accordingly, this Court finds that the application of Title VII's exemptions in cases

where sex and religion are intimately intertwined remains an open question in the Fourth Circuit.

### B. Analysis

Having reviewed the applicable, binding law, our analysis now confronts two primary

questions, equal in importance but unequal in challenge: **(1)** Does Liberty qualify as the type of

religious institution contemplated by Sections 702 or 703?; and, if so, **(2)** Does Liberty's

termination of Zinski for her transgender status qualify as the type of employment decision made

on the basis "of a particular religion" that is exempted from Title VII scrutiny under Sections 702

and 703?

We quickly dispense with the first question. At this stage of litigation, Liberty qualifies as

a "religious corporation, association, [or] educational institution" under Section 702 and as a

university whose "curriculum . . . is directed toward the propagation of a particular religion"

under Section 703. The parties do not dispute this in their briefing; in fact, no argument is

23

devoted at all to the question. But the pleadings, including Liberty's attached exhibits, as well as

the Court's judicial notice of publicly available facts, all support the conclusion. Liberty is a

"Virginia nonstock corporation with its principal place of business in Lynchburg, Virginia." Dkt.

1 at 3. Liberty maintains a "Doctrinal Statement" that outlines the school's religious standards,

and it provides employees with a copy of this statement and requires their assent upon hiring. *See*

Dkt. 12-2 (Letter from Liberty to Zinksi, incorporating doctrinal statement by hyperlink

reference). The Doctrinal Statement sets forth Liberty's view of "a Christian lifestyle . . . that

avoids sin." *Id*. Sins include "denial of birth sex by self-identification with a different gender."

*Id*.[12]

Furthermore, taking judicial notice of Liberty's publicly available information,[13]

Liberty's mission statement reads as follows: "Maintaining the vision of the founder, Dr. Jerry

Falwell, Liberty University develops Christ-centered men and women with the values,

knowledge, and skills essential to impact the world. . . . [T]he University educates men and

women who will . . . follow their chosen vocations as callings to glorify God, and fulfill the

Great Commission."[14] Liberty's educational philosophy states that education "occurs most

effectively when both instructor and student are properly related to God and each other through

Christ." [15] Finally, the university maintains an Office of Spiritual Development whose role is to

infuse the campus community with the Christian faith, and the university regularly hosts worship

---

[12]    For the full statement, *see* Doctrinal Position, Liberty University (last visited February 05, 2025) at
https://www.liberty.edu/about/doctrinal-statement/.

[13]    "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally
known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources
whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Here, the Court has no reason to question
Liberty's publicly posted information, especially given that the parties do not dispute these facts.

[14]    Educational Philosophy & Mission Statement, Liberty University (last visited February 05, 2025) at
https://www.liberty.edu/about/purpose-and-mission-statement/.

[15]    *Id*.

services and convocations.[16] All of these factors lead the Court to conclude that Liberty qualifies as a type of institution contemplated by the plain text of both Section 702 and 703.

With Liberty deemed a qualifying institution, we turn to the more challenging question: whether Liberty's termination of Zinksi was the type of employment action immunized by Sections 702 and 703, or whether it was impermissible sex discrimination. We begin with the statutory text, draw from legislative history, and ultimately consider the consequences of our decision. For the reasons set forth below, we conclude that Liberty is not entitled to an exemption under Sections 702 and 703. Discrimination on the basis of transgender status is sex discrimination, even if religiously motivated.

### 1. Statutory Text

When interpreting a statute, we "first and foremost strive to implement congressional intent by examining the plain language of the statute." *U.S. v. George*, 946 F.3d 643, 645 (4th Cir. 2020) (cleaned up). In doing so, "we consider all the words employed and do not review isolated phrases." *United States v. Mitchell*, 518 F.3d 230, 233–34 (4th Cir.2008). Our analysis is informed by "the specific context in which that language is used, and the broader context of the statute as a whole." *U.S. v. Ide*, 624 F.3d 666, 668 (4th Cir. 2010). "[A]bsent ambiguity or a clearly expressed legislative intent to the contrary," we apply the plain meaning of the statute as "determined by reference to its words' ordinary meaning at the time of the statute's enactment." *George*, 946 F.3d at 645; *see also Bostock*, 590 U.S. at 654 ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment.").

Here, we seek to interpret two provisions of Title VI—Section 702 and Section 703—and

---

[16]    Office of Spritual Development, Liberty University (last visited February 05, 2025) at https://www.liberty.edu/osd/.

within those provisions, several different operative clauses. Both Section 702 and 703 use the

phrase "of a particular religion." This is the first object of our analysis. Section 702 also uses the

clause "This subchapter shall not apply," whereas Section 703 does not. This is the second object

of our analysis. In each case, however, we find that the plain language of the statute is

ambiguous and not dispositive of the question before us.

### a.  Of a Particular Religion Clause

Section 702, in relevant part, provides as follows:

> **This subchapter shall not apply** . . . to a religious corporation,
> association, educational institution, or society **with respect to the
> employment of individuals of a particular religion** to perform
> work connected with the carrying on by such corporation,
> association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a) (emphasis added).

Section 703, in relevant part, provides as follows:

> [I]t shall not be an unlawful employment practice for a school,
> college, university, or other educational institution or institution of
> learning to hire and employ employees **of a particular religion** if
> such school, college, university, or other educational institution or
> institution of learning is . . . owned, supported, controlled, or
> managed by a particular religion or by a particular religious
> corporation, association, or society, or if the curriculum of such
> school, college, university, or other educational institution or
> institution of learning is directed toward the propagation of a
> particular religion.

42 U.S.C. § 2000e-2(e) (emphasis added).

From a reading of the operative language above, we observe that Sections 702 and 703

apply when a religious institution makes decisions "with respect to the employment of

individuals of a particular religion" (Section 702) or when "hir[ing] and employ[ing] employees

of a particular religion" (Section 703). There is no question that the case before us implicates

26

hiring, employing, and "employment,"[17] so we focus exclusively on what it means for a person

to be "of a particular religion." The statute defines "religion" to include "all aspects of religious

observance and practice, as well as belief."[18] 42 U.S.C. § 2000e. Thus, combining these

provisions, we ask what it means to make **an employment decision based on an employee's**

**religious observance, practice, or belief.**

      The application of this text to the facts before us leads to competing conclusions. On one

hand, Liberty finds some support. Liberty terminated Zinksi because her transgender status

contravenes Liberty's religious belief that sex is a God-given, immutable binary. *See* Dkt. 12 at 5

(citing Doctrinal Statement). If Zinksi's transgender status contravenes Liberty's religious belief,

it follows, from Liberty's perspective, that Zinksi's transgender status is a form of deviant

religious practice or belief, whether Zinksi recognizes this or not. Thus, terminating Zinksi for

her transgender status is an employment decision based on the employee's "particular religion,"

within the bounds of the statute.

      On the other hand, Zinksi finds some support, too. She can argue that the "ordinary

meaning" of the terms **religious belief, practice, or observance—**"at the time of the statute's

enactment" in 1964—did not likely encompass an employee's sex or transgender status.[19]

Indeed, a separate term was used in the statute to capture ideas about an employee's sex: "sex."

---

[17]    *See Kennedy*, 657 F.3d at 193-94 (finding that "employment" includes discharge, retaliation, and harassment).

[18]    The definition goes on to say: "unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." However, this caveat is not relevant here, since Zinksi has neither required nor requested any accommodations from Liberty.

[19]    The parties in *Bostock* made these arguments, though the Court's decision did not rely on them. "Appealing to roughly contemporaneous dictionaries, the employers say that . . . the term 'sex' in 1964 referred to 'status as either male or female as determined by reproductive biology.' The employees counter by submitting that, even in 1964, the term bore a broader scope, capturing more than anatomy and reaching at least some norms concerning gender identity and sexual orientation. But because nothing in our approach to these cases turns on the outcome of the parties' debate, and because the employees concede the point for argument's sake, we proceed on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female." *Bostock*, 590 U.S. at 655.

Thus, if Zinksi's transgender status is not a characteristic ordinarily subsumed within the terms

religious belief, practice, or observance, then firing Zinksi for her transgender status cannot be

firing an employee on the basis of her "particular religion."

However, this analysis quickly reveals itself to be an unwieldy exercise of *whose religion*

*is it anyway*. Without greater textual guidance, we conclude that the statute is inconclusive as to

the meaning of persons "of a particular religion."

### b.  *This Subchapter Shall Not Apply Clause*

Section 702 contains an introductory clause that Section 703 does not contain: "This

subchapter shall not apply," as reiterated below.

> **This subchapter shall not apply** . . . to a religious corporation,
> association, educational institution, or society with respect to the
> employment of individuals of a particular religion.

42 U.S.C. § 2000e-1(a). Liberty argues that this clause means that <u>all of Title VII's provisions</u>, as

contained in "this subchapter," fall away as soon as an entity like Liberty qualifies under the

statute. Liberty is not the first to press this interpretation.

In *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, Judge Easterbrook

issued a concurring opinion concluding that Section 702 allows religious organizations to

discriminate on any basis as long the employment decision is motivated by religious belief. 41

F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring). Judge Easterbrook reasoned that the

clause "this subchapter" refers to "Title 42, Chapter 21, Subchapter VI, which comprises *all* of

Title VII." *Starkey,* 41 F.4th at 946. And because Section 702 deems that "[t]his subchapter shall

not apply" to religious organizations, Judge Easterbrook posits that Section 702 exempts

religious organizations from *all* of Title VII's prohibitions, *i.e.*, not only from the prohibition

against religious discrimination, but also from discrimination based on race, sex, and national

origin. "I cannot imagine any plausible reading of 'this subchapter' that boils down to 'churches can discriminate against persons of other faiths but cannot discriminate on account of sex." *Starkey*, 41 F.4th at 947.[20] Judge Brennan, colleague to Judge Easterbrook, echoed this sentiment a year later in another concurring opinion: "This subchapter refers to Title 42, Chapter 21, Subchapter VI, which comprises all of Title VII. So when the exemption applies, all of Title VII drops out, including the provisions prohibiting discrimination on non-religious bases and providing for mixed-motive liability." *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529 (7th Cir. 2023) (Brennan, J., concurring) (citations and quotations omitted) (citing *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 945 (7th Cir. 2022) (Easterbrook, J., concurring)). Judge Brennan characterized a contrary interpretation of this language as "atextual." *Id*.

Similarly, although briefly, Judge King of the Fourth Circuit has stated that a plaintiff who was fired by a religious school for being gay has no claim for sex discrimination under a "straightforward reading of [Section] 702 of Title VII." *Billard*, 101 F.4th at 335 (King, J., dissenting in part and concurring in the judgment) (citing *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring))). That was the extent of Judge King's explication of the issue, however, since his separate opinion was dedicated to arguing that the Court should have decided "Billard's sex discrimination claim solely on nonconstitutional grounds" under the doctrine of constitutional avoidance. *Id*.[21]

---

[20] In addition to this issue of statutory interpretation, Judge Easterbrook also argues for pragmatism, observing that sex discrimination and religious discrimination are often intertwined: "[H]ow could one distinguish religious discrimination from sex discrimination in Starkey's situation? Firing people who have same-sex partners is sex discrimination, *Bostock* holds. But it is also religious discrimination. The Diocese is carrying out its theological views; that its adherence to Roman Catholic doctrine produces a form of sex discrimination does not make the action less religiously based." *Starkey*, 41 F.4th at 948.

[21] "To remain faithful to *Ashwander* and *Palmer* in this appeal, we should be deciding Billard's sex discrimination claim solely on nonconstitutional grounds. Put simply, I would dispose of Charlotte Catholic's appeal by ruling only on Title VII's religious exemption, in that a "straightforward reading" of § 702 of Title VII bars

Here, the Court finds these arguments to carry substantial weight, given that "only the words on the page constitute the law adopted by Congress." *Bostock*, 590 U.S. at 654. While no majority of a federal circuit court has endorsed this view of the issue, "that does not mean that the claim is easily dismissed, as demonstrated by separate writings from judges who would adopt it." *Billard*, 101 F.4th at 328 (citing *Starkey*, 41 F.4th at 945-47 (Easterbrook, J., concurring); *Fitzgerald*, 73 F.4th at 534-35 (Brennan, J., concurring)).

However, as a matter of statutory interpretation, the text remains far from open and shut. True enough, Section 702 states that "this subchapter shall not apply" to religious organizations; and the reasonable meaning of "this subchapter" is Title 42, Chapter 21, *Subchapter* VI, which comprises "all of Title VII." Title VII prohibits discrimination on the basis of sex, race, religion, and national origin. Thus, if all of those prohibitions fall away, religious organizations are free to discriminate on race, religion, sex, and national origin—end of conversation.

But the statute does not stop there. Section 702 states that the "subchapter shall not apply" to religious organizations "*with respect to the employment of individuals of a particular religion.*" If religious organizations were wholesale exempted by the clause "this subchapter shall not apply," what is the purpose of the clause "of a particular religion"? The inclusion of this latter clause generates three alternative interpretations: (1) this latter clause is just redundant, such that religious organizations are indeed wholesale exempted and can discriminate on any basis; (2) the latter clause means that religious organizations can discriminate on any basis—sex, race, what have you—so long as the discrimination is motivated by a desire to employ people of a particular religion; or, (3) the latter clause means that religious organizations can discriminate only on the basis of a person's *religion*, as distinguished from other criteria upon which

---

Billard's discrimination claim." *Billard*, 101 F.4th at 335 (King, J., dissenting in part and concurring in the judgment).

discrimination cannot be based, *i.e.*, race, sex, national origin.

We can only eliminate the first option, guided by the principle that statutory language should be interpreted to avoid redundancy or surplusage.[22] The other two are both reasonable. The second option is the most textually faithful: none of Title VII's prohibitions ("this subchapter") apply when seeking to employ a person of a certain religion, and there is no limitation on the range of that discrimination so long as it is religiously motivated. The third option, however, is not beyond the pale: this subchapter shall not apply when seeking to employ a person of a particular religion—but only discrimination based on that person's religion *qua* religion is permitted. In any case, we find that neither interpretation persuades us to the exclusion of the other.

### 2. *Legislative History*

Without clear directions from the text, we turn to the statute's legislative history and binding judicial interpretation. As to legislative history, two federal circuit decisions are particularly illuminating: *Rayburn*, out of the Fourth Circuit, and *E.E.O.C. v. Pacific Press Publishing Association*, out of the Ninth Circuit. Although *Rayburn* is the binding authority for this Court, *Pacific Press* provides a fuller history, which *Rayburn* later largely adopts.

*Pacific Press* states as follows:

> The original version of the 1964 Civil Rights Act passed by the House, H.R. 7152, contained a broad exemption entirely excluding religious employers from coverage under the Act: "s 703. This title shall not apply . . . to a religious corporation, association, or society."[23] A substitute bill proposed by Senators Humphrey, Dirksen and Mansfield adopted a more limited exemption, making

---

[22]    "Principles of statutory construction require a court to construe all parts to have meaning and, accordingly, avoid constructions that would reduce some terms to mere surplusage." *In re Total Realty Mgt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (cleaned up).

[23]    H.R.Rep.No.914, 88th Cong., 1st Sess. 10 (1963), reprinted in EEOC, Legislative History of Title VII and XI of Civil Rights Act of 1964 at 2010 (1968) ("1964 Legis.Hist.") 1964 U.S.Code Cong. & Ad.News p. 2355.

Title VII applicable to religious employers, but permitting them to employ individuals of a particular religion to perform work connected with its religious activities.[24] The Senate declined an opportunity to revert to a total exemption for religious organizations proposed in a later substitute bill by Senators Clark and Case. After debate on the various proposals, the Senate passed the Dirksen-Mansfield substitute.[25] The House accepted the substitute without amendment.[26]

During the 1972 Amendments, Senators Ervin and Allen proposed that the employment practices of all religious institutions be removed completely from EEOC jurisdiction.[27] Again the Senate rejected the blanket exemption.

The Senate accepted a subsequent proposal by Senator Ervin that broadened the scope of the exemption only slightly to allow religious employers to discriminate on the basis of religion with respect to all—not just religious activities[28] . . . . The legislative history shows that Congress consistently rejected proposals to allow religious employers to discriminate on grounds other than religion: "(church-affiliated) organizations remain subject to the provisions of Title VII with regard to race, color, sex or national origin."[29]

*See E.E.O.C. v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1276-77 (9th Cir. 1982)

(internal citations in footnotes).

Three years later, *Rayburn* produced a similar analysis:

The original Act passed by the House in 1964 excluded religious employers from coverage altogether.[30] The final version excluded such employers only with respect to discrimination based on religion, and then only with respect to persons hired to carry out the employer's "religious activities."[31] In 1972 the statute was

---

[24]    "Congressional Debate on Titles VII and XI Introduction," in 1964 Legis.Hist. at 3001, 3004, 3050; 110 Cong.Rec. 12812.

[25]    1964 Legis.Hist. at 11.

[26]    Title VII, s 702, 78 Stat. 255 (1964) (current version at 42 U.S.C. s 2000e-1).

[27]    Legislative History of Title VII of the Equal Employment Opportunity Act of 1972 at 1229-1230 ("1972 Legis.Hist.") 118 Cong.Rec. 1982.

[28]    1972 Legis.Hist. at 789; 118 Cong.Rec. 7170.

[29]    Section by Section Analysis of H.R. 1746, The Equal Employment Opportunity Act of 1972, 1972 Legis.Hist. 1845; 118 Cong.Rec. 7167.

[30]    H.R.Rep. No. 914, 88th Cong., 1st Sess. (1964), reprinted in 1964 U.S.Cong. & Admin.News, 2355, 2391, 2402.

[31]    P.L. 88–352, Title VII, § 702, 78 Stat. 255 (July 2, 1964), reprinted in 1964 U.S.Cong. & Admin.News 287, 304.

amended to delete the word "religious" [from the clause "religious activities"],[32] but Congress specifically rejected proposals to broaden further the scope of the exemption.[33] To the contrary, the analysis pertaining to § 702 states clearly that "Such organizations remain subject to the provisions of Title VII with regard to race, color, sex or national origin."[34]

*Rayburn*, 772 F.2d at 1167 (internal citations in footnotes).

This legislative history shows that Congress purposefully stopped short of the interpretation that Liberty and other religious defendants across the country have advanced in these types of lawsuits. Congress intentionally drew a line between discrimination based upon religion and discrimination that strays into other protected classes, and it kept the line there despite proposed amendments to the contrary. This legislative history supports (and informed) the Fourth Circuit's conclusion that "[w]hile the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin." *Rayburn*, 772 F.2d at 1166. And it counsels against opposing interpretations which would permit religious organizations to discriminate on any religiously-motivated basis. *See*, *e.g.*, *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). Accordingly, we find that the legislative history strongly supports a conclusion that a religious institution engages in sex discrimination when firing someone for their transgender status, even if that decision is motivated by religion.

Aside from these findings drawn from Congressional reports and the like, we note a

---

[32]    P.L. 92–261 § 3, 86 Stat. 103 (March 24, 1972).
[33]    Subcommittee on Labor of the Committee on Labor and Public Welfare of the United States Senate, Legislative History of the Equal Employment Opportunity Act of 1972 (Comm.Print 1972), at 1229–1230, 1258–1260.
[34]    Section-by-Section Analysis of H.R. 1946, the Equal Employment Opportunity Act of 1972, reprinted in id. at 1844, 1845.

Supreme Court case which supports the above conclusion that Congress, in passing Title VII, only intended to exempt religious employers to a narrow degree. In *Hishon v. King & Spalding*, the Court evaluated a claim that Title VII "categorically exempts [law firm] partnership decisions from scrutiny." 467 U.S. 69, 77-78. The Court rejected this argument for multiple reasons. For one, the claimants could not point to any evidence "in the statute or the legislative history that would support such a per se exemption." *Hishon*, 467 U.S. at 77. In fact, the Court observed that **"[w]hen Congress wanted to grant an employer complete immunity [from Title VII], it expressly did so."** *Id*. at 77-78. For this proposition the Court cited Section 702 of Title VII, among other provisions of Title VII which exempted certain parties: "For example, Congress expressly exempted Indian tribes and certain agencies of the District of Columbia, 42 U.S.C. § 2000e(b)(1), small businesses and bona fide private membership clubs, § 2000e(b)(2), and *certain employees of religious organizations*, § 2000e–1." *Id*. at 78, n.11 (emphasis added). We consider the Court's use of the word "certain" to be important. It suggests that not every employee of a religious organization is stripped of Title VII protection, but only those "certain employees" who may be discriminated against on the basis of "a particular religion." This rebuts Judge Easterbrook's interpretation that the clause "this subchapter" exempts religious employers wholesale, *Starkey*, 41 F.4th at 946, and it rebuts the idea that the phrase "of a particular religion" includes any form of discrimination as long as it's religiously motivated discrimination. If the phrases "certain employees" and "of a particular religion" are to have any meaning, we must interpret them to mean that the "certain employees" who can be discriminated against are strictly those employees who are "of a particular religion." And as noted, "religion" is a narrow term, since Congress did not intend to make the word "religion" a catch-all for discrimination on the basis of sex, race, and national origin.

34

Nonetheless, we acknowledge the limitations of relying on legislative history in a system where law springs from multiple sources and spans generations.[35] Congress could not likely have foreseen that in the decades after enacting Title VII, "sex" would be interpreted to include transgender status. That development in the law—*Bostock*—may reasonably have changed how Congress drafted law in 1964 and 1972.[36] Thus it is illogical to superimpose our understanding of Congress's intent onto a situation Congress had not likely considered. Though "only the words on the page constitute the law adopted by Congress," *Bostock*, 590 U.S. at 654, words change with time, thereby placing prior Congresses' views of the present situation beyond our reach.

### 3. *Weight of Bostock*

*Bostock* does not address the issue before us, but it provides a guiding light. In *Bostock*, the Supreme Court stated that the question presented was "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Bostock*, 590 U.S. at 681. The answer was yes: transgender discrimination is sex discrimination. *Id.* at 656, 659.

However, the employers in *Bostock* were not religious employers, and the case did not implicate Sections 702 and 703. Indeed, the Court distinguished its opinion from one which

---

[35]    *See, e.g.*, Jonathan R. Siegel, *The Inexorable Radicalization of Textualism*, 158 U. PA. L. REV. 117, 175–76 (2009) (in arguing for purposivism and intentionalism, conceding that even these approaches "must acknowledge, in the face of the textualists' realist attack, (1) that a legislature is a multimember institution to which attribution of 'intent' can be dangerous, (2) that the complex bargaining necessary to the enactment of statutes may produce a statute that implements multiple, conflicting intentions, and therefore (3) statutory text is usually the best evidence of legislative intent").

[36]    *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 653 (2020) ("Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result. Likely, they weren't thinking about many of the Act's consequences that have become apparent over the years, including its prohibition against discrimination on the basis of motherhood or its ban on the sexual harassment of male employees.").

might implicate Title VII's religious carve-outs. The Court observed that while "[f]iring employees because of a statutorily protected trait" surely counts as discrimination, it left for "future cases" whether such action might "find justification[] under other provisions of Title VII." *Bostock*, 590 U.S. at 681. The Court explicitly stated that "Congress included an express statutory exception for religious organizations." *Id*. at 682 (citing Section 702). And it concluded that how these provisions, and other doctrines protecting religious liberty, "interact with Title VII are questions for future cases." *Id*.

In light of these qualifying statements, we conclude—and agree with other courts—that *Bostock* does not address the applicability of Sections 702 and 703 to our case, despite its holding that "sex" encompasses sexual orientation and transgender status. *See, e.g., Billard*, 2021 WL 4037431, at *7 ("An unanswered question in *Bostock* is whether a religious employer might have a viable statutory or constitutional defense to Title VII claims of sexual orientation discrimination.").

Nonetheless, Bostock announces two important principles that inform our decision today. First, "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Bostock*, 590 U.S. at 660. Second, Title VII's discrimination standards employ a strict but-for standard of causation. Where sex is one but-for cause of discrimination, that amounts to a statutory violation—no matter the motivation or confluence of motivations. *Bostock*, 590 U.S. at 656-57.

These principles, the second especially, provide some guidance for applying Sections 702 and 703. Knowing that statutes are to be read as a collective and harmonious whole,[37] we see no

---

[37]    "Canons of construction [] require that, to the extent possible, identical terms or phrases used in different parts of the same statute be interpreted as having the same meaning. This presumption of consistent usage ensures that the statutory scheme is coherent and consistent." *In re Total Realty Mgt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (quotations omitted).

reason why *Bostock*'s but-for causation standard should not carry over to Sections 702 and 703, absent text or instruction to the contrary. If discharge based upon transgender status is sex discrimination under Title VII generally, it follows that the same should be true for religious employers, who, it has been shown, were not granted an exception from the prohibition against sex discrimination. They have been entitled to discriminate on the basis of religion but on no other grounds. In other words, a religious motivation does not trump the bright-line rule of <u>no but-for sex discrimination</u> in the workplace. The district court in *Billard* similarly announced this rule, which we find compelling and adopt here for our purposes: "[R]eligious entities are only allowed to be shielded from liability when they can show (1) the purpose of the employment decision is religious discrimination, and (2) that sex is not a but-for cause in the decision." *Billard*, 2021 WL 4037431 at *10. This result conforms to the principles of *Bostock*: transgender status is sex, and where transgender status is involved, sex discrimination follows.

### 4. Final Considerations

Finally, we turn to judgment. Having determined that no source of law—from statutory text to legislative history to precedent—answers the question before us, the Court is left to weigh the imperfect arguments above, alongside the potential legal and social consequences of our decision. Drawing upon all of these considerations, we conclude that Sections 702 and 703 must be narrowly construed so as to permit discrimination only on the basis of an employee's espoused religious belief or practice, such that religious employers have no license to discriminate on the basis of any other protected class. Where a religious employer discriminates on the basis of any other protected class in a but-for fashion, a statutory violation occurs, even if the decision was religiously motivated.

Several sources of law, described above, support this conclusion. First, the statutory text

is ambiguous as to the meaning of "a particular religion," rendering a strict textualist approach unsound. Second, the legislative history of Title VII evinces a clear Congressional intent to subject religious institutions to Title VII scrutiny with only narrow exceptions. Congress drew a line between religious discrimination (permissible), and discrimination based on other protected classes (impermissible)—though the line itself can be challenging to discern. Third, *Bostock* announces a but-for causation standard that logically maps on to Sections 702 and 703 just as it does to the general provisions of Title VII. Under this standard, a statutory violation occurs if discrimination operates on the basis of any protected class except religion; and discrimination triggering other protected classes—sex, race, national origin—cannot be converted into religious discrimination by claiming a religious motivation. (*Bostock*, in other words, draws the line that Congress only sketched.)

Our interpretation of Sections 702 and 703 conforms with several circuit courts who have addressed a similar issue,[38] and is readily distinguished from circuit courts that have found otherwise.[39,40] Furthermore, we find that a decision to the contrary would portend far-reaching and detrimental consequences for our system of civil law and the separation between church and

---

[38]    *See, e.g., E.E.O.C. v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986) (holding that religious school engaged in sex discrimination—not religious discrimination—when the school provided health insurance coverage to its married male employees but not to its married female employees); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410 (6th Cir. 1996) (holding that a religious school engaged in sex discrimination—not religious discrimination—when it fired a teacher for being pregnant and unwed, in violation of the school's religious tenets about premarital sex).

[39]    *See Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) (Catholic school engaged in permissible religious discrimination when firing a teacher for her entering a second marriage without proper validation, in violation of Catholic law); *Killinger v. Samford Univ.*, 113 F.3d 196, 198 (11th Cir. 1997) (Baptist university engaged in permissible religious discrimination when removing a Baptist faculty member from his teaching position because his theological beliefs differed from those of the dean).

[40]    We additionally note that the Fourth Circuit has held that transgender status is a quasi-suspect class triggering heightened scrutiny under the Equal Protection clause. Though the Equal Protection clause is not at issue here, the Fourth Circuit reached this conclusion in part upon the observation that "one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment than transgender people." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–11 (4th Cir. 2020), as amended (Aug. 28, 2020).

state. This case—and the law it implicates—points to the delicate balance between two competing and laudable objectives: eradicating discrimination in employment, on the one hand, and affording religious institutions the freedom to cultivate a workforce that conforms to its doctrinal principles, on the other. We find that our holding today—that religious institutions cannot discriminate on the basis of sex, even if motivated by religion—most appropriately maintains this balance. For one, this is because there is a backstop to our decision. Religious institutions already escape Title VII liability for a good number of their employees under the ministerial exception. *See* Part V, *infra*. That constitutional doctrine declares that Title VII does not apply to a religious institution's employment of its ministers. *See, e.g., Hosanna-Tabor Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012). In recent cases, the term minister has been expanded far beyond clergy, reaching so far as to include English teachers who occasionally sub-in for religious classes. *See Billard*, 101 F.4th at 324-25. There also exists the bona fide occupational qualification under Title VII, which allows an employer to discriminate against employees "on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-1.[41] Both of these doctrines afford religious institutions substantial leeway in discriminating

---

[41]    Consequences aside, we note that the bona fide occupational qualification (BFQ) provides additional fodder for the conclusion that the term "religion" in Sections 702 and 703 does not encompass sex. In the BFQ provision, the statute lists three protected classes—religion, sex, national origin—as exempt from scrutiny in certain circumstances. 42 U.S.C. § 2000e-1. The very next sentence constitutes the provision known as Section 703. 42 U.S.C. § 2000e-2(e). That provision, which exempts religion educational institutions from Title VII with respect to employing people of a certain religion, notably uses the term "religion" alone. Why should the term "religion" in Section 703 be read to <u>encompass</u> sex, as Liberty argues, when in the preceding sentence the term religion was used <u>in a list</u> with the word sex? If religion encompassed sex, they need not both be used in the sentence. This demonstrates that religion does not encompass sex. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("[T]here is a presumption that a given term is used to mean the same thing throughout a statute, a presumption surely at its most vigorous when a term is repeated within a given sentence.") (citation omitted); *In re Total Realty Mgt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) ("Canons of construction [] require that, to the extent possible, identical terms or phrases used in different parts of the same statute be interpreted as having the same meaning.") (quotations omitted).

against those employees whose hold a spiritual role and whose religious beliefs may press upon the faithful, such that religious institutions maintain substantial control and free exercise over their flocks. What's more, these exceptions, the ministerial exception in particular, would be rendered entirely redundant and superfluous were we to reach an opposite result today, because no exception for ministers or anyone else would be needed if religious employers had free license to discriminate against *any employee*.

Meanwhile, there is little backstop to a finding for Liberty in this instance. To decide that sex discrimination is acceptable so long as it is religiously motivated would allow employers to achieve all manner of discrimination under the banner of religion.[42,43] So long as the religious institution can show that its view—despite directly implicating sex, race, or national origin—is a sincerely held religious belief, the religious institution would have free license to discriminate at will and evade the scrutiny of civil law. Not only would this subject potentially thousands of people to discrimination, *see* Dkt. 1, ¶9 ("On information and belief, Liberty employs more than 12,000 employees worldwide."), but it would supply religious institutions with a power not afforded to secular institutions, thereby generating favorites under the law and raising Establishment Clause questions. Many of these consequences, though hypothetical, are the very ills that Title VII was designed to stop.

Accordingly, we are firm in our conclusion that Sections 702 and 703 provide only

---

[42]   This result "would be wide-ranging indeed. . . . [T]hat exemption would apply equally to all employees of qualifying religious institutions—not only the relatively small number of employees with a claim to ministerial status, but also the hundreds of thousands of groundskeepers, custodians, administrative personnel, and the like that all agree fall outside the ministerial exception. And it would deprive those employees not only of Title VII's protections against religious discrimination, but also Title VII's protections against sex discrimination and, at least presumptively, those against race and national-origin discrimination, as well." *Billard*, 101 F.4th at 327 (citations and quotations omitted).
[43]   This is particularly true given how low a standard it is to claim something as a religion. *See Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 714 (1981) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.").

narrow exemptions for the religious employer to discriminate on the basis of an employee's espoused religious belief. An employer steps outside the bounds of this immunity insofar as he discriminates against a protected class on a but-for basis. To decide otherwise would allow the exemptions in Sections 702 and 703 to swallow Title VII whole, exempting religious institutions wholesale and stripping religious employees of any Title VII protection whatsoever. Liberty is not entitled to any exemption under Section 702 or 703 for firing Zinksi for her transgender status.

## IV.    Religious Freedom Restoration Act

Liberty's next statutory defense arises under the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq*. RFRA prohibits the federal government from "substantially burdening a person's exercise of religion unless [the government] demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest." *Bostock*, 590 U.S. at 682 (citing 42 U.S.C. § 2000bb–1). "Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases." *Id*. (citing 42 U.S.C. § 2000bb–3, which states that "This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise.").

However, the terms of RFRA do not appear to authorize suits between private parties, since judicial relief can only be obtained under the statute by proceeding against a government: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and **obtain appropriate relief against a government**." 42 U.S.C. § 2000bb–1(c) (emphasis added). Indeed, RFRA repeatedly uses the word "government" in its provisions. *See, e.g., id.* § 2000bb-1(a) ("Government shall not

41

substantially burden a person's exercise of religion."); *id*. § 2000bb(b) ("The purposes of this

chapter are to  . . . provide a claim or defense to persons whose religious exercise is substantially

burdened by government." ); *id*. § 2000bb-1(b) (requiring the "[g]overnment" to meet its burden

under the statute); *id*. § 2000bb-1(c) (providing for "appropriate relief against a government").

Although neither the Supreme Court nor the Fourth Circuit has directly addressed this

element in the statute, the Fourth Circuit has observed that "the great weight of court authority"

holds RFRA to be inactionable between private parties. *Billard v. Charlotte Catholic High Sch*.,

101 F.4th 316, 324 (4th Cir. 2024). In *Billard*, the Fourth Circuit faced an appeal which raised

many of the same issues presented here (*see* Part III, Section A, Subsection 2, *supra¸* for an

explication of *Billard*), including the same question presented regarding whether RFRA can form

a cause of action between private parties. The Fourth Circuit resolved the case on the ministerial

exception—a constitutional ground—instead of a statutory ground like RFRA, but in doing so it

observed that the RFRA question was not entirely uncharted: "[O]nly one federal court of

appeals has held that RFRA applies to a lawsuit between private parties, while all others to

consider the question disagree." *Billard*, 101 F.4th at 328 (citing *Hankins v. Lyght*, 441 F.3d 96,

103 (2d Cir. 2006) (single circuit court to hold that RFRA authorizes suits between private

parties); *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736-37 (7th Cir. 2015)

(collecting cases demonstrating that majority of courts hold that RFRA does not authorize suits

between private parties). The Court further observed that deciding that RFRA provides for suits

between private parties would "expand RFRA's scope [] dramatically" and generate "largely

untested and difficult to anticipate" consequences. *Billard*, 101 F.4th at 328. Furthermore, the

Court commented with approval on the district court's opinion which held that RFRA was not

actionable. *Billard*, 101 F.4th at 323 ("The district court likewise rejected [the Catholic school's]

statutory defense under RFRA, holding, consistent with the great weight of court authority, that RFRA does not apply to suits between private parties . . . . As the district court recognized, endorsing any one of [the Catholic school's] preferred defenses would require us to step beyond existing precedent and significantly diminish Title VII's protections.").

Liberty argues, and we acknowledge, that this theory of decision creates an awkward result, in that a claimant like Liberty is precluded from raising RFRA as a defense simply because a private party (Zinksi), instead of a governmental entity like the Equal Employment Opportunity Commission, has brought the suit—despite the EEOC having granted Zinksi the right to sue in the first place. But such a result, while awkward, is not absurd: the EEOC's right-to-sue letter is an indication that the government has chosen *not to enforce* Title VII on its own, thereby taking the government out of the equation and leaving only private persons as parties to the suit. Moreover, the judiciary cannot constitute a government under the statute, since it cannot be argued that the judiciary is both the "government" which is "substantially burdening" Liberty pursuant to Section 2000bb-1(a) and also the "government" which must carry the burden of evidence and persuasion required in Section 2000bb-1(b).

Thus, where RFRA's plain text repeatedly indicates that the government must be a party for its provisions to be in play, and where the great weight of judicial authority has heeded this textual guidance in construing the statute, we find scarce justification for charting a divergent course that will dramatically expand RFRA's scope, generate "largely untested and difficult to anticipate" consequences, and "require us to step beyond existing precedent and significantly diminish Title VII's protections." *Billard*, 101 F.4th at 328, 323. Therefore, we reject Liberty's argument that RFRA precludes Title VII liability in this instance.

And even if Liberty were entitled to raise RFRA as a defense, we find that Title VII

43

likely passes strict scrutiny. Asserting a successful RFRA defense first requires the claimant to demonstrate that the government has substantially burdened its exercise of a sincerely held religious belief. *Holt v. Hobbs*, 574 U.S. 352, 361-62 (2015). If the claimant meets this threshold, the burden shifts to the government to show that its action was (1) in furtherance of a compelling governmental interest; and (2) was the least restrictive means of furthering that compelling governmental interest. *Id.*; *see* 42 U.S.C. § 2000cc–1(a). Thus, here, Liberty must show that its exercise of a sincere religious belief is substantially burdened by Title VII requiring it to maintain Zinksi as an employee, and the government (here, Zinksi, as Liberty would have it) would in turn be required to show that this burden is justified by a compelling governmental interest and is the least restrictive means of achieving that interest.

As to substantial burden, Liberty argues that Title VII would require the university to violate its sincere religious convictions by employing a person who "openly, intentionally, and unrepentantly flout[s] the Bible's teachings on sex and gender, as articulated in Liberty University's Doctrinal Statement." Dkt. 12 at 23. "Title VII's application in this manner would in effect tell Liberty University that its beliefs are flawed." *Id*. Liberty analogizes to *Hobby Lobby v. Burwell*, in which the Supreme Court held that the Affordable Care Act's mandate for contraceptive coverage substantially burdened Hobby Lobby's free exercise of religion under RFRA, since Hobby Lobby had religious, pro-life objections to providing contraception. 573 U.S. 682, 726 (2014). But in that case, the Supreme Court emphasized not only Hobby Lobby's dignitary harm arising from its forced violation of its religious conviction, but also the severe tax penalties that would follow had Hobby Lobby not complied with the Affordable Care Act: "Because the contraceptive mandate forces them to pay an enormous sum of money—as much as $475 million per year in the case of Hobby Lobby—if they insist on providing insurance

coverage in accordance with their religious beliefs, the mandate clearly imposes a substantial

burden on those beliefs." *Hobby Lobby*, 573 U.S. at 726. Here, Liberty can make no similar

claim about Title VII's application. On the record before us, enforcing this statute in Zinksi's

case merely requires Liberty to maintain an employee who has not followed the university's

Doctrinal Statement to the letter, *i.e.*, an employee who has sinned. It does not require Liberty to

change its belief, to endorse Zinksi's behavior, or to allow Zinksi to spread a new message

within the organization, for example. Liberty suffers no pecuniary consequences, either.

Furthermore, we note that the Fourth Circuit has urged courts to distinguish between "incidental

burdens on free exercise in the service of a compelling state interest" and "burdens where the

'inroad on religious liberty' is too substantial to be permissible." *Rayburn v. Gen. Conf. of

Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985). Here, we are dealing with the

former situation—"incidental burdens on free exercise in the service of a compelling state

interest." The minimal inroad on religious liberty here is easily justified by the exceedingly

compelling governmental interest in eradicating sex discrimination in employment. Accordingly,

we find that Liberty's brief argument as to burden is insufficient to show *substantial burden* at

this stage of litigation. Thus, strict scrutiny does not apply, and our analysis can come to an end.

RFRA provides no defense at this stage of litigation.

## V.    Ministerial Exception

The ministerial exception, a constitutional defense based in the Religion Clauses of the

First Amendment, generally operates to "exempt from the coverage of various employment laws

the employment relationships between religious institutions and their 'ministers.'" *E.E.O.C. v.

Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 800 (4th Cir. 2000). Following a

consistent pattern of lower court decisions recognizing a religious exemption from anti-

discrimination claims, the Supreme Court first embraced the ministerial exception in *Hosanna-Tabor Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), and it later expanded the scope of the exception in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020).

Here, the parties dispute whether Zinski is a minister, but they also dispute, as a preliminary matter, whether the ministerial exception is properly before the Court at this stage of litigation. After resolving this procedural question, we turn to the merits of the ministerial exception and find that it does not apply in this case.

### A.  Whether the Ministerial Exception is Properly Before the Court

Liberty argues that the ministerial exception is a jurisdictional bar, hence Liberty's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See* Dkt. 12 at 25. Liberty further argues that the ministerial exception, as a jurisdictional bar, must be adjudicated upon this motion to dismiss and in no other procedural context, because "subjecting a religious institution to court ordered discovery and intrusively probing inquiries into its religious decisions violates the First Amendment." Dkt. 12 at 27. Zinski, by contrast, argues that the ministerial exception is an issue of liability, not jurisdiction, and that the defense is typically litigated at the motion for summary judgment stage because it is so fact intensive.

The Court finds that Zinski is correct on both fronts.

On the first question, the Supreme Court and the Fourth Circuit have both explicitly stated that the ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. That is because the issue presented by the exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear the case.'" *Hosanna-Tabor*, 565 U.S. 171, 195 (2012); *see Palmer v. Liberty Univ., Inc*., 72 F.4th 52, 68 (4th Cir. 2023), *cert. denied sub nom. Liberty Univ., Inc. v. Bowes*,

46

144 S. Ct. 1030 (2024) (stating that "the ministerial exception is an affirmative defense to liability — not a jurisdictional bar").

As to the second question, the Court finds that courts addressing the ministerial exception have often done so at the summary judgment stage, and such was the posture of the Supreme Courts' review in the leading cases *Hosanna-Tabor*[44] and *Our Lady of Guadalupe*.[45] While this observation does not demand that the ministerial exception be resolved *only* at the summary judgment stage, it categorically discredits Liberty's argument that the ministerial exception must be resolved *only* at the motion to dismiss stage. Resolving the ministerial exception at summary judgment makes sense, given that disposition of the issue is "highly fact-intensive," requiring substantial record evidence and inquiry regarding an employee's title, work responsibilities, presence within an organization, and self-regard—not all of which information may be gleaned from a complaint. *See Billard v. Charlotte Catholic High Sch*., 101 F.4th 316, 333 (4th Cir. 2024) ("Ministerial exception cases are, as the Supreme Court instructs, highly fact-intensive, turning on consideration of a 'variety of factors' and 'all relevant circumstances.'"). Accordingly, we find that the ministerial exception is a defense which is most properly evaluated with the benefit of discovery or more extensive briefing, *i.e*., at summary judgment. Nonetheless, a court may still preliminarily address the question in an earlier stage to determine whether the ministerial exception applies to end the instant litigation. For that reason, we proceed.

### B.  Merits of the Ministerial Exception Defense

In *Hosanna-Tabor*, the Court developed a functional analysis to determine which

---

[44]    *Hosanna-Tabor*, 565 U.S. at 180–81 ("The District Court agreed that the suit was barred by the ministerial exception and granted summary judgment in Hosanna-Tabor's favor.").
[45]    *Our Lady of Guadalupe*, 591 U.S. at 745 (2020) ("Like [Our Lady of Guadalupe], St. James obtained summary judgment under the ministerial exception.").

employees at religious organizations are "ministers," laying out four non-exhaustive considerations: (1) how the employer held out the employee, including her title, (2) whether the employee had undergone significant religious training, (3) how the employee held herself out, and (4) what functions the employee performed. *Hosanna-Tabor*, 565 U.S. at 190–192.

In *Our Lady of Guadalupe*, the Court emphasized this last factor: "What matters, at bottom, is what an employee does." *Our Lady of Guadalupe*, 591 U.S. at 754. The Court noted that the four considerations from *Hosanna-Tabor* were not dispositive, nor would they always be relevant: They are not "factors to be assessed and weighed in every case." *Our Lady of Guadalupe*, 591 U.S. at 760. Indeed, the Court in *Our Lady of Guadalupe* held that the teacher-plaintiffs in that case fell within the ministerial exception despite those teachers not meeting the majority of the *Hosanna-Tabor* factors. Namely, the teachers "were not given the title of 'minister,' did not hold themselves out as ministers, and had received relatively little religious training." *Billard*, 101 F.4th at 330 (analyzing *Our Lady of Guadalupe*). "Instead, both were 'lay teachers,' denominated as such by the Catholic elementary schools at which they worked, which did not require (though they preferred) that such teachers be Catholic." *Id*. Despite this distance between the teachers' situations and the Hosanna-Tabor factors, the Court still found they were "ministers," largely because the teachers "performed 'vital religious duties' in connection with the school's religious mission." *Id*. (citing *Our Lady of Guadalupe*, 591 U.S. at 756-57. The Court explained further:

> There [was] abundant record evidence that [the lay teachers] both performed vital religious duties. Educating and forming students in the Catholic faith lay at the core of the mission of the schools where they taught, and their employment agreements and faculty handbooks specified in no uncertain terms that they were expected to help the schools carry out this mission and that their work would be evaluated to ensure that they were fulfilling that responsibility. As elementary school teachers responsible for providing

> instruction in all subjects, including religion, they were the
> members of the school staff who were entrusted most directly with
> the responsibility of educating their students in the faith.

*Our Lady of Guadalupe*, 591 U.S. at 756-57.

Here, nothing in the record suggests that Zinski was a minister. Her title was entirely secular: "Information Services Apprentice." She was staffed at the university's IT Helpdesk, a department with a secular objective. Her work involved strictly technological and administrative duties. Her work involved no form of teaching—religious or secular. And the record nowhere suggests that Zinski held herself out as a minister.

The most resonant parallel between the instant case and *Our Lady of Guadalupe* lies in the fact that all of the relevant institutions had religious missions and expected their employees to assent to that mission, if not perpetuate it. Liberty, for instance, maintains a doctrinal statement which Zinksi was required to endorse and abide by, just as the schools in *Our Lady of Guadalupe* maintained "employment agreements and faculty handbooks [which] specified in no uncertain terms that [the teachers] were expected to help the schools carry out this mission." *Our Lady of Guadalupe*, 591 U.S. at 756-57.

But "[w]hat matters, at bottom, is what an employee does." *Our Lady of Guadalupe*, 591 U.S. at 754. Whereas the plaintiff-teachers in *Our Lady of Guadalupe* were "elementary school teachers responsible for providing instruction in all subjects, including religion" and, in fact, were "the members of the school staff who were **entrusted most directly** with the responsibility of educating their students **in the faith**," Zinksi, here, engages in no teaching whatsoever, and she has limited to no contact with those persons at Liberty who are enrolled to receive guidance or education in "the faith." Far from the "abundant record evidence" of *Our Lady of Guadalupe*, here there is *no* record evidence that Zinksi performed "vital religious duties" or "religious

duties" at all.

Thus, while there is no "rigid formula" for determining who is a minister, *Hosanna-Tabor*, 565 U.S. at 190, we find that on the facts thus far presented, taken as true, Zinski was not a minister under any formula. The ministerial exception does not provide an affirmative defense to liability at this stage of litigation.

## VI.    Freedom of Association

Liberty next argues that even if the terms of Title VII apply to characterize Liberty's actions as sex discrimination, Liberty is nonetheless safe from liability under the First Amendment's freedom of expressive association. In the following, we review the applicable law and find that the collision of Title VII and expressive association in the context of religious employment is a matter of first impression in the Fourth Circuit. We ultimately conclude that although Liberty engages in protected First Amendment activity, any burden imposed by Title VII on Liberty's expressive interest is minimal, such that rational basis review is satisfied, and Title VII stands constitutionally sound. Thus, at this stage of litigation, Liberty cannot claim any expressive association defense to Title VII liability.

### A.  Legal Framework

The First Amendment guarantees the freedom of "expressive association," which entails the right to "associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). "The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties," since "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State

50

unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. 618, 622. This right to associate applies in any context— "political, social, economic, educational, religious, and cultural." *See Roberts*, 468 U.S. at 622. It is a right "enjoyed by religious and secular groups alike," *Hosanna-Tabor*, 565 U.S. at 189, and is "not reserved for advocacy groups"—though an organization "must engage in some form of expression, . . . public or private," to come under its protection. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

The freedom of association also "plainly presupposes a freedom **not** to associate," since "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Roberts*, 468 U.S. at 623. Indeed, "[s]uch a regulation may impair the ability of the original members to express only those views that brought them together." *Roberts*, 468 U.S. at 623.

Nonetheless, "the freedom of expressive association, like many freedoms, is not absolute." *Dale*, 530 U.S. at 648. "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623; *see also Dale*, 530 U.S. at 658-59 ("[I]n these cases, the associational interest in freedom of expression has been set on one side of the scale, and the State's interest on the other.").

Three opinions from the Supreme Court of the United States form the modern legal framework for expressive association: (1) *Roberts v. U.S. Jaycees*,[46] (2) *Board of Director of*

---

[46]    468 U.S. 609, 618 (1984).

*Rotary International v. Rotary Club of Duarte*,[47] and (3) *Boy Scouts of America v. Dale.*[48]
However, we observe that each of these seminal cases involved challenges to state public
accommodations laws, which, as applied, required certain **volunteer associations or civic
groups** to admit certain members they did not desire. For example, in *Roberts* and *Duarte*,
Minnesota and California public accommodations statutes forced the U.S. Jaycees and the Rotary
Club, both all-male civic organizations, to admit women members to their ranks. And in *Dale*,
New Jersey's public accommodations law forced the Boy Scouts of America to admit a gay man
as a scoutmaster, despite the Boy Scouts opposing homosexuality. Notably, these cases did not
involve **employment**, as our present case does. Since expressive association exists to protect the
right to **associate** with others for First Amendment rights of "speech, assembly, petition for the
redress of grievances, and the exercise of religion," *Roberts*, 468 U.S. at 618, there is good
reason to pause and consider whether the notion of "association" extends to employment, and
how the Supreme Court's expressive association jurisprudence applies to the employment
context.

Reinforcing this hesitation, Justice O'Connor opined in *Roberts* that "there is only
minimal constitutional protection of the freedom of *commercial association*." *Roberts*, 468 U.S.
at 634 (O'Connor, J., concurring in the judgment) (emphasis added).[49] "There are, of course,
some constitutional protections of commercial speech—speech intended and used to promote a

---

[47]    481 U.S. 537, 549 (1987).
[48]    530 U.S. 640, 648 (2000).
[49]    In *Roberts*, the Court held that the Jaycees' right to expressive association was not impaired by a Minnesota
public accommodations law requiring it to admit women. Justice O'Connor concurred in the judgment but criticized
the Court's reasoning: "The Court declares that the Jaycees' right of association depends on the organization's
making a 'substantial' showing that the admission of unwelcome members 'will change the message communicated
by the group's speech . . . . I agree with the Court that application of the Minnesota law to the Jaycees does not
contravene the First Amendment, but I reach that conclusion for reasons distinct from those offered by the Court. I
believe the Court has adopted a test that unadvisedly casts doubt on the power of States to pursue the profoundly
important goal of ensuring nondiscriminatory access to commercial opportunities in our society." *Roberts*, 468 U.S.
at 632-33 (O'Connor, J., concurring in the judgment

commercial transaction with the speaker." *Id*. "But the State is free to impose any rational regulation on the commercial transaction itself." *Id*. **"The Constitution does not guarantee a right to choose employees . . . without restraint from the State."** *Id*. "[A]n organization engaged in commercial activity enjoys only minimal constitutional protection of its recruitment, training, and solicitation activities." *Id*. at 635.

In *Dale*, Justice Stevens' dissenting opinion pointed to a similar idea. The Boy Scouts of America expressly acknowledged that their organization would have been subject to **employment laws** which prevented discrimination based on sexual orientation. *Dale*, 530 U.S. at 672 (Stevens, J., dissenting) (quoting Boy Scouts President and Chief Scout Executive Letter on policies and procedures with regards to gay men in the Boy Scouts, stating "[W]e are unaware of any statute or ordinance . . . which prohibits discrimination against individual's employment upon the basis of homosexuality . . . . In the event that such a law was applicable, it would be necessary for the Boy Scouts of America to obey it.") Due to *Bostock*, such a law now exists— Title VII.

Furthermore, there exists a separate line of cases, *see Hishon v. King & Spalding*, in which the Supreme Court has declared that "[i]nvidious private discrimination may be *characterized* as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *Hishon v. King & Spalding*, 467 U.S. at 78 (quoting *Norwood*, 413 U.S. at 455) (emphasis added). Zinksi proposes that *Hishon* and its progeny demonstrate that "an employer-employee relationship is not an expressive association" and "freedom of expressive association is inapplicable in commercial contexts where Title VII's antidiscrimination provisions apply." *See* Dkt. 21 at 36 (opposition to motion to dismiss).

However, neither Justice O'Connor's nor Justice Steven's perspective has been adopted by a majority of the Supreme Court, and the *Hishon* line of cases is not dispositive either, as explained below. Furthermore, we observe that employment, though perhaps distinguishable from "association" and certainly not a First Amendment interest itself, serves as an essential aide to First Amendment interests and expressive association. Consider any advocacy organization that employs people for purposes of spreading a certain viewpoint. *See also Roberts*, 468 U.S. at 622 (stating that the right to associate applies in any context—"political, social, economic, educational, religious, and cultural"). Such an organization does not lose First Amendment bona fides simply because it associated for First Amendment purposes by hiring people instead of associating with them as volunteers or un-paid members.

Here, Liberty certainly stakes a claim to a viable expressive association interest, as a sectarian institution aiming to spread its religion. But is Liberty entitled to exercise this interest in the employment context, in contravention of civil employment laws, especially with respect to the employment of non-theological staff members? Noting that the Fourth Circuit has not issued further guidance on the collision of Title VII and expressive association, [50] we find that this question presents a question of first impression for this Court and the Fourth Circuit. Accordingly, before turning to our analysis, we first review the *Hishon* line of cases, and, second, finding *Hishon* inapposite, outline the final legal test to be applied.

---

[50]    For instance, the Fourth Circuit has only had occasion to cite *Dale* twice, despite its issuance in 2000 and it representing a shift in the Supreme Court's exposition of expressive association. On neither occasion did the Fourth Circuit expound upon *Dale*. *See Sons of Confederate Veterans, Inc. v. Commr. of Virginia Dept. of Motor Vehicles*, 305 F.3d 241, 252 (4th Cir. 2002) (Gregory, J., dissenting) (cited for the proposition that *Dale* "recogniz[ed] private organization's interest in not communicating message of individual member that is incompatible with organization's message"); *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 323 (4th Cir. 2024) (noting that defendant had raised a freedom of expressive association defense, but not addressing the issue).

## 1. *Norwood, Hishon, and Wisconsin*

*Hishon* drew from *Norwood v. Harrison*,[51] so we begin with *Norwood*. In *Norwood*, the

Supreme Court declared that "although the Constitution does not proscribe private bias, it places

no value on discrimination." *Norwood*, 413 U.S. at 469. Furthermore, the Court observed that

while "[i]nvidious private discrimination may be characterized as a form of exercising freedom

of association protected by the First Amendment, [] it has never been accorded affirmative

constitutional protections." *Id*. "And even some private discrimination is subject to special

remedial legislation in certain circumstances . . . [in which] Congress has made such

discrimination unlawful in other significant contexts." *Norwood*, 413 U.S. at 469, n.10 (citing

several federal statutes, including Title VII of the Civil Rights Act, Title II of the Civil Rights

Act (public accommodations), and the Fair Housing Act). *Id*. at n.10.

Accordingly, it may be alluring to point to *Norwood* for the proposition that an interest in

discrimination cannot constitute an interest in expressive association. *See, e.g.,* Dkt. 21 at 38

(Plaintiff's Brief suggesting that this proposition, later reiterated by *Hishon*, dispositively rejects

Liberty's expressive association claim). But, in addition to that conclusion flying in the face of

*Dale* holding that the Boy Scouts had an expressive interest in excluding homosexual members,

we do not find that the context of *Norwood* supports such a conclusion.

*Norwood* involved a "Mississippi statutory program under which textbooks [were]

purchased by the State and lent to students in both public and private schools, without reference

to whether any participating private school has racially discriminatory policies." *Norwood*, 413

U.S. at 456. Parents of four schoolchildren in Mississippi filed a class action on behalf of

students throughout Mississippi to enjoin the enforcement of the Mississippi textbook lending

---

[51]   413 U.S. 455 (1973).

program, on the basis that it constituted state-sponsored racial segregation and violated the Equal

Protection Clause. *Norwood*, 413 U.S. at 456, 460 (citing *Brown v. Board of Education*, 347 U.S.

483 (1954)). Reversing the district court, Justice Burger, writing for the majority, concluded that

"if the school engages in discriminatory practices[,] the State by tangible aid in the form of

textbooks thereby gives support to such discrimination" and thereby violated the Equal

Protection Clause. *Norwood*, 413 U.S. at 464.

But Mississippi offered an additional counterargument based on a somewhat-sideways

reference to religion. The state pointed to Supreme Court precedent that had upheld state

assistance to religious schools, based upon the conclusion that state assistance "properly

confined to the secular functions of sectarian schools" did not violate the Establishment Clause.

*Norwood*, 413 U.S. at 468 (citing *Everson v. Board of Education*, 330 U.S. 1, 67 (1947); *Board

of Education v. Allen*, 392 U.S. 236 (1968)). Mississippi, in turn, attempted to flip this argument

around, contending that private discriminatory schools, like religious schools, still fulfill

important educational functions, and that to deny private schools assistance based on their

discriminatory policies ran afoul of their constitutional rights. *Norwood*, 413 U.S. at 468-69. The

Court rejected this argument. The Court observed that private schools engaging in discrimination

renounce any claim to Constitutional protection: Though "private bias is not barred by the

Constitution, . . . neither can it call on the Constitution for material aid from the State."

*Norwood*, 413 U.S. at 469.

In doing so, the Court distinguished "private bias" from discrimination based upon the

Free Exercise of religion: "In contrast, although the Constitution does not proscribe private bias,

it places no value on discrimination **as it does on the values inherent in the Free Exercise

Clause**." *Norwood*, 413 U.S. at 469-70 (emphasis added). At this point the Court uttered its here-

cited statement that "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *Norwood*, 413 U.S. at 470. But we read this statement to mean that "private bias," as opposed to "bias" in the name of religion, does not directly attach to any expressive interests protected by the First Amendment.

Accordingly, the decisional value of *Norwood* as related to *religious* claims of expressive association is unclear. *Norwood* declares a profound statement of law limiting the extent to which plain, "private bias" can be considered an expressive association interest—but that construction does not seem to apply with equal strength to discriminatory impulses rooted directly in the First Amendment.

Nonetheless, *Norwood* has subsequently been cited with approval by the Supreme Court in *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) and *Wisconsin v. Mitchell*, 508 U.S. 476 (1993). Indeed, *Hishon* shared the same author: Justice Burger.

In *Hishon,* plaintiff Elizabeth Hishon worked as an associate attorney at King & Spalding and was passed over for partnership selection despite, in her view, being qualified on the merits. *Hishon*, 467 U.S. at 71-73. Hishon brought sex discrimination claims under Title VII, but the district court dismissed the complaint "on the ground that Title VII was inapplicable to the selection of partners by a partnership." *Hishon*, 467 U.S. at 72-73. The Supreme Court reversed, finding that there was no support for the conclusion that Title VII should not apply to partnership promotion decisions. *Hishon*, 467 U.S. at 76-77 ("The benefit a plaintiff is denied need not be employment to fall within Title VII's protection; it need only be a term, condition, or privilege of employment.").

Important for our purposes, the Court also evaluated the law firm's First Amendment

expressive association defense. *Hishon*, 467 U.S. at 78. ("[R]espondent argues that application of Title VII in this case would infringe constitutional rights of expression or association."). The Court recognized that "the activities of lawyers may make a 'distinctive contribution to the ideas and beliefs of our society,'" *Hishon*, 467 U.S. at 78 (quoting *NAACP v. Button*, 371 U.S. 415, 431 (1963)), thus implying that a law firm may engage in some form of expressive association. But here the firm had not "shown how its ability to fulfill such a function would be inhibited by a requirement that it consider [Hishon] for partnership on her merits." The Court emphasized that while law firms may have expressive association interests for certain ends, sex discrimination was not one of those ends recognized by the Constitution, at which point the Court cited *Norwood*: "Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *Hishon*, 467 U.S. at 78 (quoting *Norwood*, 413 U.S. at 455). Because King & Spalding had refused to consider Hishon's partnership application for no other reason than her sex, the Court found that the firm had no expressive association interest that was protected by the First Amendment, and thereby the firm's First Amendment defense was fruitless.

Accordingly, we ascribe much the same meaning to *Hishon* as we do to *Norwood*: plain, private, "invidious" discrimination cannot be considered an expressive association interest. But, again, that construction does not seem to apply with equal strength to discriminatory impulses rooted directly in the First Amendment, such as religion.

Finally, *Wisconsin v. Mitchell*.[52] In *Wisconsin*, a post-conviction criminal defendant argued that Wisconsin's penalty-enhancement statute (under which he was convicted) was

---

[52]   508 U.S. 476 (1993).

invalid because it punished his racially discriminatory motive for acting, in violation of his claimed First Amendment rights to hold discriminatory views. The Court acknowledged that the First Amendment was at issue, since the law raised questions about content and viewpoint neutrality: "the fact remains that under the Wisconsin statute the same criminal conduct may be more heavily punished if the victim is selected because of his race or other protected than if no such motive obtained." *Wisconsin*, 508 U.S. at 484-85. But the Court ultimately disagreed that the statute violated the First Amendment.

The Court reasoned that "the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations in criminal sentencing," and that the "the sentencing judge [is allowed] to take into account the defendant's racial animus towards his victim." *Wisconsin*, 508 U.S. at 486. Furthermore, the Court observed that "motive plays the same role under the Wisconsin statute as it does under federal and state antidiscrimination laws, which we have previously upheld against constitutional challenge." *Wisconsin*, 508 U.S. at 487 (citing *Roberts*, 468 U.S. at 628; *Hishon*, 467 U.S. at 78). The Court specifically acknowledged that "Title VII of the Civil Rights Act of 1964, for example, makes it unlawful for an employer to discriminate against an employee 'because of such individual's race, color, religion, sex, or national origin.'" *Id*. With these observations in mind, the Court held that the Wisconsin statute was not an impermissible content- or viewpoint-based law and also rejected the defendant's expressive association challenge.

In this light, *Wisconsin* is best understood to affirm that Title VII does not offend First Amendment speech or expressive association rights simply by employing race as a criterion for liability. But *Wisconsin* speaks no further to the interplay between Title VII and expressive association.

59

Thus, after reviewing *Wisconsin*, *Hishon*, and *Norwood* in detail, we conclude that none of these cases are directly relevant to the case before us, and certainly none demonstrate that expressive association falls away in the employment context, as Zinksi argues. In fact, none of these cases even suggest that the expressive association analysis should be any different in the employment context. The only strand of law that suggests expressive association may be limited in the context of "commercial association" or employment is Justice O'Connor's concurring opinion in *Roberts*. We find Justice O'Connor's perspective compelling indeed, since a decision that a religious employer can discriminate on the basis of expressive association would swallow Title VII whole (just as finding for Liberty in interpreting Sections 702 and 703 would have). But because Justice O'Connor's view has never been endorsed by the majority of the Court, we cannot rely on her perspective as authoritative. Therefore, we proceed on what the law says absent contrary instruction, *i.e.*, that expressive association applies with equal force in the employment context.

### 2.  *The Test to be Applied*

We now state the operative legal test by synthesizing the succinct formulations of the Second and Third Circuit Courts of Appeals, as follows: "First, we consider whether the group making the claim engaged in expressive association." *Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023) (citing *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000)). Second, we analyze "whether the state action at issue significantly affected the group's ability to advocate its viewpoints." *Id*. Third, we "weigh the state's interest implicated in its action against the burden imposed on the associational expression to determine if the state interest justified the burden." *Id.* If the state action imposes severe burdens on associational rights at the second step, we apply strict scrutiny, in which case the restriction survives only if it

is narrowly drawn to advance a compelling state interest, at the third step. *Id.*

### B. Analysis

#### 1. Expressive Activity

As to whether Liberty engages in expressive association, we answer in the affirmative. At the most general level, and without the benefit of discovery, we observe that Liberty engages in religious worship, teaching, and evangelizing—all components of religious association which constitutes a fundamental freedom guaranteed by the First Amendment. *See Roberts*, 468 U.S. at 622 ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). Indeed, the same facts that supported the conclusion that Liberty is a religious employer, and that Liberty fired Zinksi for a religiously motivated reason, now support the conclusion that Liberty engages in an expressive activity tied to religion. *See* Part III, Section B, *supra*. Liberty requires students and employees to assent to a religious doctrinal position, which outlines the school's religious standards, and it provides employees with a copy of this statement and requires their assent upon hiring. *See* Dkt. 12-2 (Letter from Liberty to Zinksi, incorporating doctrinal statement by hyperlink reference). Liberty's mission statement states that "the University educates men and women who will . . . follow their chosen vocations as callings to glorify God, and fulfill the Great Commission."[53] Liberty's educational philosophy states that education "occurs most effectively when both instructor and student are properly related to God and each

---

[53]    Educational Philosophy & Mission Statement, Liberty University (last visited February 05, 2025) at https://www.liberty.edu/about/purpose-and-mission-statement/.

other through Christ." [54] Finally, the university maintains an Office of Spiritual Development whose role is to infuse the campus community with the Christian faith, and the university regularly hosts worship services and convocations.[55]

These factors support the conclusion that Liberty maintains a system of values and a seeks to instill these values in its members—students and employees alike. *See Dale*, 530 U.S. at 649-50 (finding that the Boy Scouts engaged expressive activity when the organization "inculcate[s] members with the Boy Scouts' values" by "spending time with the youth members, instructing and engaging them in activities like camping, archery, and fishing").

Furthermore, Liberty need not expressly advocate against transgender identification, *etc.*, in order for Liberty to engage in expressive association for purposes of this suit. *See Dale*, 530 U.S. at 654-55 (stating that "associations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment."). And even if that was required, Liberty's doctrinal statement specifically announces its belief that sex is a God-given, immutable binary. The Doctrinal Statement sets forth Liberty's view of "a Christian lifestyle . . . that avoids sin," including the "denial of birth sex by self-identification with a different gender." *See* Dkt. 12-2.

Thus, we conclude on the evidence thus far submitted that Liberty engages in expressive association related to religion.

### 2. *Burden on Expressive Interest*

Next, we consider whether Title VII "significantly burdens" Liberty's right to freedom of expressive association. *Dale*, 530 U.S. at 653. We answer in the negative. Upon the record

---

[54]    *Id*.
[55]    Office of Spritual Development, Liberty University (last visited February 05, 2025) at https://www.liberty.edu/osd/.

adduced at this stage of litigation, we are not persuaded that Liberty is burdened, significantly or otherwise, in its ability to associate for purposes of its religion. Zinksi worked in the IT department at Liberty, where her role consisted strictly of technological or administrative tasks. Zinksi assisted students and staff who came to the helpdesk with computer issues, troubleshooted problems with classroom equipment, offered on-call assistance for IT issues that arose during class, and managed other office tasks, such as restocking printer paper. Dkt. 1 at 3. But Zinski's "only contact with students **concerned IT issues**, and a significant portion of her time was spent speaking with other staff." Dkt. 1 at 3. Throughout her employment, Zinski was "successful in her job and met Liberty's legitimate employment expectations." Dkt. 1 at 3. There is no evidence in the record to suggest that Zinksi has done anything to hamper Liberty's associational interests, or that Liberty has been rendered unable to promote its religious views simply by dint of maintaining Zinksi as an employee.

The case before us is unlike *Dale*, where the Court found a significant burden existed. In *Dale*, Plaintiff James Dale, a Boy Scouts volunteer scoutmaster, was expelled from the Boy Scouts for being gay. Dale sued the Boy Scouts under a New Jersey state law forbidding discrimination on the basis of sexual orientation in places of public accommodation, and the Boy Scouts defended on the ground that the law violated their First Amendment rights to expressive association. *Dale*, 530 U.S. at 644-47. After concluding that the Boy Scouts engaged in expressive activity, the Supreme Court sought to "determine whether the forced inclusion of Dale as an assistant scoutmaster would significantly affect the Boy Scouts' ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 650. Deferring to the Boy Scouts' own assertion of its values, the Court noted that "the Boy Scouts believes that homosexual conduct is inconsistent with the values it seeks to instill in its youth members . . . [and] it will not 'promote

63

homosexual conduct as a legitimate form of behavior.'" *Dale*, 530 U.S. at 653-54. The Court

stated that "expressive association [cannot] erect a shield against antidiscrimination laws simply

by asserting that mere acceptance of a member from a particular group would impair its

message." *Dale*, 530 U.S. at 653. But the Court took special note of Dale's role and Dale's

presence in the community: "Dale, by his own admission, is one of a group of gay Scouts who

have 'become leaders in their community and are open and honest about their sexual

orientation.'" *Id*. "Dale was the copresident of a gay and lesbian organization at college and

remains a gay rights activist." *Id.* On these facts, the Court reasoned that "Dale's presence in the

Boy Scouts would, at the very least, force the organization to send a message, both to the youth

members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of

behavior," and it would "interfere with the Boy Scouts' choice not to propound a point of view

contrary to its beliefs." *Id. Compare with Roberts*, 468 U.S. at 624 (finding that "the Jaycees []

failed to demonstrate that the [public accommodations law] imposes any serious burdens on the

male members' freedom of expressive association"); *Duarte*, 481 U.S. at 548 (finding that the

"evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any

significant way the existing members' ability to carry out their various purposes").

Here, like *Dale*, we must defer Liberty's claim that it opposes transgender identification

and seeks to avoid any promotion of transgender status as an appropriate form of behavior.

However, contrary to *Dale*, we cannot conclude that Zinksi's presence at Liberty would "force

the organization to send a message" that Liberty accepts transgender conduct as a "legitimate

form of behavior." *Dale*, 530 U.S. at 653. Whereas the plaintiff in *Dale* held himself out as a gay

rights activist and, more importantly, **actively interfaced with youth members of the Boy

Scouts** to inculcate those members with the Boy Scouts' values, thereby offering opportunities

64

for Dale's values to influence youth members, Zinksi is an IT employee who has limited to no

interactions with students, has no role in influencing or promoting Liberty's value system, and

has no role in Liberty's religious curriculum or programming. The only inference that we can

draw for Liberty is that Liberty may be seen as a hypocrite for employing a transgender person

when it opposes transgender identity; but the same could be said for Liberty's employment of

any other type of person who "sins" despite Liberty's opposition to sin in general. Liberty cannot

"erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a

member from a particular group would impair its message." *Dale*, 530 U.S. at 653. Thus, on the

record before us, and weighing all reasonable inferences in Zinksi's favor, we conclude that

Liberty's continued employment of Zinksi does not significantly burden Liberty's ability to

maintain its views and associate for its expressed purposes.

### *3. Rational Basis Review*

Because Title VII only imposes minor burdens on Liberty's expressive freedom, we

apply rational basis review to discern whether the statute is constitutional. *See Jacoby & Meyers,*

*LLP v. Presiding Justices, Appellate Div. of the S. Ct. of New York*, 852 F.3d 178, 191 (2d Cir.

2017) ("[D]epending on the burden that the statute imposes on those rights, we will apply either

strict scrutiny, in which case the restriction survives only if it is narrowly drawn to advance a

compelling state interest, or rational basis review, in which case the restriction need only be

rationally related to a legitimate government interest.").

Here, Title VII is easily a legitimate state interest. Indeed, aimed at eliminating

employment discrimination, it is "an interest of the highest order." *Rayburn*, 772 F.2d at 1169;

*see also Duarte*, 481 U.S. at 549 ("Even if the [California public accommodations law] does

work some slight infringement on Rotary members' right of expressive association, that

infringement is justified because it serves the State's compelling interest" in eliminating sex discrimination); *Roberts*, 468 U.S. at 624-26 (recognizing the importance of "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women," and finding that Minnesota's public accommodations law passed strict scrutiny because it was committed to "eliminating discrimination"). Its terms prohibiting discrimination are rationally related to achieving that interest. Therefore, Title VII as applied to Liberty in this instance, satisfies rational basis review and does not offend Liberty's freedom of expressive association.

## VII.    Ecclesiastical Abstention

Finally, Liberty argues that the ecclesiastical abstention doctrine protects it from Title VII scrutiny and liability. *See* Dkt. 12 at 14 ("It has been settled for over 150 years that the First Amendment ecclesiastical abstention doctrine prohibits Article III courts from entertaining suits arising specifically from the religious doctrinal positions, as such decisions are exclusively within the province of the church.") (citations omitted).

The ecclesiastical abstention doctrine is derived from a line of Supreme Court jurisprudence recognizing that, under the First Amendment, churches possess "an independence from secular control or manipulation" which affords them the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.A.*, 344 U.S. 94, 116 (1952). The doctrine is grounded in the First Amendment's Free Exercise and Establishment Clauses. *See Bollard v. Cal. Province of the Soc'y of Jesus*, 211 F.3d 1331, 1332 (9th Cir. 2000) (order denying rehearing en banc) (Wardlaw, J., dissenting) ("Though the concept originated through application of the Free Exercise Clause, the Supreme Court has held that the Establishment

66

Clause also protects church autonomy in internal religious matters.").[56] Historically, the doctrine arose from disputes over church property and the selection of clergy,[57] while, more recently, the Supreme Court has held that it "applies with equal force to church disputes over church polity and church administration." *Serbian E. Orthodox Diocese for U. S. of Am. and Canada v. Milivojevich*, 426 U.S. 696, 710 (1976). At bottom, ecclesiastical abstention demands that "where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, . . . . civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." *Milivojevich*, 426 U.S. at 709.

Ecclesiastical abstention is "not without limits," however, and it generally "does not apply to purely secular decisions, even when made by churches." *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 657 (10th Cir. 2002). The doctrine contemplates that courts should avoid controversies that require courts to rely on religious doctrine or second-guess a religious tribunal; the doctrine does *not* contemplate avoidance of civil controversies merely because the controversies involve religious parties or spring incidentally from religious law. *See Milivojevich*, 426 U.S. at 709 (emphasizing that the doctrine applies where disputes cannot be

---

[56]    The ecclesiastical abstention doctrine is "related to but distinct from the ministerial exception," *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 46 (D.D.C. 2017), and it is also commonly labeled the "church autonomy doctrine." *See Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 655 (10th Cir. 2002) ("This church autonomy doctrine prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity.") (citing *Kedroff*, 344 U.S. at 116); *Billard*, 2021 WL 4037431 at *11 ("It has long been held that church autonomy, supported by the Religion Clauses, guarantees religious organizations 'independence from secular control or manipulation,' especially regarding ecclesiastical matters . . . . The ministerial exception is a branch of church autonomy doctrine.") (quoting *Kedroff*, 344 U.S. at 116).

[57]    *See Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871) (Court declining to intervene in a property dispute between two factions of a church); *Kedroff*, 344 U.S. 94 (striking down as unconstitutional a statute changing who in the church would control a cathedral); *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1 (1929), abrogated by Serbian E. Orthodox Diocese for U. S. of Am. and Canada v. Milivojevich, 426 U.S. 696 (1976) (upholding a church's right to determine the essential qualifications of a chaplain and whether a candidate possessed them).

resolved "without extensive inquiry by civil courts into religious law and polity"). "[W]hile we recognize that applying any laws to religious institutions necessarily interferes with the *unfettered* autonomy churches would otherwise enjoy, this sort of generalized and diffuse concern for church autonomy, without more, does not exempt them from the operation of secular laws." *Bollard v. California Province of the Socy. of Jesus*, 196 F.3d 940, 948 (9th Cir. 1999) (emphasis added).

Though addressing the contours of the ministerial exception, the Fourth Circuit has also emphasized that "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer." *E.E.O.C. v. Roman Catholic Diocese of Raleigh*, N.C., 213 F.3d 795, 801 (4th Cir. 2000). Thus, the relevant inquiry is "whether the employment dispute is ecclesiastical, meaning it concerns 'discipline, faith, internal organization, or ecclesiastical rule, custom or law,'" or whether it is a case involving "purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization." *Billard v. Charlotte Catholic High Sch.*, No. 3:17-CV-00011, 2021 WL 4037431, at *11 (W.D.N.C. Sept. 3, 2021), *rev'd and remanded on other grounds*, 101 F.4th 316 (4th Cir. 2024).

Here, Liberty argues that ecclesiastical abstention should apply because Zinski's complaint raises questions "concerning Liberty University's interpretation and application of Scripture," as set forth in its doctrinal statement, and that this Court "is not authorized to adjudicate the proper interpretation of Scripture." Dkt. 12 at 15.

We wholeheartedly agree that the Court is not authorized to interpret scripture, but we disagree that Zinski's complaint requires us to do so. Zinski's complaint asks the Court to determine whether Title VII prohibits a religious institution from firing a transgender person, not

whether a religious institution, like Liberty, has properly interpreted its religious doctrine when determining that a transgender person violates religious law and must be fired. Far from questioning the contours of Liberty's espoused "faith and doctrine," *Kedroff*, 344 U.S. at 116, and far from requiring "extensive inquiry by civil courts into religious law and polity," *Milivojevich*, 426 U.S. at 709, Zinski here proceeds in a civil tribunal and invokes no form of law other than civil law. We need not glance at scripture, second-guess a religious tribunal, or put a civil stamp on religious doctrine. Furthermore, it is not even clear that Zinski—an employee in the IT department—maintains any "spiritual function" within the institution, such that the Court's review of Liberty's decision to fire her would impinge upon Liberty's First Amendment interests. *Diocese of Raleigh*, 213 F.3d at 801. Finally, we observe that if the ecclesiastical abstention doctrine were expanded to the horizon that Liberty seeks (*i.e.*, immunizing secular decisions of religious institutions), "well-settled" [58] doctrine like the ministerial exception, which applies much more narrowly, would be effectively swallowed whole and made redundant.[59] For these reasons, the Court finds the ecclesiastical abstention doctrine is inapplicable.

## VIII.    Conclusion

The Court concludes that on the facts thus far presented, none of Liberty's proposed defenses apply to prevent Title VII liability in this matter. Therefore, in an order that will accompany this memorandum opinion, the Court will **DENY** Liberty's motion to dismiss. *See*

---

[58]    *Billard*, 101 F.4th at 328.
[59]    *Billard v. Charlotte Catholic High Sch.*, No. 3:17-CV-00011, 2021 WL 4037431, at *12 (W.D.N.C. Sept. 3, 2021), *rev'd and remanded on other grounds*, 101 F.4th 316 (4th Cir. 2024) ("If the church autonomy doctrine was so expansive as to create in all religious employers a First Amendment right to engage in employment discrimination, then there would be no need to have a ministerial exception because Title VII would not protect any employee of a religious organization.").

Dkt. 11.

     The Clerk of Court is directed to send a copy of this Memorandum Opinion to the parties.

     Entered this 21st day of February, 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE